The Honorable Anthony Williams
Mayor of the District of Columbia
One Judiciary Square, Suite 1100
Washington, DC 20001

Mr. Charles H. Ramsey
Chief of Police
Metropolitan Police Department
300 Indiana Avenue, N.W.
Washington, DC 20001

Re: Department of Justice Investigation of Use of Force by the Washington Metropolitan Police
Department

Dear Mayor Williams and Chief Ramsey:

We are pleased to transmit the enclosed Memorandum of Agreement between the Department of Justice,
the District of Columbia, and the Washington Metropolitan Police Department (MPD). As you are
aware, the Agreement resulted from the Department of Justice's review of use of force issues in MPD
pursuant to our authority under the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C.
§ 14141). We conducted the investigation at your request to inform you whether MPD officers engage in
a pattern or practice of using excessive force. At your request, we also reviewed MPD's use of the Glock
firearm.

Due to the unprecedented genesis of the investigation -- at the request of the agency to be investigated --
the Department of Justice agreed that, parallel with its pattern or practice investigation, it would provide
MPD with technical assistance to correct identified deficiencies during the course of the investigation.

As discussed below, our investigation did reveal a pattern or practice of use of excessive force by MPD.
The Department of Justice, however, would like to applaud the commitment to reducing the risk of
excessive use of force demonstrated by your request that we conduct the investigation and assist MPD to
identify and begin to correct deficiencies. We acknowledge that because of your efforts, MPD has
initiated a number of significant reforms in the manner in which it tracks, investigates, monitors, and
manages use of force issues. Additionally, MPD has committed to implementing these reforms fully in
order to ensure effective and respectful policing.

We recognize that in the past two years, MPD has achieved a significant reduction in the rate at which it
uses deadly force and the rate at which its canines bite subjects. In 1998, eleven fatalities resulted from
MPD's use of deadly force. Fatalities decreased to four in 1999 and to two in 2000. Due to important
changes in its canine operations, over the same time period, canine bites have decreased from occurring
approximately 70 percent of the time that canines are deployed to slightly over 20 percent.

The use of force reforms outlined in the Memorandum of Agreement are a direct outgrowth of the
deficiencies we identified in our investigation. Accordingly, below we summarize our investigation and
our major findings in the following areas: use of force reporting and investigation; canines; early
warning tracking; complaint system; training; and discipline.

## A. Description of Investigation

The Department of Justice, aided by nationally recognized experts in police use of force, reviewed

reported use of force, including canine bites, by MPD during the period of 1994 through early 1999. During this period, approximately 1400 incidents involving uses of force by MPD officers were reported. This figure does not account for all uses of force occurring during the period under review because MPD does not require that officers report and supervisors review all uses of force.

In addition to analyzing individual use of force incidents, the Department of Justice examined MPD's management practices related to use of force including, its use of force policies, training, supervision, and disciplinary system. During the course of the investigation, when the Department of Justice identified deficient policies, practices, or procedures, it notified MPD and provided technical assistance recommendations aimed at improving the identified problem.

### B. Investigative Findings

#### 1. Use of Excessive Force

The Department of Justice conducted an in-depth analysis of a stratified random sample of the use of force incidents, and determined that approximately 15 percent of them involved use of excessive force by MPD officers. According to police use of force experts, in well-managed and supervised police departments, excessive use of force would not be expected to occur in more than 1-2 percent of all incidents. In addition, in a significant number of cases, we found that the force used, while lawful, could have been avoided had the officer utilized different tactics.

In addition to revealing a pattern or practice of use of excessive force and avoidable force, our review revealed several other disturbing patterns.

For example, 14 percent of the incidents in our sample involved uses of force by off-duty officers and roughly a quarter of these incidents may have involved alcohol (the off-duty officers were patronizing a bar, nightclub, etc.). In approximately one-third of the incidents in our sample, the subject was charged with "assault on a police officer." In many of these cases, the United States Attorney's office determined that the charges lacked prosecutorial merit and refused to prosecute the subject. These cases may indicate that some officers have attempted to justify a use of excessive force by alleging "assault on a police officer."

