**DC⬩Watch**

**Home    News    Calendar    Columns**
**Government    Elections    Organizations**
**Links    Bibliography    Photos    Search**

Back to Metropolitan Police Department main page

# Memorandum of Agreement on the Use of Force
## Between the US Department of Justice and the DC Metropolitan Police Department
### *June 13, 2001*

Home

Bibliography

Calendar

Columns
Dorothy Brizill
Bonnie Cain
Jim Dougherty
Gary Imhoff
Phil Mendelson
Mark David Richards
Sandra Seegars

DCPSWatch

DCWatch
Archives
Council Period 12
Council Period 13
Council Period 14
Election 1998
Election 2000
Election 2002

Elections
Election 2004
Election 2006

Government
and People
ANC's
Anacostia Waterfront
Corporation
Auditor
Boards and Com
BusRegRefCom
Campaign Finance
Chief Financial
Officer
Chief Management
Officer
City Council
Congress

| Department of Justice press release | Press conference at DOJ |
| --- | --- |
| Metropolitan Police Department press release | Memorandum of Agreement |

# MEMORANDUM OF AGREEMENT

Between the United States Department of Justice and the District of Columbia and the
District of Columbia Metropolitan Police Department,

June 13, 2001

# TABLE OF CONTENTS

I. INTRODUCTION

    A. Background
    B. General Provisions
    C. Definitions

II. GENERAL USE OF FORCE POLICY REQUIREMENTS

    A. General Use of Force Policy
    B. Use of Firearms Policy
    C. Canine Policies and Procedures
    D. Oleoresin Capsicum Spray Policy
    E. Implementation Schedule

III. INCIDENT DOCUMENTATION, INVESTIGATION, AND REVIEW

    A. Use of Force Reporting Policy and Use of Force Incident Report
    B. Investigating Uses of Force and Misconduct Allegations

Control Board
Corporation Counsel
Courts
DC2000
DC Agenda
Elections and Ethics
Fire Department
FOI Officers
Inspector General
Health
Housing and
Community Dev.
Human Services
Legislation
Mayor's Office
Mental Health
Motor Vehicles
Neighborhood Action
National Capital
Revitalization Corp.
Planning and Econ.
Dev.
Planning, Office of
Police Department
Property
Management
Public Advocate
Public Schools
Public Service
Commission
Public Works
Regional Mobility
Panel
Sports and
Entertainment Com.
Taxi Commission
Telephone Directory
University of DC
Water and Sewer
Administration
Youth Services
Administration
Zoning Commission

Issues in DC
Politics

Budget issues
DC Flag
DC General, PBC
Gun issues
Health issues
Housing initiatives
Mayor's mansion
Public Benefit
Corporation
Regional Mobility
Reservation 13
Tax Rev Comm
Term limits repeal
Voting rights,
statehood
Williams's
Fundraising
Scandals

Links

Organizations
Appleseed Center
Cardozo Shaw
Neigh.Assoc.
Committee of 100
Fed of Citizens
Assocs
League of Women

1. Use of Force Investigations
2. Investigations of Misconduct Allegations

IV. RECEIPT, INVESTIGATION, AND REVIEW OF MISCONDUCT ALLEGATIONS

    A. Coordination and Cooperation Between MPD and OCCR
    B. Public Information and Outreach
    C. Receipt of Complaints
    D. OCCR Misconduct Investigations
    E. Evaluating and Resolving MPD Misconduct Allegations

V. DISCIPLINE AND NON-DISCIPLINARY ACTION

VI. PERSONNEL PERFORMANCE MANAGEMENT SYSTEM

    A. Performance Evaluation System

VII. TRAINING

    A. Management Oversight
    B. Curriculum
    C. Instructors
    D. Firearms Training
    E. Canine Training

VIII. SPECIALIZED MISSION UNITS

IX. PUBLIC INFORMATION

X. MONITORING, REPORTING, AND IMPLEMENTATION

    A. Independent Monitoring
    B. MPD Compliance Coordinator
    C. Reports and Records
    D. Implementation, Termination, and Enforcement
    E. Compliance
    F. Modifications

Back to top of page

# I. INTRODUCTION

## A. Background

1. In January 1999, District of Columbia Mayor Anthony A. Williams and Chief Charles H. Ramsey requested the Department of Justice to review all aspects of the

Voters
Parents United
Shaw Coalition

Photos

Search

What Is
DCWatch?

themail
archives

Washington Metropolitan Police Department's use of force. This unprecedented request indicated the City and the Chief's commitment to minimizing the risk of excessive use of force in the Washington Metropolitan Police Department (MPD) and to promoting police integrity. Because of the unusual genesis of the investigation -- at the request of the agency to be investigated -- the Department of Justice agreed that, parallel with its pattern or practice investigation, it would provide MPD with technical assistance to correct identified deficiencies during the course of the investigation. The Department of Justice conducted the investigation requested by the City, and analyzed every reported use of force and citizen complaint alleging excessive use of force during the period from 1994 to through early 1999. The Department of Justice also examined MPD's policies, practices, and procedures related to use of force.

2. In addition to conducting an investigation, the Department of Justice has provided MPD with on-going technical assistance recommendations regarding its use of force policies and procedures, training, investigations, complaint handling, canine program, an early warning tracking system. Based upon these recommendations, MPD has begun to implement necessary reforms in the manner in which it investigates, monitors, and manages use of force issues.

3. The Department of Justice, the District of Columbia, and the District of Columbia Metropolitan Police Department, share a mutual interest in promoting effective and respectful policing. They join together in entering this agreement in order to minimize the risk of excessive use of force, to promote the use of the best available practices and procedures for police management, and to build upon recent improvements MPD has initiated to manage use of force issues. The parties acknowledge that additional reforms may be appropriate in order to identify and to prevent discriminatory law enforcement. The parties are currently reviewing officer communications on Mobile Data Terminals to identify unlawful or otherwise inappropriate conduct. Based upon the outcome of this review, MPD agrees to implement appropriate reforms.

## B. General Provisions

4. This agreement is effectuated pursuant to the authority granted DOJ under the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. §14141) to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprive individuals of rights, privileges or immunities secured by federal law.

5. Nothing in this Agreement is intended to alter the lawful authority of MPD police officers to use reasonable and necessary force, effect arrests and file charges, conduct searches or make seizures, or otherwise fulfill their law enforcement obligations to the people of the District of Columbia in a manner consistent with the requirements of the Constitution and laws of the United States and the District of Columbia.

6. Nothing in this Agreement is intended to: (a) alter the existing collective bargaining agreements between the City and MPD employee bargaining units; or (b) impair the collective bargaining rights of employees in those units under law.

7. This Agreement constitutes the entire integrated agreement of the parties. With the exception of thelatestworking drafts and correspondenceresulting from the technical

assistance described in paragraph 2, no prior drafts or prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

8. This Agreement is binding upon the parties hereto, by and through their officials, agents, employees, and successors. This Agreement is enforceable only by the parties. No person or entity is intended to be a third party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. This Agreement is not intended to impair or expand the right of any person or organization to seek relief against the District Columbia for its conduct or the conduct of MPD officers. This Agreement does not constitute an admission, adjudication, or finding on the merits in any action or proceeding. This Agreement does not authorize, nor shall it be construed to authorize, access to any City or MPD documents, except as expressly provided by this Agreement, by persons or entities other than DOJ, the City, and the Independent Monitor.

## C. Definitions

9. The term "actively resisting" means the subject is making physically evasive movements to defeat the officer's attempt at control, including bracing, tensing, pushing, or verbally signaling an intention not to be taken into or retained in custody, provided that the intent to resist has been clearly manifested.

10. The term "CCRB" means the Citizen Complaint Review Board.

11. The term "City" means the City of the District of Columbia.

12. The term "complaint" means any complaint by a member of the public regarding MPD services, policy or procedure, claims for damages (which allege officer misconduct) or officer misconduct; and any allegation of possible misconduct made by an MPD officer. All complaints shall be recorded on the complaint form described in paragraph 88. A complaint may be initiated by any of the methods set forth in paragraph 92. For purposes of this Agreement, the term "complaint" does not include any allegation of employment discrimination.

13. The term "complainant" means any person who files a complaint against an officer or MPD.

14. The term "consult" means an exchange of information in a timely manner between the parties intended to consider the parties' respective positions. This exchange of information shall include, but not be limited to, preliminary investigative files, reports, statements, photographs, and radio runs, as such items become available.

15. The term "deadly force" means any use of force likely to cause death or serious physical injury, including but not limited to the use of a firearm or a strike to the head with a hard object.

16. The term "Department" means the Washington Metropolitan Police Department.

17. The terms "document" and "record" include all "writings and recordings" as defined by Federal Rules of Evidence Rule 1001(1).

18. The term "DOJ" means the United States Department of Justice and its agents and employees.

19. The term "effective date" means the day this Agreement is signed by all the parties.

20. The term "FIT" means the Force Investigation Team.

21. The term "including" means "including, but not limited to."

22. The term "Independent Monitor" or "Monitor" as used in this document means the Monitor established by Section X of this Agreement, and all persons or entities associated by the Monitor to assist in performing the monitoring tasks.

23. The term "MPD" means the Chief of Police of the Department and all employees under his or her command.

24. The term "MPD employee" means any employee under the command of the Chief of Police, including civilian employees.

25. The term "MPD unit" means any officially designated organization of officers within MPD, including Regional Operation Centers, Districts, Divisions, Groups, Patrol Service Areas, Teams, and specialized units.

26. The term "manager" means an MPD supervisor at the rank of lieutenant or above.

27. The term "non-deadly force" means any use of force that is neither likely nor intended to cause death or serious physical injury.

28. The term "non-disciplinary action" refers to action other than discipline taken by an MPD supervisor to enable or encourage an officer to modify his or her performance. It may include: oral or written counseling; training; increased field supervision for a specified time period; referral to Police/Fire Clinic; referral to the Employee Assistance Program; a change of an officer's partner; or a reassignment or transfer.

29. The term "OCCR" refers to the Office of Citizen Complaint Review.

30. The term "OPR" refers to the Office of Professional Responsibility.

31. The term "police officer" or "officer" means any law enforcement officer employed by MPD, including supervisors and managers.