Twenty-two percent of the firearms incidents sampled involved claims by MPD officers that a use of deadly force was justified because the subject "reached into his waistband" or possessed a firearm. In each case, however, post-incident searches failed to reveal any weapon. Approximately 22 percent of the sampled incidents involved officers firing their weapons at moving vehicles. MPD has, however, revised its policies to limit this practice significantly.

#### 2. Use of Force Reporting

We found MPD policies regarding the reporting of force to be under-inclusive and inconsistently followed. The policies in place during the period of our review appeared to require that officers report use of firearms, electronic stun devices, pepper spray (oleoresin capsicum), batons, carotid artery holds, and forcible frisks. Based on statements from MPD employees, including senior supervisory personnel, we had serious concerns regarding whether any use of force, except firearms, was consistently reported. We found widespread variances in how MPD officers understand and define the kinds of force they need to report.

The under-reporting of force appears to be a consequence of under-inclusive reporting policies and

reporting forms. MPD policy does not explicitly mandate officers to report the use of all physical force. The policy does not mandate officers to report the use of most hands-on force or some instruments, like flashlights, which may cause injuries. MPD policy does not mandate that officers report when they unholster their firearm to point it at an individual. Further, MPD's reporting forms are not designed to capture this type of information. For example, MPD's "Nonlethal Control Devices Incident Report" form only provides spaces for reporting the use of tasers or chemical spray.

MPD's failure to collect and analyze detailed data regarding all uses of force makes it extremely difficult for MPD supervisors and executives to measure and manage use of force. With the exception of firearms, MPD cannot measure accurately whether certain officers use force more than others, under what circumstances MPD officers use force, what kinds of force are being used, the frequency of use of force by MPD officers, or officer or civilian injury resulting from uses of force.

We recommended that MPD redefine and expand what it considers a use of force and when officers are obligated to report it. Specifically, we recommended that MPD adopt and implement the following policies: (1) define "use of force" to include all physical (pain compliance, kicks, punches, etc.) and instrumental (flashlight, radio, baton, ASP, firearm, etc.) acts that impose any degree of force on a civilian; (2) require officers to report every use of force; (3) create a use of force reporting form that adequately captures the type of force used, the circumstances of the use, injuries to officers and civilians, and all other relevant information; (4) train officers on these new policies; and (5) monitor compliance with the new policies.

We also recommended, in light of MPD's high level of firearms use at the time our investigation was initiated, that MPD require officers to report when they make a discretionary decision to unholster their firearm and point it at an individual. This reporting requirement would allow MPD to identify the kinds of circumstances in which officers seriously consider using firearms in order to better identify and address tactical considerations in use of firearms and alternatives to firearm use.

In response to our recommendations, MPD has drafted a new use of force policy and reporting form. When finalized and fully implemented and enforced, the new policy and reporting form will go a long way to address the deficiencies identified during our investigation.

> 3. Use of Force Investigations

When force incidents are accurately reported, the incident should be thoroughly and neutrally investigated and adjudicated. Our investigation uncovered serious shortcomings in the quality of MPD use of force investigations. Our review of a sample of MPD use of force investigations and our interviews with MPD use of force investigators, made us concerned about the competency, thoroughness, and impartiality of use of force investigations. For example, we found instances in which investigators failed to interview victims, suspects, or MPD or civilian witnesses. In other instances, MPD investigators failed: (i) to record the location of shell casings and other physical evidence, (ii) to perform ballistics comparisons, or (iii) to take relevant photographs.

These failures may derive from inadequate training for use of force investigators (usually lieutenants). We recommended that MPD provide all of its use of force investigators with, at a minimum, training in the following: investigation techniques; observation and surveillance skills; basic forensics; interviewing and interrogation skills; report writing; basic criminal law; basic court procedures; basic rules of evidence; and MPD's disciplinary and administrative procedures.

In addition to the above investigative deficiencies, we observed a lack of impartiality in certain use of

force investigations. With the exception of investigations conducted by MPD's new Force Investigation Team, discussed below, use of force investigations are conducted by investigators from the district where the use of force occurred. This practice can create conflicts of interest, particularly where the investigator and officer under investigation are personally acquainted or work together. Conflicts also may arise if the investigator was involved in or supervised the use of force incident. For these reasons, for significant categories of cases, we recommended that investigators not be based in the district in which the incident occurred.