32. The term "PPMS" means Personnel Performance Management System.

33. The term "serious use of force" means lethal and less-than-lethal actions by MPD officers including: (i) all firearm discharges by an MPD officer with the exception of range and training incidents and discharges at animals; (ii) all uses of force by an MPD

officer resulting in a broken bone or an injury requiring hospitalization; (iii) all head strikes with an impact weapon: (iv) all uses of force by an MPD officer resulting in a loss of consciousness, or that create a substantial risk of death, serious disfigurement, disability or impairment of the functioning of any body part or organ; (v) all other uses of force by an MPD officer resulting in a death; and (vi) all incidents where a person receives a bite from an MPD canine.

34. The term "supervisor" means sergeant or above (or anyone acting in those capacities) and non-sworn personnel with oversight responsibility for other officers and managers.

35. The term "use of force" means any physical coercion used to effect, influence or persuade an individual to comply with an order from an officer. The term shall not include unresisted handcuffing. The term "use of force indicating potential criminal conduct by an officer" shall include all strikes, blows, kicks or other similar uses of force against a handcuffed subject.

<u>Back to top of page</u>

---

# II. GENERAL USE OF FORCE POLICY REQUIREMENTS

## A. General Use of Force Policy

36. DOJ acknowledges that MPD has initiated a number of important use of force policy reforms. The provisions in this section build upon MPD's ongoing initiatives.

37. MPD shall complete development of a Use of Force Policy that complies with applicable law and current professional standards. The policy shall emphasize the goal of de-escalation and shall encourage officers to use advisements, warnings, and verbal persuasion when appropriate. The policy shall advise that the use of excessive force shall subject officers to discipline and possible criminal prosecution and/or civil liability.

38. The policy shall define and describe the types of force and the circumstances under which use of such force is appropriate. The policy shall prohibit officers from unholstering, drawing, or exhibiting a firearm unless the officer reasonably believes that a situation may escalate to the point where deadly force would be authorized.

39. The policy shall require officers, when feasible, to identify themselves as police officers and to issue a warning before discharging a firearm.

40. The policy shall require officers, immediately following a use of force, to inspect subjects for injury resulting from the use of force, and to obtain any necessary medical care.

## B. Use of Firearms Policy

41. MPD shall complete development of a Use of Firearms policy that complies with applicable law and current professional standards. The policy shall prohibit officers from possessing or using unauthorized firearms or ammunition and shall inform officers that any such use may subject them to disciplinary action. The policy shall establish a single, uniform reporting system for all firearms discharges. The policy shall prohibit officers from obtaining service ammunition from any source except through official MPD channels, and shall specify the number of rounds MPD authorizes its officers to carry.

42. Within 30 days from the effective date of this agreement, the Mayor of the District of Columbia shall submit a request to the City Council for the District of Columbia for an amendment to Section 206.1 of Title 6A of the District of Columbia Municipal Regulations. The requested amendment shall permit the Chief of Police to determine the policy concerning the off-duty carrying of firearms by MPD officers while in the District of Columbia, including, but not limited to appropriate prohibitions regarding the carrying and or use of firearms in situations where an officer's performance may be impaired.

43. The policy shall require that when a weapon reportedly incurably malfunctions during an officer's attempt to fire, the weapon shall be taken out of service and an MPD armorer shall evaluate the functioning of the weapon as soon as possible. The policy shall require that, following the evaluation by the armorer, MPD shall document in writing whether the weapon had an inherent malfunction and was removed from service, malfunctioned because it was poorly maintained, or if the malfunction was officer-induced and a determination of the causes.

## C. Canine Policies and Procedures

44. DOJ acknowledges that MPD has implemented an interim canine policy via teletype and has initiated significant improvements in its canine operations, including the introduction of a new handler-controlled alert curriculum and the use of new canines.

45. The policy shall limit off-leash canine deployments, searches and other instances where there is otherwise a significant risk of a canine bite to a suspect, to instances in which the suspect is wanted for a serious felony or is wanted for a misdemeanor and is reasonably suspected to be armed. MPD shall continue to require canine officers to have approval from an immediate supervisor (sergeant or higher) before the canine can be deployed. If the handler is unable to contact a canine unit supervisor, approval must be sought from a field supervisor before the canine can be deployed. The approving supervisor shall not serve as a canine handler in the deployment. MPD shall continue to issue a loud and clear announcement that a canine will be deployed and advise the suspect to surrender and remain still if approached by a canine.

46. The policy shall also require that in all circumstances where a canine is permitted to bite or apprehend a suspect by biting, the handler shall call off the dog at the first possible moment the canine can be safely released. Whenever a canine-related injury occurs, immediate medical treatment must be sought either by rescue ambulance, transportation to an emergency room, or admission to a hospital.

## D. Oleoresin Capsicum Spray Policy

47. MPD shall complete development of an Oleoresin Capsicum Spray (OC Spray) policy that complies with applicable law and current professional standards. The policy shall prohibit officers from using OC Spray unless the officer has legal cause to detain, take into legal custody or to maintain in custody a subject who is, at a minimum, actively resisting the officer. The policy shall prohibit officers from using OC spray to disperse crowds or others unless those crowds or others are committing acts of public disobedience endangering public safety and security.

48. The policy shall provide that, absent exceptional circumstances, officers shall not use OC spray on children and elderly persons. The policy shall prohibit officers from using OC spray to prevent property damage except when its use meets the standard defined in paragraph 47 above.

49. The policy shall require officers to issue a verbal warning to the subject unless a warning would endanger the officer or others. The warning shall advise the subject that OC spray shall be used unless resistance ends. The policy shall require that prior to discharging the OC spray, officers permit a reasonable period of time to allow compliance with the warning, when feasible.

50. The policy shall require officers to aim OC spray only at a person's face and upper torso. The policy shall require officers to utilize only two, one second bursts and to do so from at least 3 feet away from the subject, unless exceptional circumstances require otherwise. The policy shall require that, absent exceptional circumstances, officers shall decontaminate every sprayed subject with cool water or a decontamination solution within 20 minutes after the application of the spray. Officers shall transport sprayed subjects to the hospital for treatment when they complain of continued effects after having been contaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by OC Spray. The policy shall prohibit officers from keeping any sprayed subject in a face down position, in order to avoid positional asphyxia.

## E. Implementation Schedule

51. MPD shall complete development of the policies and procedures referenced in this section within 30 days from the effective date of the agreement. In developing the final policies and procedures, MPD shall build upon the latest working drafts and correspondence exchanged between DOJ and MPD during the course of the investigation.

52. Prior to implementation of the policies and procedures referenced in this section, MPD shall submit them to DOJ for approval. In the event MPD revises any of the policies, procedures, or forms referenced in this section during the term of this agreement, it shall obtain approval from DOJ prior to implementation of the revised policy or form.

Back to top of page

# III. INCIDENT DOCUMENTATION,

# INVESTIGATION, AND REVIEW

## A. Use of Force Reporting Policy and Use of Force Incident Report

53. MPD shall complete development of a Use of Force Reporting policy and Use of Force Incident Report. The policy shall require officers to notify their supervisor immediately following any use of force or receipt of an allegation of excessive use of force and to complete a Use of Force Incident Report. Additionally, the policy shall require officers to complete a Use of Force Incident Report immediately following the drawing of and pointing of a firearm at, or in the direction of, another person. The policy shall require supervisors, upon notification of a use of force or allegation of excessive force, to respond to the scene. In every incident involving deadly force, as defined by paragraph 15, a serious use of force, as defined by paragraph 33, or any use of force indicating potential criminal conduct by an officer, as defined by paragraph 35, the supervisor shall ensure that the Force Investigation Team (FIT) is immediately notified.

54. MPD shall notify the Office of the United States Attorney for the District of Columbia (USAO) immediately, in no case later than the next business day, following a deadly use of force or a serious use of force by an MPD officer or following any use of force indicating potential criminal conduct by an officer.

55. Data captured on the reports described above in paragraph 53 shall be entered into MPD's Personnel Performance Management System (PPMS). Hard copies of these reports shall be maintained centrally by the Office of Professional Responsibility.

## B. Investigating Uses of Force and Misconduct Allegations

### 1. Use of Force Investigations

56. MPD created the Force Investigation Team (FIT) to conduct fair, impartial and professional reviews of firearm discharges. The provisions in this section build upon the investigative techniques employed by FIT and expand FIT's role within MPD.

57. Within 60 days from the effective date of this Agreement, MPD shall fully implement its plan, subject to approval of DOJ, to reallocate responsibility for MPD criminal investigations of officer use of force from District Violent Crime Unit supervisors or other District supervisors to the Force Investigation Team (FIT). The plan shall include procedures to address the rights and responsibilities of officers and supervisors in carrying out their duties, including the preparation of both preliminary investigative files and complete investigative files.

58. MPD shall consult with the USAO regarding the investigation of an incident involving deadly force, a serious use of force, or any other force indicating potential criminal misconduct by an officer. If the USAO indicates a desire to proceed criminally based on the on-going consultations with MPD, or MPD requests criminal prosecutions in these incidents, any compelled interview of the subject officers shall be delayed, as described in paragraph 60. However, in order to ensure the collection of all relevant information, all other aspects of the investigation shall proceed. The USAO shall

respond to a written request by MPD for charges, declination, or prosecutorial opinion within three business days, by either filing charges, providing a letter of declination, or indicating the USAO's intention to continue further criminal investigation.

59. In every incident involving deadly force, a serious use of force, or any use of force indicating potential criminal misconduct by an officer, the USAO shall notify and consult with the Chief of Police or the appropriate OPR official whenever possible, unless doing so would compromise the investigation, or is otherwise prohibited by law, rule, or regulation.

60. MPD and the USAO jointly acknowledge the need to continue consultation throughout the course of an investigation; and recognize the investigative process may ultimately proceed to an administrative conclusion and/or criminal charges. MPD agrees that it will not compel or order a subject officer to make a statement if the USAO has not yet issued a written criminal declination, for all incidents subject to the notice and consultation provisions described in paragraphs 58 and 59.

61. FIT shall respond to the scene of every incident involving deadly force, a serious use of force, or any use of force indicating potential criminal misconduct by an officer. In each of these incidents, FIT shall conduct the investigation of the use of force. That investigation may result in criminal charges, administrative action or both. Investigators from the involved officers' District shall not conduct the investigation. Based upon its review of use of force incidents from throughout MPD, FIT shall forward policy and training recommendations to the Chief of Police or his designee.