We also recommended that every supervisory review of a use of force include an assessment of the following issues: (1) was the force used in policy, reasonable, and necessary; (2) should the incident be investigated to determine whether misconduct occurred; (3) does the incident indicate a need for additional training, counseling or other remedial measures; and (4) whether the incident suggests that MPD should revise its policies, training, or tactics.

To begin to address the investigative deficiencies, MPD created the Force Investigation Team (FIT) in 1999. FIT is a group of highly trained and centralized investigators. MPD created FIT to investigate uses of deadly force by MPD officers. We have recommended and MPD has agreed to expand FIT's role to include investigation of all serious uses of force. Additionally, in the Memorandum of Agreement, MPD has agreed to remedial efforts aimed at improving all use of force investigations, including additional training for investigators and creation of standardized investigation manuals.

### 4. Use of Canines

Our investigation revealed that MPD's policies and practices related to deployment of canine units resulted in bites nearly 70 percent of the time the canines were deployed between 1996 and 1999. By comparison, in tightly run police canine programs, bites occur in only about 10 percent of deployments. At MPD, the bites resulted from a "find and bite" policy, allowing dogs to bite the subject upon locating him or her. The bites also resulted from inadequate training for canine handlers regarding appropriate control of the dogs.

We recommended that MPD adopt a "find and bark" policy, requiring the dog to bark, rather than bite, upon locating the subject. We also recommended that MPD limit the circumstances in which canines may be deployed; to require supervisory approval prior to deployment; to require greater handler control of the dogs; to improve its practices related to verbal warnings prior to deployment; to prohibit biting passive resisters; and to require handlers to order the dog to release a bite as soon as possible.

In addition, we recommended improvements in the manner in which MPD reviews and investigates canine bites to ensure that they are treated as serious uses of force and receive heightened scrutiny.

In response to our recommendations, MPD has initiated ambitious reforms to its canine program, including adopting a "find and bark" program, purchasing new canines, limiting the circumstances in which it allows deployment, requiring supervisory approval prior to deployment, and providing enhanced training to handlers and canines. As a result of this work, MPD's bite ratio has decreased from nearly 70 percent to slightly over 21 percent. If MPD continues with planned reforms in its canine operations, the ratio should continue to decline.

### 5. Early Warning Tracking System

Our examination of MPD's current use of force tracking system and associated policies and practices led us to conclude that MPD does not have a comprehensive program to minimize use of excessive force.

As a result, MPD cannot adequately identify officers or units who have, or may in the future, engage in excessive force or other misconduct. Without such identification, MPD cannot fully manage the risks such officers or units pose.

MPD's current early warning system suffers from a number of deficiencies. First, it is seriously limited in scope. The database only captures citizen complaints, civil lawsuits, official reprimands, and vehicle accidents. Significantly, the system does not specifically capture officer uses of force. Second, it is too limited in time. The database maintains information for only two years. Third, the system offers insufficient options to deal with potential problem officers. The sole consequence of the early warning that results from the current system is a referral to the police and fire psychology clinic. This narrow option is apparently not accompanied by any corresponding requirement that clinic attendance be confirmed. Fourth, the MPD unit responsible for maintaining the system has a very low staffing level. At times during our investigation, only one sworn officer staffed the office. This staffing level is substantially less than the minimum needed to perform the currently assigned functions: maintain the early warning system, track citizen complaints, review the quality of citizen complaint investigations, and conduct financial audits. At this staffing level, the unit cannot reasonably perform a meaningful role in developing and implementing a comprehensive risk management strategy to reduce unnecessary force.

To address these deficiencies, we recommended that MPD immediately begin, at a minimum, to collect at one location all available data related to officer use of force, including: officer and supervisor reports on all uses of force; citizen complaints alleging use of excessive force; civil lawsuits alleging use of excessive force; and the results of all investigations of and litigation regarding uses of force, including sustained/not sustained judgments, civil verdicts, and settlement amounts.