62. FIT shall complete its administrative use of force investigations within 90 days from the criminal declination described in paragraph 60, absent special circumstances which must be documented, and shall continue to conduct investigations in accordance with paragraphs 81 and 82, below. At the conclusion of each use of force investigation, the investigator shall prepare a report on the investigation, which shall be made a part of the investigation file. The report shall include a description of the use of force incident and any other uses of force identified during the course of the investigation; a summary and analysis of all relevant evidence gathered during the investigation; and proposed findings and analysis supporting the findings. The proposed findings shall include the following: 1) a determination of whether the use of force is consistent MPD policy and training; 2) a determination of whether proper tactics were employed; and 3) a determination whether lesser force alternatives were reasonably available.

63. Within 120 days from the effective date of this Agreement, MPD shall train and assign a sufficient number of personnel to FIT to fulfill the requirements of this Agreement.

64. Chain of command district supervisors may investigate all use of force incidents except for those incidents involving a serious use of force, serious physical injury, or any use of force indicating potential criminal conduct by an officer. At the discretion of the Chief of Police or designee, any incident that may be investigated by chain of command district supervisors may be assigned for investigation to FIT or to chain of command supervisors from a district other that the district in which the incident occurred. No supervisor who was involved in the incident shall be responsible for the investigation of the incident.

MPD and DOJ Memorandum of Agreement on the Use of Force. June 13, 2001    Page 11    Page 11 of 40

Case 1:05-cv-02224-JDB    Document 4-3    Filed 12/19/2005    Page 11 of 40

65. Chain of command use of force investigations shall be completed within 90 days following the use of force incident, absent special circumstances which must be documented, and shall be conducted in accordance with paragraphs 81 and 82, below. At the conclusion of each use of force investigation, the investigator shall prepare a report on the investigation, which shall be made a part of the investigation file. The report shall include a description of the use of force incident and any other uses of force identified during the course of the investigation; a summary and analysis of all relevant evidence gathered during the investigation; and proposed findings and analysis supporting the proposed findings. The proposed findings shall include the following: 1) a determination of whether the use of force is consistent and MPD policy and training; 2) a determination of whether proper tactics were employed; and 3) a determination whether lesser force alternatives were reasonably available.

66. Upon completion of a chain of command use of force investigation, the investigator shall forward the investigation to the Unit Commander, who shall review the investigation to ensure that it is complete and that the findings are supported by the evidence. The Unit Commander shall order additional investigation when necessary. When the Unit Commander determines the investigation is complete and the findings are supported by the evidence, the investigation file shall be forwarded to the Use of Force Review Board (UFRB). Whenever there is evidence of criminal wrongdoing, the Unit Commander shall suspend the investigation immediately and notify FIT and the USAO.

67. Within 60 days from the effective date of this Agreement, MPD shall complete the development and implementation of a policy to enhance the UFRB, subject to approval by DOJ. The policy shall require the UFRB to conduct timely reviews of all use of force investigations. The policy shall set forth the membership of the UFRB and establish timelines for UFRB review of use of force investigations. The policy shall authorize the UFRB to recommend discipline for violations of MPD's policies and training. The policy shall authorize the UFRB to direct District supervisors to take non-disciplinary action to enable or encourage an officer to modify his or her performance . The policy shall require the UFRB to act as a quality control mechanism for all use of force investigations, with the responsibility to assign to FIT, or return to the investigating unit, all incomplete or mishandled use of force investigations. The policy shall provide the UFRB the authority and responsibility to recommend to the Chief of Police, or his designee, investigative protocols and standards for all force investigations. The policy shall require the UFRB to conduct annual reviews of all use of force cases examined to detect patterns/problems and to issue a report to the Chief of Police with findings and recommendations.

## 2. Investigations of Misconduct Allegations

68. The Office of Professional Responsibility shall be responsible for the investigation of allegations of criminal misconduct set forth in the categories in paragraph 72, (a) through (i) below. Within 60 days from the date of this Agreement, MPD shall develop a plan, subject to approval of DOJ, to allocate sufficient personnel and establish procedures to accomplish this new responsibility.

69. MPD shall notify the USAO immediately, in no case later than the next business day, following the receipt or discovery of any allegations of criminal misconduct

referred to in paragraphs 72 and 73. In every incident involving allegations of criminal misconduct referred to in paragraphs 72 and 73, the USAO shall notify and consult with the Chief of Police or the appropriate OPR official whenever possible, unless doing so would compromise the investigation, or is otherwise prohibited by law, rule, or regulation.

70. MPD shall consult with the USAO regarding the investigation of an incident involving allegations of criminal misconduct in the categories of matters described in paragraphs 72 and 73. If the USAO indicates a desire to proceed criminally based on the on-going consultations with MPD, or MPD requests criminal prosecutions in these incidents, any compelled interview of the subject officers shall be delayed, as described in paragraph 71. However, in order to ensure the collection of all relevant information, all other aspects of the investigation shall proceed. The USAO shall respond to a written request by MPD for charges, declination, or prosecutorial opinion within three business days, by either filing charges, providing a letter of declination, or indicating the USAO's intention to continue further criminal investigation.

71. MPD and the USAO jointly acknowledge the need to continue consultation throughout the course of an investigation; and recognize the investigative process may ultimately proceed to an administrative conclusion and/or criminal charges. MPD agrees that it will not compel or order a subject officer to make a statement if the USAO has not yet issued a written criminal declination, for all incidents involving allegations of criminal misconduct in the categories of matters described in paragraphs 72 and 73.

72. Within 60 days from the date of this Agreement, MPD shall develop a plan, subject to approval of DOJ, to reallocate responsibility for MPD administrative complaint investigations of misconduct complaints from chain-of-command District supervisors to OPR with respect to the following:

    a. all referrals pursuant to paragraphs 76 and 77;

    b. all civil suits alleging any misconduct by an officer while acting in an official capacity;

    c. all civil suits against an officer for off-duty conduct (while not acting in an official capacity) that alleges physical violence, threats of physical violence, or racial bias;

    d. all criminal arrests of or filing of criminal charges against an officer;

    e. all allegations of unlawful discrimination (e.g., on the basis of race, ethnicity, gender, religion, national origin, sexual orientation, or disability), including improper ethnic remarks and gender bias, but excluding employment discrimination;

    f. all allegations of unlawful search and stops;

    g. all allegations of unlawful seizure (including false imprisonment and false arrest);

h. any act of retaliation or retribution against an officer or person; and

i. all allegations of strikes, blows, kicks, or other similar uses of force against a compliant subject or administered with a punitive purpose; and

j. OPR shall assign for investigation outside of the District Chain of Command all allegations of misconduct related to the types of misconduct covered by "a" to "i" of this paragraph; and

OPR shall assign to FIT all allegations of excessive force by an officer involving a use of deadly force, as defined in paragraph 15, a serious use of force, as defined in paragraph 33, or any use of force indicating potential criminal conduct by an officer, as defined in paragraph 35.

73. OPR, shall also assign for administrative investigation outside of the District chain of command the following:

a. all incidents in which both (i) a person is charged by an officer with assault on a police officer, resisting arrest, or disorderly conduct, and (ii) the prosecutor's office notifies MPD either that it is dismissing the charge based upon officer credibility or a judge dismissed the charge based upon officer credibility;

b. all incidents in which MPD has received written notification from a prosecuting agency in a criminal case that there has been (i) an order suppressing evidence because of any constitutional violation involving potential misconduct by an MPD officer, or (ii) any other judicial finding of officer misconduct made in the course of a judicial proceeding or any request by a federal or District of Columbia judge or magistrate that a misconduct investigation be initiated pursuant to some information developed during a judicial proceeding before a judge or magistrate. MPD shall request that all prosecuting agencies provide them with written notification whenever the prosecuting agency has determined that any of the above has occurred.

74. All administrative investigations of misconduct allegations conducted pursuant to paragraphs 72 and 73 shall be completed within 90 days from MPD receiving the complaint, or within 90 days from the criminal declination described in paragraph 71, where applicable, absent special circumstances which must be documented. At the conclusion of each such investigation, the investigator shall prepare a report on the investigation, which shall be made a part of the investigation file. The report shall include a description of the misconduct incident and any other misconduct identified during the course of the investigation; a summary and analysis of all relevant evidence gathered during the investigation; and proposed findings and analysis supporting the findings.

75. The Corporation Counsel's Office shall notify OPR whenever a person files a civil claim against the City alleging misconduct by an officer or other employee of MPD.

76. MPD shall continue to require all officers promptly to notify MPD of the following:

the officer is arrested or criminally charged for any conduct; the officer is named as a party in any civil suit involving his or her conduct while on duty (or otherwise while acting in an official capacity); or the officer is named as a party in any civil suit regarding off-duty conduct (while not acting in an official capacity) that alleges any of the following: physical violence, threats of physical violence, racial bias, dishonesty, or fraud by the officer. Officers shall report this information either directly to OPR or to a supervisor who shall report the information to OPR.

77. MPD shall require officers to report to MPD without delay: any conduct by other officers that reasonably appears to constitute (a) an excessive use of force or improper threat of force; (b) a false arrest or filing of false charges; (c) an unlawful search or seizure; (d) unlawful discrimination; (e) an intentional failure to complete use of force reports required by MPD policies and in accordance with procedures; (f) an act of retaliation for complying with any MPD policy or procedure; or (g) an intentional provision of false information in an MPD or OCCR investigation or in any official report, log, or electronic transmittal of information. Officers shall report such alleged misconduct by fellow officers either directly to OPR or to a supervisor who shall report the information to OPR. This requirement applies to all officers, including supervisors and managers who learn of evidence of possible misconduct through their review of an officer's work. Failure to voluntarily report as described in this paragraph shall be an offense subject to discipline if sustained.

78. The City shall in fiscal year 2002 provide all necessary funds to fully implement paragraphs 68 and 74. Misconduct investigation responsibilities shall be transitioned as positions are filled. Prior to positions being filled, investigation responsibilities shall be transitioned commensurate with available resources. Positions shall be filled and investigation responsibility transition shall be completed by December 31, 2002.

79. OPR shall continue to review all misconduct complaints as they are received. OPR shall determine whether a misconduct complaint meets the criteria (set forth in paragraphs 72 and 73 ) for being assigned for investigation outside of the District Chain of Command.