We also recommended that MPD form a team to purchase or develop an adequate early warning tracking system. In response to our recommendations, MPD has developed a draft Request for Proposals for the design and program of a comprehensive early warning computer database. As described in the Memorandum of Agreement, in addition to agreeing to the creation of a comprehensive early warning system, MPD has pledged to input relevant data into the forthcoming system, develop the necessary protocols and supports for the execution of an early warning program, and develop an array of programs and options to deal with officers whose conduct is considered problematic or may indicate a likelihood of using excessive force.

### 6. Complaint System

We found MPD's system for receiving, investigating, and resolving complaints from individuals alleging misconduct to be inadequate. In 1980, the District of Columbia Council created a Civilian Complaint Review Board (CCRB). See Civilian Complaint Review Board Act of 1980, D.C. Code § 4-901 to 4-911 (1988 & Supp. 1992). The CCRB was given exclusive jurisdiction to receive and investigate certain categories of civilian complaints, including complaints alleging excessive force by MPD officers. The CCRB was abolished in mid-1995 because it was a "patently inadequate system" which allowed "serious misconduct to go unchecked." Cox v. District of Columbia, 40 F.3d 475 (D.C. Cir. 1994).

When the CCRB disbanded, it left a backlog of nearly 800 unresolved complaints which were transferred to MPD. In the years since inheriting these complaints, MPD has not devoted sufficient resources to resolve them. Many have grown stale, making the possibility of adequate investigation remote, if not impossible. Timely investigation of allegations of officer misconduct is necessary because witnesses are transient, memories fade, and physical evidence can irretrievably be lost.

In addition to being responsible for resolution of complaints inherited from the disbanded CCRB, during the period of our review, MPD was responsible for receiving and investigating new complaints of officer misconduct. An adequate complaint system must be open and accessible to the public; conduct thorough, fair, and timely investigations; and promote officer and department accountability. MPD's complaint system falls short in all of these respects.

We found that MPD's complaint intake system discourages individuals from filing complaints. MPD policy 1202.5, Citizen Complaints, authorizes complaints to be registered in person, by correspondence, or by telephone. However, the policy requires MPD employees to ask individuals who attempt to file a written or telephonic complaint to appear in person at MPD in order to file the complaint. This practice has a deterrent effect on would-be-complainants who fear retaliation or who are simply unable or otherwise reluctant to come to a police station. The practice is particularly problematic because MPD does not keep records documenting the individuals who are turned away or the nature of their attempted complaints.

MPD's investigation of complaints suffers from the same investigative deficiencies described above in Section B(3), namely a lack of thoroughness, impartiality, timeliness, and competence in investigating the allegations.

In 1998, the District passed legislation creating a new Office of Citizen Complaint Review (OCCR). The legislation became effective in March 1999, but the OCCR did not begin accepting complaints until January 8, 2001. Accordingly, we do not discuss the new OCCR here.

We have, however, recommended that, in order to help avoid repeating some of the failures of the old CCRB, it is critical that the new OCCR and MPD clearly delineate their respective roles and establish strong lines of communication between the two entities. MPD has created a special order providing some preliminary guidance to MPD officers regarding how to handle complaints in light of the new OCCR. Pursuant to the Memorandum of Agreement, MPD will implement several reforms to improve its handling of complaints, including conducting expanded community outreach and education regarding complaints; centralized recording and tracking of complaints; and improved investigation of complaints.

### 7. Use of Force Training

We examined MPD's use of force training in a variety of settings: academy, in-service (including roll-call and the firing range) and field. When we began our investigation, MPD had recently expanded and enhanced its use of force training program. We found, however, that the program continued to suffer from the following deficiencies.

We found that MPD provided use of force training in an uncoordinated manner with insufficient oversight by MPD policymakers or legal staff. As a result, use of force training was disjointed and, at times, in conflict with applicable law and MPD policy.

We offered MPD a series of recommendations to overcome these deficiencies and MPD has recently implemented a number of reforms in its training program aimed at increasing both the quantity and quality of use of force training provided to MPD officers. For example, MPD developed a mandatory 40-hour in-service training program, set up systems to guarantee officers achieve timely firearms re-certification, and developed more interactive training programs using role-play and computer simulations related to use of force training.