80. MPD shall prohibit any officer who has a potential conflict of interest related to a pending misconduct investigation from participating in any way in the conduct or review of that investigation.

81. In conducting administrative misconduct investigations (whether conducted by FIT, Chain of Command, or OPR, following a criminal declination, where applicable) MPD shall, subject to and in conformance with applicable law, at a minimum:

    a. tape record or videotape interviews of complainants, involved officers, and material witnesses in investigations involving a serious use of force or serious physical injury (if a complainant or non-officer witness refuses to be tape-recorded or videotaped, then MPD shall prepare a written narrative of the statement to be signed by the complainant or non-officer witness);

    b. whenever practicable and appropriate, interview complainants and witnesses at sites and times convenient for them, including at their residences or places of business;

c. prohibit group interviews;

d. notify the supervisors of the involved officers of the investigation, as appropriate;

e. interview all appropriate MPD officers, including supervisors;

f. collect, preserve, and analyze all appropriate evidence, including canvassing the scene to locate witnesses and obtaining complainant medical records, where appropriate; and

g. identify and report in writing all inconsistencies in officer and witness interview statements gathered during the investigation.

82. In conducting misconduct investigations, MPD shall continue to assess the propriety of all officer conduct during the incident in which the alleged misconduct occurred. If during the course of an investigation the investigator has reason to believe that misconduct occurred other than that alleged, the investigator also shall investigate the additional potential misconduct to its logical conclusion.

83. Within 120 days from the effective date of this Agreement, MPD shall develop a manual, subject to approval by DOJ, for conducting all MPD misconduct investigations. The manual shall include timelines and shall provide investigative templates to assist investigators in gathering evidence, conducting witness interviews, and preparing investigative reports.

84. Within 90 days from the effective date of this Agreement, MPD shall develop a plan, subject to approval by DOJ, to ensure that all MPD investigators (whether conducting use of force investigations or misconduct investigations) receive adequate training to enable them to carry out their duties. All MPD investigators shall receive training and re-training in MPD policies and procedures, including, but not limited to, use of force and use of force reporting, canine deployment, transporting individuals in custody, restraints, arrests, report writing; investigative and interview techniques, including examining and interrogating witnesses, and collecting and preserving evidence; cultural sensitivity; ethics; integrity; and professionalism. MPD shall provide specialized training to investigators who conduct shooting investigations. The training shall occur within 180 days of the approval of the plan.

Back to top of page

___

# IV. RECEIPT, INVESTIGATION, AND REVIEW OF MISCONDUCT ALLEGATIONS

## A. Coordination and Cooperation Between MPD and OCCR

85. Within 60 days from the effective date of this Agreement, the City and MPD shall develop a written plan, in timely consultation with DOJ, that clearly delineates the roles

and responsibilities of OCCR and MPD regarding the receipt, investigation, and review of complaints. At minimum, the plan shall specify each agency's responsibility for receiving, recording, investigating, and tracking complaints; each agency's responsibility for conducting community outreach and education regarding complaints; how, when, and in what fashion the agencies shall exchange information, including complaint referrals and information about sustained complaints; and the role and responsibilities of MPD official serving on the Citizen Complaint Review Board (CCRB).

86. The City shall provide OCCR sufficient qualified staff, funds, and resources to perform the functions required by this Agreement and by District of Columbia Law 12-208 creating OCCR, including the conduct of timely, thorough, and independent investigations of alleged police misconduct; the conduct of mediation; the conduct of hearings; and the operation of a professional office.

## B. Public Information and Outreach

87. MPD shall continue to require all officers to provide their name and identification number to any person who requests it.

88. Within 90 days of the effective date of this agreement, the City and MPD shall develop and implement an effective program to inform persons that they may make complaints regarding the performance of any officer. This program shall, at a minimum, include the development and distribution of complaint forms, fact sheets, informational posters, and public service announcements describing both the Office of Citizen Complaint Review (OCCR) and MPD complaint processes. The City shall make such materials available in English, Spanish, and other appropriate languages.

89. Within 120 days of the effective date of this agreement, the City shall make complaint forms, and informational materials available at OCCR, MPD headquarters, all MPD District stations and sub-stations, libraries, the internet, and, upon request, to community groups and community centers. At each MPD District station and sub-station, MPD shall permanently post a placard describing the complaint process and include the phone number of MPD's Office of Professional Responsibility.

90. MPD shall require all officers to carry informational brochures and complaint forms in their vehicles at all times while on duty. MPD shall require all officers to inform persons who object to an officer's conduct that persons have a right to make a complaint. MPD shall prohibit officers from discouraging any person from making a complaint.

91. For the term of this agreement, MPD shall conduct a Community Outreach and Public Information program for each MPD District. The program shall require the following:

> a. to continue at least one open meeting per quarter in each of the patrol service areas for the first year of the Agreement, and one meeting in each patrol service area semi-annually thereafter, to inform the public about the provisions of this Agreement, and the various methods of filing a complaint against an officer. At least one week before such meetings the

City shall publish notice of the meeting (i) in public areas, including libraries, schools, grocery stores, community centers; (ii) taking into account the diversity in language and ethnicity of the area's residents; (iii) on the City and MPD website; and (iv) in the primary languages spoken by the communities located in such area.

b. the open public meetings described above shall continue to include presentations and information on MPD and MPD operations in order to enhance interaction between officers and community members in daily policing activities.

## C. Receipt of Complaints

92. Within 90 days from the effective date of this Agreement, MPD shall make it possible for persons to initiate complaints with MPD in writing or verbally, in person, by mail, by telephone (or TDD), facsimile transmission, or by electronic mail. MPD shall accept and investigate anonymous complaints and complaints filed by persons other than the alleged victim of misconduct. MPD shall ask anonymous and third-party complainants for corroborating evidence. MPD shall not require that a complaint be submitted in writing or on an official complaint form to initiate an investigation.

93. Within 120 days from the effective date of this Agreement, the City shall institute a 24-hour toll-free telephone hotline for persons to call to make a complaint regarding officer conduct. The hotline shall be operated by OCCR. The City and MPD shall publicize the hotline telephone number on informational materials and complaint forms. The City shall tape record all conversations on this hotline and shall notify all persons calling the hotline of the tape recording. The City shall develop an auditing procedure to assure that callers are being treated with appropriate courtesy and respect, that complainants are not being discouraged from making complaints, and that all necessary information about each complaint is being obtained. This procedure shall include monthly reviews of a random sample of the tape recordings.

94. Within 60 days from the effective date of this Agreement, MPD's Office of Professional Responsibility (OPR) shall be responsible for receiving all complaints filed directly with MPD. MPD shall assign and record a control system number for each complaint immediately. All complaints made at MPD locations other than OPR shall be forwarded to OPR within 24 hours, or the next business day. Within 24 hours, or the next business day OPR shall notify OCCR of any complaint alleging any of the following: harassment; use of unnecessary or excessive force; use of insulting, demeaning, or humiliating language; or discriminatory treatment..

95. The City shall continue to locate OCCR offices separate from any building occupied by other MPD personnel.

## D. OCCR Misconduct Investigations

96. Within 90 days from the effective date of this Agreement, the City shall develop and implement a plan, in timely consultation with DOJ and the Monitor, to ensure that the investigative staff of OCCR receive adequate training to enable them to carry out their duties. OCCR investigative staff shall receive training and re-training in MPD

policies and procedures, including, but not limited to, use of force and use of force reporting; canine deployment, transporting individuals in custody, restraints, arrests, report writing; investigative and interview techniques, including examining and interrogating witnesses, and collecting and preserving evidence; cultural sensitivity; ethics; integrity; and professionalism.

97. Within 90 days from the effective date of this Agreement, the City shall develop a manual, in timely consultation with DOJ , for conducting all OCCR complaint investigations. The manual shall include timelines and provide investigative templates to assist investigators in gathering evidence, conducting witness interviews, and preparing investigative reports.

## E. Evaluating and Resolving MPD Misconduct Allegations

98. MPD shall continue to make findings based on a "preponderance of the evidence" standard. Within 90 days, MPD shall develop a policy and training implementing this standard.

99. In each misconduct investigation, MPD shall consider all relevant evidence including circumstantial, direct and physical evidence, as appropriate, and make credibility determinations, if feasible. There shall be no automatic preference for an officer's statement over a person's statement. MPD shall make efforts to resolve inconsistent statements between witnesses.

100. MPD shall resolve each allegation in a misconduct investigation by making one of the following dispositions:

    a. "Unfounded," where the investigation determined no facts to support that the incident complained of actually occurred;

    b. "Sustained," where the person's allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper;

    c. "Insufficient Facts," where there are insufficient facts to decide whether the alleged misconduct occurred;

    d. "Exonerated," where a preponderance of the evidence shows that the alleged conduct did occur but did not violate MPD policies, procedures, or training.

101. MPD shall not close any misconduct investigation without rendering one of the dispositions identified above. Withdrawal of a complaint or unavailability of the complainant or the victim of the alleged misconduct to make a statement shall not be a basis for closing an investigation without further attempt at investigation. MPD shall investigate such matters to the extent reasonably possible to determine whether or not the allegations can be resolved.

102. At the conclusion of each misconduct investigation, the individual responsible for the investigation shall prepare a report on the investigation, which shall be made a part

of the investigation file. The report shall include a description of the alleged misconduct and any other misconduct issues identified during the course of the investigation; a summary and analysis of all relevant evidence gathered during the investigation; and proposed findings and analysis supporting the findings.

103. MPD shall complete all misconduct investigations within 90 days after receiving the allegations unless the complexity of the case dictates otherwise, or within 90 days from a criminal declination, where applicable.

104. MPD shall require its Unit Commanders to evaluate all misconduct investigations to identify underlying problems and training needs. After such evaluations the Unit Commander shall implement appropriate non-disciplinary actions, if any, or make a recommendation to the proper MPD entity to implement such actions. Sustained misconduct allegations will be handled pursuant to the disciplinary policy described in paragraph 105.

Back to top of page

# V. DISCIPLINE AND NON-DISCIPLINARY ACTION

105. Within 120 days from the effective date of this Agreement, MPD shall revise and update its disciplinary policy, General Order 1202.1 (Disciplinary Procedures and Processes), subject to the approval of DOJ. The policy shall describe the circumstances in which non-disciplinary action is appropriate. The policy shall describe the circumstances in which District-level discipline or corrective action is appropriate. The policy shall establish a centralized and formal system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the District level. It shall also specify the procedure for notifying complainants in writing of the resolution, including significant dates, general allegations and the disposition.