Significantly, MPD has undertaken an ambitious and necessary review of all use of force training

curricula. MPD's general counsel is now reviewing all of MPD's training materials to ensure compliance with law and MPD policy. Additionally, MPD is creating a training resource library and has updated and computerized its training records. MPD hired a professional curriculum development specialist and is in the process of developing an instructor development course. MPD has also created a training task force made up of individuals from across the Department to conduct a use of force training needs assessment.

At the request of Chief Ramsey, we also reviewed MPD's use and training of the Glock firearm. We were pleased with MPD's efforts to ensure that all officers complete firearms semi-annual re-certification training. We were also impressed with the expertise of MPD's firearms training management staff. Our review of firearm training, however, revealed deficiencies that potentially compromise MPD's safe use of the Glock. We found that MPD fails to reinforce safe gun handling skills, such as repeatedly failing to admonish officers to keep their fingers off the triggers unless appropriate and ready to shoot, an imperative warning since the Glock does not have an external safety mechanism. We also noted MPD's review of officer shootings fails to examine weapons alleged to have malfunctioned, or to review an officer's firearm safety training needs in unintentional shootings.

We recommended that MPD enhance its firearm training, both written documents and as applied, to ensure safe usage of the Glock and that MPD enhance its investigations of shootings to include a firearm safety perspective. As described in the Memorandum of Agreement, MPD has agreed to implement these enhancements.

### 8. Disciplinary System

We examined MPD's system for disciplining officers who engage in excessive force because the timely and effective imposition of appropriate discipline is critical for preventing and controlling excessive force. We determined that MPD does not have an adequate disciplinary system in place to respond to use of excessive force.

Although we requested all documents related to MPD's discipline of officers for use of excessive force, we received very few records, indicating that few officers are ever disciplined for excessive force. For example, the documents provided indicate that in approximately 350 use of force incidents referred to the United States Attorney's Office for possible criminal prosecution, MPD recommended discipline for only 16 officers. In many instances in which MPD held a use of force "unjustified", or in which MPD held a citizen complaint of excessive force "sustained," we did not receive any documents evidencing that MPD imposed any form of discipline. From the documents MPD provided, it appears that of 31 uses of force held by MPD to be unjustified, discipline was recommended in less than 50 percent of the cases. Similarly, of 11 sustained citizen complaints of excessive force, discipline was recommended in only 7 cases.

We have recommended that, consistent with its collective bargaining obligations, MPD revise and update its disciplinary policies to ensure the timely imposition of adequate discipline for excessive force cases. We have also recommended that MPD establish a centralized system for documenting and tracking all disciplinary and corrective action. As described in the Memorandum of Agreement, MPD has agreed to implement these improvements.

### C. Conclusion

The Memorandum of Agreement provides for the development and implementation of updated use of force policies and procedures addressing the issues raised by our investigation as summarized above. Additionally, the Agreement builds upon work MPD started during the course of our review. In

particular, MPD will continue with reforms initiated in its canine operations; will improve its use of force investigations; will address deficiencies in its handling of misconduct complaints; will update and revise its disciplinary policies; and will continue to enhance use of force training. Finally, the Agreement provides that implementation of the Agreement will be monitored by an independent monitor, who is jointly selected by the parties. The monitor will assist the City and MPD with compliance and issue periodic reports.

In conclusion, we would like to commend the City and MPD for their willingness to work together with us to resolve this matter amicably, and we look forward to your continued cooperation as the terms of the Agreement are implemented. We believe that, working together, the City and the Civil Rights Division, have helped to promote exemplary policing by the Washington Metropolitan Police Department.

Sincerely,

William R. Yeomans
Acting Assistant Attorney General
Civil Rights Division

Enclosure

cc: Mr. Robert Rigsby, Corporation Counsel
Mr. Terrence D. Ryan, General Counsel
Kenneth L. Wainstein, U.S. Attorney for the District of Columbia

*Return to the Civil Rights Division Home Page*