Back to top of page

# VI. PERSONNEL PERFORMANCE MANAGEMENT SYSTEM

106. MPD has invested a significant amount of time and energy in developing a Request for Proposal to create a Personnel Performance Management System ("PPMS"). In connection therewith, the City has committed to develop and fully implement a computerized relational database for maintaining, integrating, and retrieving data necessary for supervision and management of MPD and its personnel. The computerized data shall be used regularly and affirmatively by MPD to promote civil rights integrity and best professional police practices; to manage the risk of police misconduct, and potential liability thereof; and to evaluate and audit the performance of

MPD officers of all ranks, and MPD units, sub-units, and shifts. It shall be used to promote accountability and proactive management and to identify, manage, and control at-risk officers, conduct, and situations. This system shall be a successor to, and not simply a modification of, MPD's existing automated systems.

107. PPMS shall contain information at minimum on the following matters:

a. all uses of force that are required to be reported in MPD "Use of Force Incident Report" forms or otherwise are the subject of a criminal or administrative investigation by the Department;

b. all instances in which a police canine is deployed to search for or find a member of the public;

c. all officer-involved shootings and firearms discharges, both on-duty and off-duty;

d. all other lethal uses of force;

e. all studies, reviews, or determinations with respect to the criminal, administrative, tactical, strategic, or training implications of any use of force, including all preliminary and final decisions regarding whether a given use of force was or was not within MPD policy;

f. all vehicle pursuits and traffic collisions;

g. all complaints (whether made to MPD or OCCR);

h. with respect to the foregoing clauses (a) through (g), the results of adjudication of all investigations (whether criminal or administrative) and a chronology or other complete historical record of all tentative and final decisions or recommendations regarding discipline, including actual discipline imposed or non-disciplinary action taken;

i. all commendations received by MPD about officer performance;

j. all criminal arrests and investigations known to MPD of, and all charges against, MPD employees;

k. all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City, or its officers, or agents, resulting from MPD operations or the actions of MPD personnel.

l. assignment, and rank history for each officer;

m. training history;

n. all management and supervisory actions taken pursuant to a review of PPMS information, including non-disciplinary actions;

o. educational history;

p. military service and discharge status;

q. all instances in which MPD is informed by a prosecuting authority that a declination to prosecute any crime was based in whole or in part upon concerns about the credibility of an MPD officer or that a motion to suppress was granted on the grounds of a constitutional violation by an MPD officer; and

r. PPMS further shall include, for the incidents included in the database, appropriate additional information about involved officers (e.g., name and badge number), and appropriate information about the involved members of the public (including demographic information such as race, ethnicity, or national origin). Additional information on officers involved in incidents (e.g., work assignment, officer partner, field supervisor, and shift at the time of the incident) shall be determinable from PPMS.

108. MPD shall prepare for the review and approval of DOJ, and thereafter implement, a plan for inputting historical data into PPMS (the "Data Input Plan"). The Data Input Plan shall identify the data to be included and the means for inputting such data (direct entry or otherwise), the specific fields of information to be included, the past time periods for which information is to be included, the deadlines for inputting the data, and the responsibility for the input of the data. The Data Input Plan shall include historical data that are up-to-date and complete in PPMS.

109. PPMS shall include relevant numerical and descriptive information about each incorporated item and incident, and scanned or electronic attachments of copies of relevant documents. PPMS shall have the capability to search and retrieve (through reports and queries) numerical counts, percentages and other statistical analyses derived from numerical information in the database, listings, descriptive information, and electronic document copies for (a) individual employees, MPD units, and groups of officers, and (b) incidents or items, and groups of incidents or items. PPMS shall have the capability to search and retrieve this information for specified time periods, based on combinations of data fields contained in PPMS (as designated by the authorized user).

110. Where information about a single incident is entered in PPMS from more than one document (e.g., from a complaint form and a use of force report), PPMS shall use a common control number or other equally effective means to link the information from different sources so that the user can cross-reference the information and perform analyses. Similarly, all personally identifiable information relating to MPD officers shall contain the badge or other employee identification number of the officer to allow for linking and cross-referencing information.

111. MPD shall, within 90 days, prepare for the review and approval of DOJ, and thereafter implement, a protocol for using PPMS, including, but not limited to, supervision and auditing of the performance of specific officers, supervisors, managers, and MPD units, as well as MPD as a whole. The City shall submit for the review and approval of DOJ all proposed modifications to the protocol prior to implementing such

modifications.

112. The protocol for using PPMS shall include the following provisions and elements:

> a. The protocol shall require that, on a regular basis, but no less than quarterly, managers, and supervisors review and analyze all relevant information in PPMS about officers under their supervision to detect any pattern or series of incidents that indicate that an officer, group of officers, or an MPD unit under his or her supervision may be engaging in at-risk behavior.

> b. The protocol shall provide that when at-risk behavior may be occurring based on a review and analysis described in the preceding subparagraph, appropriate managers, and supervisors shall undertake a more intensive review of the officer's performance.

> c. The protocol shall require that MPD and managers on a regular basis, but no less than quarterly, review and analyze relevant information in PPMS about subordinate managers and supervisors in their command regarding the subordinate's ability to manage adherence to policy and to address at-risk behavior.

> d. The protocol shall state guidelines for numbers and types of incidents requiring a PPMS review by supervisors and managers (in addition to the regular reviews required by the preceding subparagraphs), and the frequency of these reviews.

> e. The protocol shall state guidelines for the follow-up executive, managerial or supervisory actions (including nondisciplinary actions) to be taken based on reviews of the information in PPMS required pursuant to this protocol.

> f. The protocol shall require that managers and supervisors use PPMS information, among other relevant information, in determining when to undertake an audit of an MPD unit or group of officers.

> g. The protocol shall require that all relevant and appropriate information in PPMS be taken into account for pay grade advancement, promotion, transfer, and special assignment, and in connection with annual personnel performance evaluations. Supervisors and managers shall be required to document in writing their consideration of any sustained criminal or administrative investigation, adverse judicial finding or significant monetary settlement, in determining when such officer is selected for special assignment, or assignment with increased pay, transfer, promotion, and in connection with annual personnel performance evaluations. For purposes of this paragraph, a special assignment shall include, but not be limited to, assignment as a training officer, assignment to any specialized unit orto OPR.

> h. The protocol shall specify that actions taken as a result of information

from PPMS shall be based on all relevant and appropriate information, and not solely on the number or percentages of incidents in any category recorded in PPMS.

i. The protocol shall provide that managers' and supervisors' performance in implementing the provisions of the PPMS protocol shall be taken into account in their annual personnel performance evaluations.

j. The protocol shall provide specific procedures that provide for each MPD officer to be able to review on a regular basis all personally-identifiable data about him or herself in PPMS in order to ensure the accuracy of that data. The protocol also shall provide for procedures for correcting data errors discovered by officers in their review of the PPMS data.

k. The protocol shall require regular review at no less than quarterly intervals by appropriate managers of all relevant PPMS information to evaluate officer performance citywide, and to evaluate and make appropriate comparisons regarding the performance of all MPD units in order to identify any patterns or series of incidents that may indicate potential liability or other at-risk behavior. These evaluations shall include evaluating the performance over time of individual units, and comparing the performance of units with similar responsibilities.

l. The protocol shall provide for the routine and timely documentation in PPMS of actions taken as a result of such reviews of PPMS information.

m. The protocol shall require that whenever an officer transfers into a new assignment, the commanding officer shall promptly cause the transferred officer's PPMS record to be reviewed by the transferred officer's watch commander or supervisor.

n. The protocol shall require that all relevant and appropriate information in PPMS shall be considered in connection with the adjudication of misconduct allegations and determinations of appropriate discipline for sustained misconduct allegations.

o. MPD shall train and thereafter hold managers, and supervisors accountable, consistent with their authority, for risk management and for use of PPMS and any other relevant data to address at-risk behavior, to deal with potential or actual police misconduct, and to implement the protocol described above.

113. The City shall maintain all personally identifiable information about an officer included in PPMS during the officer's employment with MPD and for at least five years thereafter (unless otherwise required by law to be maintained for a longer period). Information necessary for aggregate statistical analysis shall be maintained indefinitely in PPMS. On an ongoing basis, MPD shall enter information in PPMS in a timely, accurate, and complete manner, and maintain the data in a secure and confidential manner.

114. PPMS shall be developed and implemented according to the following schedule:

a. Within 60 days of the effective date of this Agreement, subject to approval of DOJ, MPD shall issue the Request for Proposal (RFP).

b. Within 210 days of the issuance of the RFP, MPD shall select the contractor to create the PPMS.

c. Within three months of the effective date of this Agreement, MPD shall submit the protocol for using PPMS required by paragraphs 111 and 112 hereof to DOJ for approval. MPD shall share drafts of this document with the DOJ and the Monitor to allow the DOJ and the Monitor to become familiar with the document as it develops and to provide informal comments on it. MPD and DOJ shall together seek to ensure that the protocol receives final approval within 30 days after it is presented for approval.

d. Within 12 months of selecting the contractor pursuant to paragraph 114 (b), the City shall have ready for testing a beta version of PPMS consisting of: (i) server hardware and operating systems installed, configured and integrated with MPD's existing automated systems; (ii) necessary data base software installed and configured; (iii) data structures created, including interfaces to source data; and (iv) the use of force information system completed, including historic data. The DOJ and the Monitor shall have the opportunity to participate in testing the beta version using use of force data and test data created specifically for purposes of checking the PPMS system.

e. The PPMS computer program and computer hardware shall be operational and fully implemented within 18 months of the selection of the PPMS contractor.

115. MPD shall, until such time as PPMS is implemented, and to the full extent reasonable and feasible, utilize existing databases, information and documents for all the purposes set forth herein for use of the PPMS.

116. Following the initial implementation of PPMS, and as experience and the availability of new technology may warrant, MPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MPD shall submit all such proposals for review and approval by DOJ before implementation.

117. OPR shall continue to be responsible for developing, implementing, and coordinating MPD-wide risk assessments. OPR shall be responsible for the operation of PPMS, and for ensuring that information is entered into and maintained in PPMS in accordance with this Agreement. OPR further shall provide assistance to managers and supervisors who are using PPMS to perform the tasks required hereunder and in the protocol adopted pursuant hereto, and shall be responsible for ensuring that appropriate standardized reports and queries are programmed to provide the information necessary to perform these tasks.

## A. Performance Evaluation System

118. Within 6 months of the effective date of this Agreement, MPD shall prepare for the review and approval of DOJ, and thereafter implement, a plan to enhance its new Performance Evaluation System to ensure that annual personnel performance evaluations are prepared for all MPD sworn employees that accurately reflect the quality of each sworn employee's performance, including, but not limited to:

    a. civil rights integrity and the employee's community policing efforts;

    b. adherence to law, including but not limited to performing duties in a manner consistent with the requirements of the Fourth and Fifth Amendments to the Constitution and the Civil Rights laws of the United States;

    c. with respect to managers, and supervisors, their performance in identifying and addressing at-risk behavior in subordinates, including their supervision and review of use of force; arrests, booking, and performance bearing upon honesty and integrity.

Back to top of page

---

# VII. TRAINING

## A. Management Oversight

119. Within 30 days of the effective date of this Agreement, MPD shall centrally coordinate and review all use of force training among training components to ensure quality assurance, consistency and compliance with applicable law and MPD policy. MPD shall conduct regular subsequent reviews at least semi-annually and produce a report of such reviews to the Monitor and DOJ. Any substantive changes to use of force training must have prior approval of the Director of Training.

120. MPD shall continue to have all training materials reviewed by General Counsel or other legal advisor.

121. With respect to MPD- sponsored training, MPD Director of Training shall continue, in coordination with the Curriculum Development Specialist (CDS), and MPD Training Task Force to:

    a. oversee and ensure the quality of all use of force training by all trainers, wherever it occurs: academy, in-service, field, roll call and the firearms range;

    b. develop and implement use of force training curricula;

    c. select and train MPD officer trainers;

d. develop, implement, approve and supervise all in-service training and roll call curricula;

e. establish procedures for evaluating all training (which shall include an evaluation of instructional content and the quality of instruction;

f. MPD shall continue its Field Training program. Within 120 days of the effective date of this Agreement, MPD shall develop a protocol, subject to approval by DOJ, to enhance the Field Training program. The protocol shall address the criteria and method for selecting Field Trainers, the training provided to Field Trainers to perform their duties, the length of time that probationary officers spend in the program, the assignment of probationary officers to Field Trainers, the substance of the training provided by the Field Trainers, and the evaluation of probationary officer performance by Field Trainers.

g. conduct regular needs assessments to ensure that use of force training is responsive to the knowledge, skills, and abilities of the officers being trained.

122. The CDS shall prioritize his/her efforts to focus on use of force curriculum and instructor development. The CDS shall within 180 days of the effective date of this Agreement, review, revise, provide written approval, and implement, subject to DOJ's approval, all current force-related training material (including curricula and lesson plans), as well as subsequent changes, to ensure:

a. internally consistent content and format;

b. incorporation of current law and policy requirements;

c. the presence of clear, behaviorally-anchored learning objectives and suggestions for trainers of how to present material effectively; and

d. the appropriateness of proposed training aids.

123. The CDS shall regularly review, at a minimum every quarter, all force related training for quality assurance and consistency and shall regularly audit training classes.

124. MPD shall continue to enhance its procedures to provide adequate record keeping of lesson plans and other training material such that the most current, supervisory approved training documents are maintained in a central, commonly accessible file, and are clearly dated.

125. MPD shall continue to maintain training records regarding every MPD officer which reliably indicate the training received by each officer. The training records shall, at a minimum include the course, curriculum, instructor, and day and tour delivered for each officer.

## B. Curriculum

126. The parties agree that sound critical thinking and decision making skills are critical to reducing use of excessive force and to ensuring officer safety. Accordingly, MPD shall ensure that all force-related training incorporates, in a coherent manner, critical thinking and decision making instruction, applicable law, and MPD policy.

127. MPD shall continue to provide all MPD recruits, officers, supervisors and managers with annual training on use of force, subject to approval by DOJ. Such training shall include and address, inter alia:

    a. MPD's use of force continuum;

    b. MPD's use of force reporting requirements;

    c. the Fourth Amendment and other constitutional requirements;

    d. examples of use of force and ethical dilemmas faced by MPD officers and, where practicable given the location, type, and duration of the training, interactive exercises for resolving use of force dilemmas shall be utilized.

128. MPD shall continue to provide recruits, officers, supervisors, and managers with training in cultural diversity and community policing, which shall include training on interactions with persons from different racial, ethnic, and religious groups, persons of the opposite sex, persons of different sexual orientations, and persons with disabilities.

129. MPD shall provide all supervisors, (officers with the rank of sergeant and above) with mandatory supervisory and leadership training which, in addition to the subjects addressed in paragraphs 127 and 128, shall teach command accountability and responsibility, interpersonal relationship skills, theories of motivation and leadership, and techniques designed to promote proper police practices and integrity, including the prevention and detection of use of excessive force, throughout the supervisor's command responsibility and which include proper supervisor/employee communication skills. MPD shall prioritize the topics covered in the initial training to focus on MPD's new use of force policies and procedures, new Canine policies and procedures, the new Use of Force Review Board, and revised administrative and misconduct investigation policies and procedures; MPD shall provide initial training on these topics within 180 days from execution of this Agreement and thereafter shall provide supervisory training on an annual basis.

130. MPD shall ensure that training instructors engage students in meaningful dialogue regarding "real-life" experiences involving use of force and applicable law and MPD policy when conducting force-related training. Training instructors shall encourage opportunities to explain MPD's use of force policy, reporting requirements and force-related law throughout all use of force training.

131. MPD shall ensure that training time is used in an efficient and productive manner and shall take effort to eliminate "down time" of student officers during recruit and in-service training by providing a variety of use of force training activities for students awaiting required one-to-one student-teacher training.

132. Role Play and Range 2000 Courses

    a. Within 60 days of the effective date of this Agreement, MPD shall review the Role Play (formerly known as "Simmunitions") and the Range 2000 training courses to ensure consistency with the law and MPD policy. MPD shall immediately develop a standardized curriculum, lesson plan and instructional guidelines with a list of each scenario including the title, content, lesson objectives and, for the Range 2000, the possible variations available, and shall include a checklist of items to address when critiquing students to ensure consistent application and efficient training. The curriculum, lesson plan and instructional guidelines shall be reviewed by the CDS and MPD General Counsel to ensure consistency with the law and MPD policy, and submitted to DOJ for approval.

    b. MPD shall allow sufficient time to ensure that every student officer participates in one or more Role Plays. Within 180 days of the effective date of this Agreement, MPD shall begin videotaping students in order to replay their decisions and actions during the critique portion of the courses. MPD shall have instructors challenge students to comply with applicable legal standards and MPD policy. Videotapes shall not be subject to the retention policy described in paragraph 176.

    c. MPD shall add additional simulations to comport with the training needs assessment and deficiencies identified in use of force investigations, which can either be created by MPD or obtained from other local and federal law enforcement agencies.

133. MPD shall, within 120 days, provide copies and explain the terms of this Agreement to all MPD officers and employees in order to ensure that they understand the requirements of this Agreement and the necessity for strict compliance. After MPD has adopted new policies and procedures in compliance with this Agreement, MPD shall provide timely in-service training to MPD officers regarding the new policies and procedures and the relevant provisions of this Agreement. MPD shall incorporate training on these policies and procedures into recruit training at the Academy.

## C. Instructors

134. Within 60 days, MPD shall assess (a) whether there is sufficient staff at the Training Academy; (b) what instructor training is needed in light of the courses currently being taught and those to be taught in the future; and (c) the appropriate standards for the evaluation of instructor performance by supervisors. Based on this assessment, MPD shall develop a plan for addressing training instructor needs. MPD shall submit this assessment and development plan to DOJ for approval.

135. MPD shall, within 90 days, develop and implement subject to DOJ's approval, formal eligibility and selection criteria for all Academy, Field Training, and formal training (other than roll call) positions. These criteria shall apply to all incumbent officers in these training positions and to all candidates for these training positions, and also shall be used to monitor the performance of persons serving in these positions. The criteria shall address, inter alia, knowledge of MPD policies and procedures,

interpersonal and communication skills, cultural and community sensitivity, teaching aptitude, performance as a law enforcement officer, with particular attention paid to allegations of excessive force and other misconduct; history, experience as a trainer, post-Academy training received, specialized knowledge, and commitment to police integrity.

136. MPD shall develop an instructor certification program by which the competency of the instructors is certified.

137. Within 180 days of the effective date of this Agreement, MPD shall create and implement a formal instructor training course, subject to the approval of DOJ, to ensure that all instructors receive adequate training to enable them to carry out their duties, including training in adult learning skills, leadership, teaching and evaluation, as well as training in fostering group discussions regarding use of force in "real-life" applications and the presentation of training material in a cohesive and engaging manner. MPD shall provide regular and periodic re-training on these topics. All training instructors and Field Trainers shall be required to maintain, and demonstrate on a regular bases, a high level of competence. MPD shall document all training instructors' and Field Trainers' proficiency and provide additional training to maintain proficiency.

138. MPD shall ensure adequate management supervision of use of force training instructors to ensure that their training is consistent with MPD policy, the law and proper police practices.

139. MPD shall ensure consistent and thorough instruction of approved lesson plans. All instructors must have and use a copy of current lesson plans during classroom instruction.

## D. Firearms Training

140. MPD shall continue to ensure that all officers, supervisors as well as line staff, complete the mandatory semi-annual re-qualification firearms training. Re-qualification shall consist of more than shooting a passing score, but shall consist of satisfactorily completing all re-qualification courses, as discussed in paragraphs 127 and 128, to include, Range 2000 and Role Play courses. MPD shall continue to revoke the police powers of those officers who fail to satisfactorily complete re-certification. MPD shall centralize administrative consequences of failure to attend re-qualification firearms training to ensure consistent application of such consequences.

141. MPD shall ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and the failure to utilize safe gun handling procedures at all times.

142. Within 60 days, MPD shall create and implement, subject to DOJ's approval, a checklist identifying evaluation criteria to determine satisfactory completion of firearms recruit and in-service training. Such checklists shall be completed for each student officer by a firearms instructor, who shall sign the checklist indicating that these criteria have been satisfactorily reviewed during training. The checklist shall include, but not be limited to, an evaluation of a student officer successful training of the following:

a. maintains finger off trigger unless justified and ready to fire;

b. exercises sound judgment and engages in decision making skills in Range 200 and Role Plays;

c. maintains proper hold of firearm and proper stance.

143. MPD shall immediately review and integrate all firearms training into a training curriculum that ensures material is presented in a logical manner that promotes optimal fire safety and user responsibility.

144. MPD shall regularly, at a minimum every 3 months, consult the manufacturer for accurate, consistent and current information regarding all Glock specific instructions and guidelines, particularly regarding cleaning, maintenance and marksmanship. MPD must establish procedures to ensure that such information is continually updated as necessary and such practices are duly documented.

## E. Canine Training

145. MPD shall complete development and implementation of a comprehensive canine training curriculum and lesson plans which specifically identify goals, objectives and the mission of the Canine Unit, consistent with the Canine policy described in paragraphs 44-46 of this Agreement.

146. MPD shall continue to purchase only professionally-bred canines. MPD shall ensure that, within 180 days, all of its canines are certified in handler-controlled alert methodology. MPD shall ensure that the canines receive annual re-certification and periodic refresher training. Deviations from certification or training requirements shall result in the removal of the canine from service until such requirements are fulfilled.

147. MPD shall continue to ensure that canine handlers are physically capable of implementing and maintaining the canine policy described in paragraphs 44-46 of this Agreement. Handlers should be able to maintain control of, and contact with the canine to ensure that the canine is not allowed to bite a suspect without a legal justification.

148. Within 180 days, MPD shall require that all of its in-house canine trainers are certified canine instructors.

Back to top of page

# VIII. SPECIALIZED MISSION UNITS

149. DOJ recognizes that MPD, in its discretion, utilizes temporary and permanent specialized mission units to achieve various law enforcement missions. The following provisions apply to any current or future specialized mission unit created during the existence of this Agreement in which officers engage in significant patrol-related activities on a routine basis including contacts, stops, frisks, and searches (the Mobile

Force Unit (is an example of one such specialized mission unit.).

150. MPD shall continue to institute adequate pre-screening mechanisms of officers working a specialized mission unit to select and screen out officers who may be unprepared to participate in the specialized unit. The pre-screening mechanisms shall continue to include, at a minimum, the following: (a) whether the officer is current on his/her firearms certification and other service weapons training; (b) whether the officer has received adequate training and demonstrated that he or she has a history of judicious and proficient use of force; and (c) whether the officer is generally fit for patrol duty and capable of achieving the relevant objectives of the specialized unit.

151. MPD shall continue to screen officers who are interested in participating in specialized mission units to develop and maintain a pool of seasoned and competent officers with exemplary records and up-to-date training.

152. MPD shall continue to require sufficient advance notice of participating officers to all specialized mission unit leadership to identify the need for enhanced supervision or tailor patrol activities in light of the capacities of the volunteer officers.

153. MPD shall continue to disqualify for service on a specialized mission unit any officer that has frequently used questionable force or generated numerous credible complaints alleging excessive force.

154. MPD shall continue to provide sufficient number of skilled supervisors to ensure adequate supervision of officers assigned to a specialized mission unit. Additionally, MPD shall continue to readily identify in the appropriate organizational chart and all specialized mission unit material, the Command-level official responsible for overseeing specialized mission unit activities.

155. MPD shall continue to give clear instructions to sergeants and other supervisory officers who volunteer, or are assigned to a specialized mission unit that they maintain their supervisory responsibilities while volunteering. MPD shall continue to provide clear instructions to these supervisors regarding appropriate supervision and coordination when more than one sergeant or supervisor is present.

156. MPD shall continue to provide specialized pre-service training to specialized mission unit participants to ensure compliance with current Fourth Amendment, Equal Protection law, and address the desired knowledge, skills, and abilities of the officers participating in the program.

157. MPD shall continue to monitor all activities of specialized mission unit participants to include, at a minimum, enforcement actions, uses of force, and complaints.

158. MPD shall continue its system of informing specialized mission unit supervisors within 24 hours of any complaint about the conduct of an officer on specialized mission unit duty. Additionally, MPD shall continue to track specifically all activities relating to officers participating in the specialized mission unit, including enforcement actions, complaints, and all misconduct investigations, to enable supervisors to determine whether particular officers should be allowed to continue to participate in the

specialized mission unit duty. Investigations of specialized mission unit uses of force should be consistent with the provisions outlined in Section __ of this Agreement.

159. Within 120 days, MPD shall develop a plan, subject to the approval of DOJ, to limit the total number of hours an officer may work in any twenty-four hour period and in any seven- day period to prevent officer fatigue. The parties acknowledge that implementation of the plan may take into account limitations of current labor agreements, if any.

Back to top of page

# IX. PUBLIC INFORMATION

160. MPD shall prepare quarterly public reports that include aggregate statistics of MPD use of force incidents broken down by MPD districts covering each of the geographic areas of the City, indicating the race/ethnicity of the subject of force. These aggregate numbers shall include the number of use of force incidents broken down by weapon used and enforcement actions taken in connection with the use of force. The report shall include statistical information regarding use of force investigations conducted, including the outcome. The report shall also include the total number of complaints of excessive force received, broken down by MPD Districts, and the number of complaints held exonerated, sustained, insufficient facts, and unfounded.

Back to top of page

# X. MONITORING, REPORTING, AND IMPLEMENTATION

## A. Independent Monitoring

161. Within 90 days after entry of this Agreement, the City, MPD and DOJ shall together select a Monitor who shall review and report on MPD's implementation of, and assist with MPD's compliance with, this Agreement. If the parties are unable to agree on a Monitor, each party shall submit two names of persons who have experience as a law enforcement officer, as a law enforcement practices expert or monitor, or as a Federal, state, or county prosecutor or judge along with resumes or curricula vitae and cost proposals to a third party neutral, selected with the assistance of the Federal Mediation and Conciliation Service, and the third party neutral shall appoint the Monitor from among the names of qualified persons submitted.

162. The Monitor shall not be retained by any current or future litigant or claimant in a claim or suit against the City, MPD, or its officers. The Monitor shall not issue statements or make findings with regard to any act or omission of the City, MPD, or their agents or representatives, except as required by the terms of this Agreement. The Monitor may testify in any case brought by any party to this Agreement regarding any

matter relating to the implementation, enforcement, or dissolution of this Agreement.

163. The Monitor, at any time, may associate such additional persons or entities as are reasonably necessary to perform the monitoring tasks specified by this Agreement. The Monitor shall notify in writing DOJ and the City if and when such additional persons or entities are selected for association by the Monitor. The notice shall identify and describe the qualifications of the person or entity to be associated and the monitoring task to be performed.

164. The City and MPD shall bear all reasonable fees and costs of the Monitor. In selecting the Monitor, DOJ, the City and MPD recognize the importance of ensuring that the fees and costs borne by the City and MPD are reasonable, and accordingly fees and costs shall be one factor considered in selecting the Monitor. In the event that any dispute arises regarding the payment of the Monitor's fees and costs, the City, MPD and DOJ and the Monitor shall attempt to resolve such dispute cooperatively.

165. The Monitor shall only have the duties, responsibilities and authority conferred by this Agreement. The Monitor shall not, and is not intended to, replace or take over the role and duties of the Mayor, City Council, or Chief of Police.

166. The Monitor shall offer the City and MPD technical assistance regarding compliance with this Agreement. The Monitor may not modify, amend, diminish, or expand this Agreement.

167. The City and MPD shall provide the Monitor with full and unrestricted access to all MPD and City staff, facilities, and documents (including databases) necessary to carry out the duties assigned to MPD by this Agreement. The Monitor's right of access includes, but is not limited to, all documents regarding use of force data, protocols, analyses, and actions taken pursuant to the analyses. The Monitor shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or DOJ, absent written notice to the City and either written consent by the City or a court order authorizing disclosure.

168. In monitoring the implementation of this Agreement, the Monitor shall maintain regular contact with the City, MPD and DOJ.

169. In order to monitor and report on MPD's implementation of each substantive provision of this Agreement, the Monitor shall conduct the reviews specified in paragraphs 171 and 172 and such additional reviews as the Monitor deems appropriate. The Monitor may make recommendations to the parties regarding measures necessary to ensure full and timely implementation of this Agreement.

170. In order to monitor and report on MPD's implementation of this Agreement, the Monitor, among other things, shall regularly review and evaluate the quality and timeliness of:

    a. MPD employee use of force investigations, including investigations conducted by the Districts, UFRB , OPR, and FIT, pursuant to Section III (B).

b. disciplinary and non-disciplinary actions related to officer use of force.

c. use of force reports.

d. analyses of data concerning use of force, pursuant to paragraphs 61 and 67; and any actions taken pursuant to paragraph 105.

e. complaints and resulting investigations of excessive use of force.

In performing its obligations under this Agreement, the Monitor shall, where appropriate, employ appropriate sampling techniques.

171. The Monitor, inter alia, shall review and evaluate the quality and timeliness of appropriate samples of use of force and misconduct investigations, disciplinary and non-disciplinary actions, ordered as a result of a misconduct investigation; data contained in the PPMS; and appropriate samples of Use of Force Incident reports, canine search and injury reports.

172. Subject to the limitations set forth in this paragraph, MPD shall reopen for further investigation any misconduct investigation the Monitor determines to be incomplete. The Monitor shall provide written instructions for completing the investigation. The Monitor shall exercise this authority so that any directive to reopen an investigation is given within a reasonable period following the investigation's conclusion. The Monitor may not exercise this authority concerning any misconduct investigation which has been adjudicated or otherwise disposed, and the disposition has been officially communicated to the officer who is the subject of the investigation.

## B. MPD Compliance Coordinator

173. The parties agree that MPD shall hire and retain, or reassign a current MPD employee, for the duration of this Agreement, as an MPD Compliance Coordinator. The Compliance Coordinator shall serve as a liaison between MPD, the Monitor and DOJ, and shall assist with MPD's compliance with this Agreement. At a minimum, the Compliance Coordinator shall: (a) coordinate MPD compliance and implementation activities of this Agreement; (b) facilitate the provision of data, documents and other access to MPD employees and material to the Monitor and DOJ as needed; (c) ensure that all documents and records are maintained as provided in this Agreement; and (d) assist in assigning compliance tasks to MPD personnel, as directed by MPD Chief of Police or his designee.

174. The MPD Compliance Coordinator shall take primary responsibility for collecting information to provide MPD's status reports specified in paragraph 175.

## C. Reports and Records

175. Between 90 and 120 days following the effective date of this Agreement, and every three months thereafter until this Agreement is terminated, MPD and the City shall file with DOJ and the Monitor a status report delineating all steps taken during the reporting period to comply with each provision of this Agreement.

176. During the term of this Agreement, the City and MPD shall maintain all records documenting compliance with the terms of this Agreement and all documents required by or developed pursuant to this Agreement. The City and MPD shall maintain all use of force investigation files for at least ten years from the date of the incident. The City and MPD shall maintain an officer's training records during the officer's employment with MPD and for three years thereafter (unless required to be maintained for a longer period of applicable law).

177. DOJ shall continue to have full and unrestricted access to any City and MPD documents (including databases), staff, and facilities that are relevant to evaluate compliance with this Agreement, except any documents protected by the attorney-client privilege. Should the City or MPD decline to provide the Monitor with access to a document based on attorney-client privilege, the City shall provide the Monitor and DOJ with a log describing the document. DOJ's right of access includes, but is not limited to, all documents regarding use of force data, protocols, analyses, and actions taken pursuant to the analyses. This Agreement does not authorize, nor shall it be construed to authorize, access to any MPD documents, except as expressly provided by this Agreement, by persons or entities other than DOJ, the City, MPD, and the Monitor. DOJ shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or the Monitor, absent written notice to the City and either written consent by the City or a court order authorizing disclosure.

178. DOJ shall review documents and information provided by MPD and the Monitor and shall provide its analysis and comments to the City, MPD and the Monitor at appropriate times and in an appropriate manner, consistent with the purpose of this Agreement to promote cooperative efforts.

179. The Monitor shall issue quarterly public reports detailing the City's and MPD's compliance with and implementation of this Agreement. The Monitor may issue reports more frequently if the Monitor determines it appropriate to do so. These reports shall not include information specifically identifying any individual officer. Before issuing a report, the Monitor shall provide a draft to the parties for review to determine if any factual errors have been made, and shall consider the Parties' responses and then promptly issue the report.

180. The Monitor may testify in any action brought to enforce this Agreement regarding any matter relating to the implementation or enforcement of the Agreement. The Monitor shall not testify in any other litigation or proceeding with regard to any act or omission of the City, MPD, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of his or her performance under this Agreement. Unless such conflict is waived by the parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City or its departments, officers, agents or employees. The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records. The Monitor shall not be liable for any claim, lawsuit, or

demand arising out of the Monitor's performance pursuant to this Agreement. Provided, however, that this paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

## D. Implementation, Termination, and Enforcement

181. This Agreement shall become effective upon signature by all Parties. The City and MPD shall implement immediately all provisions of this Agreement which involve the continuation of current Department policies, procedures, and practices. Within 180 days of the effective date of this Agreement, unless otherwise specified, the City and MPD shall implement the provisions of this Agreement.

182. The Agreement shall terminate five years after the effective date of the Agreement if the parties agree that MPD and the City have substantially complied with each of the provisions of this Agreement and maintained substantial compliance for at least two years. The burden shall be on the City and MPD to demonstrate that it has substantially complied with each of the provisions of the Agreement and maintained substantial compliance for at least two years. For the purposes of this paragraph, "substantial compliance" means there has been performance of the material terms of this Agreement. Materiality shall be determined by reference to the overall objectives of this Agreement. Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. At the same time, temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance.

183. The Parties agree to defend the provisions of this Agreement. The Parties shall notify each other of any court or administrative challenge to this Agreement.

184. This Agreement is enforceable through specific performance in Federal Court. Failure by any party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines and provisions of this Agreement.

185. In the event MPD or the City fail to fulfill any obligation under this Agreement, DOJ shall, prior to initiating any court proceeding to remedy such failure, give written notice of the failure to MPD and the City. MPD and the City shall have 30 days from receipt of such notice to cure the failure. At the end of the 30-day period, in the event DOJ determines that the failure has not been cured, DOJ may, without further notice to MPD or the City, file an action in the United States District Court for the District of Columbia (the "Federal Court Action") against MPD and the City for breach of contract and any other appropriate causes of action and may seek specific performance and any other appropriate form of relief.

186. In any matter requiring its approval under this Agreement, DOJ shall not unreasonably withhold any such approval. DOJ shall respond in a complete and timely manner to any submission submitted by the City or MPD for approval, and shall fully outline any bases for disapproval, together with an indication of the changes required in order for approval to be given. DOJ shall provide its approval or disapproval of all matters in writing. All communications regarding approvals required by this Agreement

shall take place in such a manner so as not to interfere with or delay compliance with any obligation contained in the Agreement.

187. In addition to any other notice it may provide, DOJ shall send copies of any correspondence containing a notice of a failure to approve any submission by the City or the MPD, or a notice of a failure to fulfill obligations under this Agreement to MPD's General Counsel.

188. In connection with the Federal Court Action, MPD and the City agree as follows:

    a. The City and MPD shall stipulate to subject matter and in personam jurisdiction and to venue.

    b. The City and MPD agree that service by hand delivery of the summons, complaint, and any other documents required to be filed in connection with the initiation of the Federal Court Action upon the Corporation Counsel of the City shall be deemed good and sufficient service upon the City and MPD.

    c. The City and MPD hereby waive the right to file, and agree not to file or otherwise assert, any motion to dismiss (except for failure to state a claim), to stay or otherwise defer, a Federal Court Action alleging a failure to fulfill any obligation under this Agreement.

    d. The City and MPD agree to a trial of the Federal Court Action alleging a failure to fulfill any obligation under this Agreement commencing (a) 120 days after service of the summons and complaint as set forth above, or (b) the Court's earliest availability, whichever is later. The parties agree that discovery in the Federal Court Action alleging a failure to fulfill any obligation under this Agreement may begin within 15 days after service of the summons and complaint. The parties agree to submit all discovery requests and to schedule all depositions within 75 days after the service of the summons and complaint.

189. In the event, the Court finds that the City or MPD has engaged in a material breach of the Agreement, the parties hereby stipulate that they shall move jointly for the Court to enter the Agreement and any modifications pursuant to paragraph 194, as an order of the court and to retain jurisdiction over the Agreement to resolve any and all disputes arising out of the Agreement.

190. Nothing in this Agreement shall preclude DOJ, after complying with paragraph 185 (provision of notice and an opportunity to cure), from filing an action under the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. Section 14141) alleging a pattern or practice of excessive force in addition to or in lieu of the Federal Court Action described above. In the event that any such action is filed, the City and MPD hereby waive, agree not to assert, any defense to that action based on statute of limitations, laches, estoppel or any objection relating to the timeliness of the filing of such action. Nothing in this Agreement shall preclude DOJ from filing an action under the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. Section 14141) alleging a pattern or practice of unlawful conduct other than excessive force.

Nothing in this Agreement shall preclude DOJ from filing an action under any other provision of law.

191. Nothing in this Agreement shall be construed to require an expenditure, obligation, or contract in violation of the Anti-Deficiency Act, 31 U.S.C. §1341 et seq. The District's obligations shall be subject to the availability of appropriated funds (including funds obtained from grants and contracts) as follows:

a. To the extent made necessary by lack of funds, beginning for fiscal year 2002, the district may obtain deferral of compliance with an obligation of this Agreement until its next annual budget cycle if, as soon as the District knows or should know of the possibility of the event, it provides in writing to DOJ a statement which shows the following:

i. that it included in its annual budget act as adopted by the Council of the District of Columbia and submitted to the President for transmission to the Congress pursuant to section 446 of the D.C. Self-Government and Governmental Reorganization Act, D.C. Code §47-304 (1997), sufficient money to carry out such objective;

ii. that it made diligent efforts to obtain Congressional enactment of that part of the budget act;

iii. that it made diligent efforts to identify and utilize grant and contract funds available to the City from federal and private funding sources to meet obligations under this Agreement (DOJ will assist the City to identify potential Department of Justice grants, or other funding sources, for which MPD may be eligible to apply and will provide MPD with appropriate technical assistance regarding any related application process);

iv. that it expressly identified in the annual fiscal year adopted budget prepared for Congressional use such obligation (not necessarily to include reference to this Agreement as such) together with the amount of money tied to performing such obligation; and

v. that Congress acted expressly to eliminate such amount of money or to reduce it below the level necessary to perform the obligation, or that Congress made an across the board reduction in the appropriation of MPD, OCCR, or any other agency with specific obligations under this Agreement as shown in the Council's budget act without expressly saving such obligation and the across the board reduction, as applied proportionately to the amount of money shown in the adopted budget for such obligation left an insufficient amount to carry out that obligation.

b. The Mayor and MPD shall make diligent efforts to safeguard all

appropriated funds available to meet obligations under this Agreement from re-programming.

### E. Compliance

192. This Agreement is a public document and shall be posted on the websites of the City or MPD and of the Special Litigation Section of the Civil Rights Division of DOJ.

193. The City and MPD agree that they shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this Agreement.

### F. Modifications

194. The Parties may jointly agree, in writing, to modify this Agreement.

For the United States Department of Justice:

_____
WILLIAM R. YEOMANS
Acting Assistant Attorney General
Civil Rights Division


_____
STEVEN H. ROSENBAUM
Chief
Special Litigation Section
Civil Rights Division


_____
SHANETTA Y. BROWN CUTLAR
Special Counsel
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
P.O. Box 66400
Washington, D.C. 20035-6400
202-514-0195

DATED: June 13, 2001

For the District of Columbia and the Metropolitan Police Department:


_____
ANTHONY WILLIAMS
Mayor of the District of Columbia


_____

CHARLES H. RAMSEY
Chief of Police
District of Columbia Metropolitan Police Department

_____

TERRANCE W. GAINER
Executive Assistant Chief of Police
District of Columbia Metropolitan Police Department

_____

ROBERT RIGSBY
Corporation Counsel
Office of the Corporation Counsel
441 4th Street, NW, Suite 1060N
Washington, D.C. 20001

Approved as to form and legal sufficiency

Back to top of page

Send mail with questions or comments to webmaster@dcwatch.com
Web site copyright ©DCWatch (ISSN 1546-4296)