Report of James E. Bradley, Jr.
August 27, 2006


Qualifications

Prior to consulting in matters of police procedures and protocols in 1995, I served the

Metropolitan Police Department (MPD) for twenty-five years, finally retiring at the rank of

Detective Grade One in November 1995. During the course of my law enforcement career, I

was assigned to the Central Records Division, the First Precinct, the Communications

Division, the Traffic Division, the Police Training Academy, the Special Operations Division

Tactical Branch, the CDU Barricade Team, the Ninth Precinct Tactical Unit, the Ninth

Precinct Old Clothes Unit, the Ninth Precinct Vice Unit, the Fifth District "C" Section, the

Fifth District Tactical Unit, the Intelligence Division Domestic Security Branch, the

Intelligence Division Major Crimes Unit, the Intelligence Division Organized Crime Unit,

the Criminal Investigations Division Homicide Squad, the United States Department of

Justice Drug Enforcement Administration Group 4, Group 3 Group 8, and the Airport

Interdiction Unit at Dulles Airport and Washington's National Airport, the United States

Department of Justice Drug Enforcement Administration REDRUM Task Force and the

United States Department of Treasury Bureau of Alcohol, Tobacco and Firearms ACES Task

Force. In addition, I was detailed to the United States Secret Service to work protective

intelligence prior to the inaugurations of five United States Presidents and during the State

visits of Mikhail Gorbechev, Nelson Mandela, the Prince and Princess of Wales, Prince

Phillip of Great Britain, as well as other dignitaries. During the course of my law enforcement career, I held the positions of officer, investigator, detective grade two, detective grade one, special deputy United States Marshal and special agent.  I worked in an undercover capacity for the Narcotics Unit MPD, the Intelligence Division MPD, the Seventh District MPD, the Drug Enforcement Administration & the Bureau of Alcohol, Tobacco and Firearms.  While working various undercover assignments, I made purchases of firearms, stolen property and narcotics including PCP, marijuana, LSD, heroin, cocaine hydrochloride, cocaine base, hashish, hashish oil, and methadone, as well as other dangerous drugs in the Washington Metropolitan Area.

During my law enforcement career, I utilized the services of the MPD Electronic Surveillance Unit, the DEA Technical Services Branch, the United States Secret Service TSU and the Federal Bureau of Investigations Surveillance and Technical Unit.  As a control officer, I supervised or participated directly in more than one hundred undercover/informant purchases of narcotics and weapons. I have been the affiant for at least one hundred search warrants in DC Superior Court and US District Courts.  I have directed or executed over one hundred operation plans prior to undercover purchases, stakeouts/surveillances, informant purchases, search warrants, "jump outs" and arrests.  From 1970 to 1995, I was privy to briefings, handouts, rules, regulations, philosophy, and instructions from trained supervisory personnel of the Metropolitan Police Department, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco and Firearms, the United States Secret Service, the United States Customs Service, and the Federal Bureau of Investigation concerning undercover

purchases and the use of informants. Since my retirement in 1995, I have kept abreast of the standards and methods of drug enforcement investigation by communicating with supervisory special agents of the Drug Enforcement Administration, police officers assigned to the Narcotics and Special Investigations Unit, and detectives of the Homicide Squad. I have also maintained an up-to-date file of current manuals, General Orders, or Special Orders and Circulars including, but not limited to, the Metropolitan Police Department, the Prince Georges County, Maryland, Police Department, the Boston Massachusetts, Police Department, the Patterson, New Jersey Police Department, and the Howard County, Maryland Police Department; as well as handbooks and manuals for procedures and/or protocols Federal Bureau of Investigation and the US Drug Enforcement Administration. In 2006 I obtained, and thoroughly researched the up-to-date general orders of the Metropolitan Police Department that is distributed to all police officers of the Metropolitan Police Department.

I currently provide investigative support, expert testimony and litigation consultation to law firms, government agencies and individual clients. Since my retirement from active law enforcement, I have been qualified in federal, state and local courts as an expert in inventory searches (1997), Metropolitan Police Department General Orders (1998), Police Procedures (1998), Gunshot Wounds (1999), Drug Trafficking (1999), The National Standard of Care in Police Procedures (1999), Drug Interdiction and Controlled Deliveries (2000), Police Investigative Techniques and Procedures (2001), Police Procedures (2002), Drug Interdiction (2002), Identification of Controlled Dangerous Substances(2002), Narcotic

Investigations (2003), Witness Identifications (2003), Use of Informants (2003) Open Air

Drug Markets (2003) and again in Police Procedures (2003),(2004) and (2006). The United

States Court of Appeals for the District of Columbia Circuit stated in a published opinion

decided January 9, 2001, that I presented sufficient evidence to establish a National Standard

of Care in Police Procedures (No.00-7008). My curriculum vitae, as well as my fee schedule

are attached as Exhibit A.

<u>Preliminary Statement</u>

The opinions offered in this report are based upon review and evaluation of the facts and

materials available to date. Discovery is still incomplete, and the defendant officer has not

yet been deposed. My opinions are subject to supplementation and/or revision based on new

or additional information provided to or obtained by me in the course of this matter, and on

continuing analysis of the documents and information listed in this report in light of such

new information I may later receive. All of the opinions expressed herein are to a reasonable

degree of probability.

<u>Factual Background</u>

The following summary of the events leading up to, and including the assault, is based

on interviews, statements, police reports, and investigative opinions of investigating officials,

and is not meant to suggest that such facts are established or uncontested.

According to Nigel Austin (known herein as Plaintiff), and corroborated in part by

Metropolitan Police Department (known herein as MPD) reports, on August 25, 2005,

Plaintiff was arrested on US Warrant 86505 which charged him with Assault with a Deadly

Weapon. Plaintiff was taken into custody at his residence, located at 1341 Howard Road, SE,

Apt. 302, Washington, DC, by MPD Officer T. Whittington at approximately 0955 hours

(9:55 am) without incident. After processing, Plaintiff was transported from the Seventh

District (MPD) to the MPD Central Cell Block, located at 300 Indiana Avenue, NW,

Washington, DC. According to the MPD arrestee lock-up log, Plaintiff was logged in at

12:15 pm, and placed in cell #2 with at least two other detainees. Officer Don Thomas,

assigned to the MPD Central Cell Block, began his tour of duty on August 25, 2005 at 1300

hours; approximately forty-five minutes after Plaintiff had arrived at the cell block.

According to Officer Thomas in his MPD PD 119 statement, dated August 30, 2005, and

given under oath to Sergeant Lance Harrison, after receiving reverse Garrity warnings, he

(Thomas) retrieved Plaintiff from the cellblock in order to place an armband on him

(Plaintiff) and escort him (Plaintiff) to the processing area. Thomas stated that he placed

Plaintiff in the attorney/prisoner interview room, and walked toward a table to retrieve the

armband. It was at that time that he allegedly heard Officer Crowder, also assigned to the

MPD Cell Block, ask Plaintiff to step back into the (attorney/prisoner interview) room.

Thomas allegedly asked Plaintiff to step back into the room, at which time Plaintiff began to

walk away from him toward the steps without permission. Officer Thomas then grabbed

Plaintiff, to prevent him from leaving. Officer Thomas appears to be implying that Plaintiff

was attempting to flee.

Incidentally, Plaintiff's Expert has been inside the MPD Cell Block on hundreds of occasions, and is familiar with the configuration of the Cell Block. The steps that Officer Thomas is referring to in his statement lead up to the intake area and the cell area of the Cell Block and down to the processing area. The Cell Block is secure with entry through an electro-locked barred door from the gated Sallie-port into the intake area, and a one-way elevator at the south-end of the processing area behind the intake desk and beyond the supervisor's office. Escape from the Central Cell Block is virtually impossible.

Regardless, it was at that time Officer Thomas alleges that Plaintiff swung at him (Thomas). In his statement, Officer Thomas never alleged that Plaintiff actually struck him. However, Thomas does state that in an effort to protect himself, he swung back at Plaintiff with a closed fist striking him about the body, and causing Thomas and Plaintiff to fall to the floor at the bottom of the landing where he then restrained Plaintiff in handcuffs with the assistance of Officers Crowder, Hawkins, and civilian technician Lewis. Finally, Officer Thomas told Sergeant Harrison in his statement that after subduing Plaintiff, he was placed in a cell at which time Plaintiff complained of being injured. Thomas notified Officer Hawkins who executed a PD 313 (an MPD form which must be completed when an injured or sick prisoner is brought to the hospital), and sent Plaintiff to the hospital for medical attention.

When questioned by Sergeant Harrison concerning his assertion that he struck Plaintiff about the body, Officer Thomas abruptly changed his initial statement to "It was somewhere in the face."

Upon further questioning by Sergeant Harrison concerning whether or not the

Plaintiff was bleeding, Thomas reported "There was some blood, not a lot, about 3x5." (most

likely referring to the size of a 3x5 card). Plaintiff's Expert has viewed a picture of Plaintiff,

taken August 30, 2005, wearing the same clothes as those on the date of the incident, which

clearly shows the entire front of Plaintiff's shirt covered in dried red stains, that from the

Plaintiff's Expert's experience in investigating hundred of homicides and assaults, appears to

be dried blood.

When asked by Sergeant Harrison why Officer Thomas did not complete the required

use of force report, Thomas replied "I thought it had to be done if you used an issued service

weapon." When asked if he attended the 40 hour training, referring to the required MPD

use of force training, Thomas responded "I recall going to one of them." When asked by

Sergeant Harrison about whether Thomas was required to notify the watch commanders

regarding the injured prisoner, Thomas answered that he did not notify the watch

commander because the watch commander already knew. This is contrary to MPD

protocols. When asked by Sergeant Harrison about MPD procedures concerning the

monitoring of prisoners, Thomas stated that he did not know whether anybody kept track of

Plaintiff's well-being and the time he kept Plaintiff waiting before receiving medical

treatment. This is also against MPD protocol. When asked by Sergeant Harrison about the

time it took to transport the injured Plaintiff to the hospital; Thomas answered "I don't

know, we were very busy," again, a direct violation of MPD protocols and general orders.

Lastly, when asked why Plaintiff was not charged with Assaulting a Police Officer, since

Thomas stated that Plaintiff attempted to strike him, Thomas answered "I don't know . . . we have to restrain combative people almost daily." When asked about the cameras in the cell block by Sergeant Harrison, Thomas replied "The only one that work is the entrance door (sic)."

On August 28, 2005, Sergeant Whittington of the MPD Force Investigation Team responded to Greater Southeast Community Hospital to interview Plaintiff regarding Plaintiff's report of use of force by Officer Thomas. Sergeant Whittington, in his report, stated that "Mr. Austin (Plaintiff) was barely able to talk due to his injury." According to Whittington, Mr. Austin stated that he became loud and demanded to be returned to his cell after he was told that he would not be able to make the cut-off at court, thereby requiring him to stay at the Central Cell Block another day. It was at that time, according to Plaintiff, that he was struck in the face by a black male police officer (later identified through investigation as Officer Thomas). Plaintiff told the investigating Sergeant, that although he complained of his injuries immediately after being struck by Officer Thomas, he received no medical assistance until 8:00 pm that night. This is a direct violation of MPD General Orders and protocols. In fact, according to Plaintiff, he was moved to another cell, and his blood was cleaned up from the floor of his original holding cell.

During the course of my evaluation of the available evidence in this matter, I interviewed Plaintiff regarding his views of what had transpired at the MPD Central Cell Block on August 25, 2005. Candidly, Plaintiff admitted that he was upset that he was not going to make the cut-off for court on the August 25, 2005, and he admitted telling Officer

8

Thomas that he wanted to go back to his cell, lacing his request with profanity. However, at this point, Plaintiff's recollection of the events that culminated in his jaw being broken differs greatly from that of Officer Thomas. Plaintiff clearly remembers after demanding to be brought back to his cell that an officer that the Plaintiff accurately described physically as Officer Thomas walked up to him and asked "What did you say?" When Plaintiff repeated his statement, he struck him in the face with such force and energy that Plaintiff's jaw was broken. Plaintiff, although badly injured at the time, recalled identical facts and circumstances during my interview in 2006 as he had recounted in his MPD F.I.T. interrogation while he was at Greater Southeast Community Hospital. Such facts and circumstances are clearly supported by the physical facts in this incident.

Opinions, Grounds and Bases

Since I have been unable to review all defendant officer statements, either written or at deposition, all pertinent police reports, internal memos, all general orders, manuals and protocols, the following opinions are based on my review and analysis of only those materials and information available to me as of August 25, 2006. As new information becomes available to Plaintiff, I anticipate supplementing this report accordingly.

My familiarity with and review of applicable police procedures, and my years of investigative experience in connection with police procedure and criminal violations, permits me to render opinions, even in light of missing reports and documentation in this matter. Again, because fact discovery is incomplete and all depositions have yet to be taken, this report is necessarily preliminary in nature and may require supplementation.

Summary of Opinions

It is an unvarying rule of police procedure that the protection of prisoners in police

custody is fundamental. Law enforcement agencies for decades have tried to remove the stain

of the past when prisoner mistreatment was allegedly commonplace.  Law enforcement

agencies nationally, and the MPD locally, have set forth stringent guidelines, in the forms of

general orders, special orders, manuals, circulars, and directives, to prevent exactly the type

of treatment that Nigel Austin received while in the custody and under the protection of the

MPD generally, and Officer Don Thomas specifically. Such general orders, special orders,

manuals, circulars, and directives include:

1.    MPD Special Order 93-28, dated December 3, 1993, which states in

        part that: "revisions to this form have been made in response to an

        immediate need to capture and document specific information that

        establishes better accountability and ensures accurate and concise

        reporting concerning the medical treatment of ill or injured prisoners

        while in police custody."  This special order was in effect at the time

        Plaintiff was assaulted, and was obviously ignored by Officer Thomas.

2.    Circular CIR 02-12, dated October 7, 2002, introduced seven (7) new

        general orders that resulted in a Memorandum of Understanding

        between the MPD and the Department of Justice, dated June 13, 2001.

        Those orders, specifically General Order 901.7, require a use of force

        report to be executed when actions, such as the assault by Officer

Thomas against Plaintiff, occur.  These general orders and circulars were in effect on August 25, 2005, and were obviously ignored by Officer Thomas.

3.      Circular CIR-02-13, dated October 7, 2002, identifies PD 901-HC as the report that Officer Thomas was required to fill out after his use of force against Plaintiff.  Officer Thomas ignored this protocol by failing to fill out such a report.

4.      Title 6A, of the DC Municipal Regulations (Formally the MPD Manual) requires in Section 202, "Standards of Conduct," that each member of the force shall: (a) maintain decorum and command of temper; (b) be patient and discreet; (c) use no harsh, violent, profane, or insolent language; (d) be courteous and considerate under all circumstances. Title 6 was in effect at the time of the assault against the Plaintiff on August 25, 2005.

5.      General Order 201-26 issued November 10, 1976, states in part: "when questioned by superior officers in connection with matters relating to the official business of the police department, subordinate members shall respond truthfully."  General Order 201-26 was in effect during the questioning of Officer Thomas by Sergeant Harrison on August 30, 2005.

6.        General Order 304-8, dated April 30, 1992, states under Part 1,
"Responsibilities and Procedures for Members of the Department," A.
Policy-7: "members investigating and/or reporting crimes which
require the services of either a CSES or District Crime Scene Officer
shall: (a) Protect the crime scene in order to prevent the destruction or
contamination of evidence." This general order was in effect when
Officer Thomas and/or other officers of the MPD destroyed evidence of
an assault against Plaintiff by Officer Thomas.

7.        General Order 502-7 issued January 17, 1975, states in Part 1-A,
"Medical Treatment:" (1) "Persons held in departmental confinement
facilities who claim a need for medical treatment due to any injury or
disease shall be immediately transported to a hospital for examination
and treatment." This General Order was in effect when Plaintiff
complained of his injury to Officer Thomas, who denied immediate
medical assistance for Plaintiff.

8.        General Order 601-2, issued during the management of Chief Maurice
T. Turner, Jr. states that all potentially discoverable material is to be
preserved. This General Order was in effect when officials of the MPD
Central Cell Block apparently failed to secure and preserve video
surveillance tape recorded at the cell block on August 25, 2005.

The actions by Officer Thomas, his co-workers, and the cell block supervisors of the Metropolitan Police Department, bring disgrace and embarrassment upon the MPD, as well as clearly demonstrate a willful and deliberate violation of National Standards of Care and nationally accepted protocols in the handling and protection of persons in custody of law enforcement. Officer Thomas violated his oath as a police officer when he viciously assaulted the Plaintiff, without provocation, causing his jaw to be broken. The assault against Nigel Austin, the cover-up of evidence, and perjured statements under oath that Officer Thomas provided investigators of the MPD who were tasked with investigating these offenses constitutes deliberate, across-the-board violations of criminal law, fundamental rules of police procedure, and National Standards of Care.

For example, careful review of Thomas' statement reveals that he is obviously attempting to make the evidence fit his purported version of the events. Time and time again, Thomas recanted earlier statements when confronted with evidence during the interview with Harrison, most specifically with regard to where he struck Plaintiff. Additionally, Thomas' allegations that Plaintiff was heading down the steps immediately prior to the assault, seem to implausibly suggest that Plaintiff was somehow trying to flee captivity.

Further, all physical evidence and facts are completely contrary to Thomas' assertions as to the amount of blood that Plaintiff lost after the assault. Pictures of the shirt that Plaintiff wore at the time of the assault clearly belie Thomas' statements.

Officer Thomas presumably lied when he told the investigator that he did not know that he was required to complete a use of force report after he assaulted and bloodied Plaintiff, as this was basic police procedure that an officer with twenty years of experience would know. Additionally, all known facts are completely contrary to Thomas' assertions that Plaintiff showed no signs of injury or distress when he checked on him several times after the assault, and that the Plaintiff was cursing at him (Thomas) every time he checked on Plaintiff's well being. It seems incredible to believe that Officer Thomas' comments were so contrary to those of Sergeant Whittington, who reported that Plaintiff was so badly injured three days after being beaten by Thomas that Plaintiff "was barely able to talk."

What is also disturbing when examining the facts of this case is the apparent complicity of other employees of the MPD who assisted in the assault of Plaintiff, and conspired to cover-up evidence and destroy a crime scene by moving Plaintiff to another cell, then cleaning up the bloody cell he had been occupying, before investigating officers of the MPD could photograph and gather evidence from the scene. The delay in transporting the Plaintiff to a hospital for medical attention is probably a direct result of the conspirators need for time to alter the crime scene. When examining the evidence, statements, and reports in this matter it is unmistakably clear whose story changes, whose actions violated national standards and MPD protocols and procedures, and who was beaten, and who did not suffer an injury. Finally, the absence of any charges against Plaintiff for Plaintiff's alleged actions against Officer Thomas are very telling as to the truthfulness of Thomas' claims that Plaintiff attempted to strike him. Attention should also be paid to the duty owed by Thomas

to Austin specifically, and all prisoners under his control generally. Nothing in this report opines that Officer Thomas has an obligation to the Plaintiff or any other persons under his custody to be assaulted. But the facts presented by Thomas never indicate that he was ever assaulted, in fact, the lack of an assault upon his person, and his egregiously violent behavior toward Mr. Austin, is indicative of his failure to adhere to the nationally accepted "Spectrum of Force" principle, that is the standard operating procedure of the Metropolitan Police Department. If we were to believe that Mr. Austin walked away from Officer Thomas, and even if we were to accept that Mr. Austin swung, or made an aggressive gesture toward Officer Thomas, Thomas' escalation to his physical assault against Mr. Austin, failed the test of the "Spectrum of Force" model. Instead of using "verbal commands" or even "soft hands," Thomas immediately elevated his response in this expert's opinion, inappropriately and excessively. Thomas actions clearly rise to "unnecessary and wanton severity in arresting or imprisoning any person", thereby, under the DC Code Section 5-123.02, Thomas should be charged with assault and battery. Finally, in summation, it appears that Thomas breached the national standard in his handling of Mr. Austin by assaulting him, failing to have Mr. Austin receive medical attention after Thomas assaulted him, covering up the evidence of his (Thomas') assault against Mr. Austin, failing to make the appropriate notifications by executing a use of force report, and by making false statements to superiors investigating his actions in an attempt to hide his unlawful actions.

It is Plaintiff's Expert's opinion that Thomas' false statements to investigators were made to cover-up both his unlawful assault against Mr. Austin, and refusal to timely obtain

medical treatment by confining him in a jail cell for an extended period of time.   Such acts and omissions were in violation of MPD directives and Plaintiff's constitutional rights, and occurred while Officer Thomas was acting under the color, authority and duties, of a sworn police officer of the Metropolitan Police Department, Washington, DC.

<u>Materials Reviewed</u>

1. Boston Massachusetts Policy and Procedure General Orders

2. Metropolitan Police Department, Washington, DC General Orders

3. Prince Georges County, Maryland General Orders

4. Howard County, Maryland General Orders

5. Patterson, New Jersey Police Manuals and Protocols

6. MPD "Probable Cause/Arrest Procedures"

7. Elements of Police Supervision

8. Title 42 Chapter 21 of The United States Code Section 1983

9. Portland Oregon Manual of Policy & Procedure

10. United States Department of Justice Principles for Promoting Police Integrity

11. MPD Manual

12. PD 113 CCN# 113-184

13. PD 119 CCN# 113-184 (Thomas)

14. United States District Court "Defendant's Initial Disclosures"

15. PD 854 Case 05-1553

16.   MPD IAD Complaint Summary Sheet 05-1553 (Lt. Taylor)

17.   MPD IAD Complaint Summary Sheet 05-1553 (Sergeant Mack)

18.   PD 668 Evidence Report

19.   PD 775 "706" (2) pages

20.   PD 119 Officer Bowman

21.   PD 119 Officer Richardson

22.   On Scene Force Assessment Form (16) pages

23.   Prisoner Log 08/25/2005 (2) pages

24.   Handwritten notes of prisoners log

25.   MPD OPR Memorandum undated  FIT Case X-O-05-180,CS-05-1553

26.   Superior Court US v. Nigel Austin "Release Order" (2) pages

27.   Emergency Physician Record (2) pages

28.   DC Code Section 5-123.2

29.   MPD General Order#901.7      (attached)

30.   MPD General Order#120.23      (attached)

31.   MPD General Order#901.11      (attached)

32.   MPD General Order#901.08      (attached)

33.   MPD General Order#901.09      (attached)

34.   MPD General Order#601.2      (attached)

35.   MPD General Order#502.7      (attached)

36.   MPD General Order#502.1      (attached)

37.    MPD General Order#304.15        (attached)

38.    MPD General Order#304.8         (attached)

39.    MPD General Order#201.26        (attached)

40.    MPD General Order#120.23        (attached)

41.    MPD Special Order#97-31         (attached)

42.    MPD Special Order#99-11         (attached)

43.    MPD Special Order#97-34         (attached)

44.    MPD Circular#02-13              (attached)

45.    MPD Circular#02-12              (attached)

46.    MPD Special Order#93-28         (attached)

47.    MPD Special Order#02-09         (attached)

48.    MPD HQRTS. Teletype 03/01/02 (attached)

I expect to review additional information and documents, including information and

documents that may become available through discovery and the reports of other witnesses

and/or expert witnesses. The opinions offered in this report  are subject to refinement or

revision based on continuing analysis of the documents and information listed in this report,

as well as new or additional information which may be provided to or obtained by me in the

course of this matter.

8/27/06

_____
James E. Bradley, Jr.

My fee in this matter is $250/hour.
$2500/day for site visits. (Plus expenses)
$2500/day for depositions. (Plus expenses)
$2500/day for trial. (Plus expenses)

All fees are fixed unless otherwise specified.

# JAMES E. BRADLEY, JR.
## LITIGATION CONSULTANT

ESTABLISHED 1995
Washington, D.C., Maryland, Virginia, and Delaware
202-297-0729

## EXPERIENCE

- 1995-2006    James E. Bradley, Jr. Consulting, a full service private investigation and litigation consulting organization
- 1989-1998    Contract Background Investigator, US DOJ/DEA
- 1996-1998    Contract Background Investigator, NLRB
- 1999-2006    Special Background Investigator, Department of Defense

## METROPOLITAN POLICE DEPARTMENT DETAILS AND PROMOTIONS

| | |
|---|---|
| 1970-1971 | Special Operations Division, Tactical Branch. |
| 1971-1973 | Ninth Precinct Tactical and Vice Unit. |
| 1973 | Promoted to Investigator, Intelligence Division. |
| 1974 | Promoted to Detective II, Intelligence Division. |
| 1976 | Detailed to the United States Secret Service, PI |
| 1978-1984 | Detailed to the United States Department of Justice, Drug Enforcement Administration, Special Deputy U.S. Marshal. |
| 1985-1988 | M.P.D./O.C.B. Intelligence Unit & Hate Crimes Unit. |
| 1988-1989 | Detailed to US Treasury, B.A.T.F. |
| 1990 | Transferred to Criminal Investigations Division, Homicide. |
| | Detailed to the United States Drug Enforcement Administration REDRUM Task Force. |
| 1991 | Promoted to rank of Supervisory Detective Grade 1. |
| 1995 | Retired as the Senior Investigator in the REDRUM Task Force. |

## AWARDS AND COMMENDATIONS

Administrator's Award, Drug Enforcement Administration 1995
US Attorney's Award, (4) 1996, 1995, 1994, and 1984
REDRUM Task Force Award, 1995
Director's Award, US Treasury, (2) 1991, 1989
Special Agent in Charge Award, Drug Enforcement Administration, 1992
Administrator's Commendation, Drug Enforcement Administration, 1984
A.C.E.S. Award, US Treasury, 1989
Australian Police Award of Merit, 1983
D.E.A. Task Force Award of Excellence (2) 1979, 1982
Secretary of State's Award, George Schultz, 1987
Scotland Yard Commendation
Special Agent In Charge Award, Drug Enforcement Administration, 1994
*Fifty other assorted commendations and awards.*

FORMAL LAW ENFORCEMENT TRAINING
Metropolitan Police Academy
Metropolitan Police, Criminal Investigations School
Federal Bureau of Investigation, Criminal Investigation School
Drug Enforcement Administration, Training School
US Department of Justice, Interdiction School
Federal Bureau of Investigation, Death Investigation School
IPTM Narcotics Academy
IPTM Investigators School
United States Secret Service, Protective Intelligence School
United States Treasury, Criminal Investigations School
Maryland State Police, Hostage S.T.A.T.E. Training
Metropolitan Police Interrogation Seminar
Certified Voice Stress Examiner
Drug Enforcement Administration, Narcotics and Dangerous Drugs
Federal Bureau of Investigation, Firearms Training
District of Columbia, Medical Examiners Certified Investigator

SERVED AS AN INSTRUCTOR IN INVESTIGATIVE METHODS FOR:
The Metropolitan Police Department
United States Park Police
Maryland State Police
Virginia State Police
Pennsylvania State Police
Connecticut State Police
New Jersey State Police
New York State Police
Institute of Police Management, University of North Florida
McGill University, Toronto, Canada

ACTED AS A GUEST LECTURER FOR:
University of Maryland Criminology Department, 1999-2002

MOST RECENT EXPERT QUALIFICATIONS
- 1997 Inventory Searches, Judge Hogan, US District Court (DC)
- 1998 MPD General Orders, Judge Kotelly, US District Court (DC)
- 1998 Police Procedures, Judge Gardner, Superior Court (DC)
- 1999 Gunshot Wounds, Judge Wynn, Superior Court (DC)
- 1999 Drug Trafficking, Judge Sullivan, US District Court (DC)
- 1999 National Standard of Care/Police Procedures, Judge Green, US District Court (DC)
- 2000 Drug Interdiction and Controlled Deliveries, Judge Roberts, US District Court (DC)

- 2001 National Standard of Care/Police Procedures, Court of Appeals (DC Circuit)
- 2001 Police Investigative Techniques and Procedures, Judge Harrington, Circuit Court, (Montgomery County, Maryland)
- 2002 Police Procedures, 2002 Drug Interdiction, 2002 Identification of CDS, Judge Loney, Circuit Court (Anne Arundel County, Maryland)
- 2002 Police Procedures, 2002 Narcotics/Investigation, Judge Diaz, DC Superior Court
- 2002 Surveillance & Investigation Procedures, US District Court (MD)
- 2003 Identification of Open Air Drug Markets, Judge Kessler, US District Court (DC)
- 2003 Drug Trafficking, Open Air Drug Markets, Informants, Judge Turk, US District Court (WDVA)
- 2004 Informants, Open Air Drug Markets, Narcotics, Judge Bates, US District Court (DC)
- 2004 Informants, Open Air Drug Markets, Narcotics, Judge Barnes, US District Court (MD)

- 2004 Police Procedures, Informants, Cooperating Individuals, Judge Jones US District Court (WDVA)

- 2006 Surveillance Procedures, Police Procedures, Judge Lombardi, Circuit Court, Prince Georges County, Maryland.


## DEATH PENALTY EXPERIENCE

| | | |
|---|---|---|
| 1) | 1998 Eastern District of Virginia | *US v. Johnson & Johnson* |
| 2) | 1998 District of Columbia | *US v. Carson* |
| 3) | 1999 Eastern District of Virginia | *US v. Young* |
| 4) | 2000 Eastern District of Virginia | *US v. Thomas* |
| 5) | 2000 District of Columbia | *US v. Moore* |
| 6) | 2001 District of Columbia | *US v. Orleans-Lindsey* |
| 7) | 2001 Alexandria, Virginia | *Commonwealth v. Murphy* |
| 8) | 2001 Eastern District of Virginia | *US v. Lentz* |
| 9) | 2003 District of Maryland | *US v. Taylor* |
| 10) | 2004 Western District of Virginia | *US v. Church* |
| 11) | 2004 Western District of Virginia | *US v. Carpenter* |


## EXPERT QUALIFICATIONS IN TRIAL

| | | |
|---|---|---|
| *US v. Taylor* | 97-cr-321 | US District Ct. DC |
| *US v. Brown-Bey* | 97-cr-498 | US District Ct. DC |
| *US v. Briscoe* | F-10404-95 | Superior Ct. DC |
| *US v. Kelly* | F-01704-98 | Superior Ct. DC |
| *US v. Thompson* | 98-cr-406 | US District Ct. DC |
| *Butera v. D.C.* | 98-cv-2794 | US District Ct. DC |
| *US v. Faulk* | 99-cr-289 | US District Ct. DC |
| *Butera v. D.C.* | 00-7008 | US Court of Appeals (DC) |
| *State v. Maiyegun* | 92204 2001 | Circuit Ct. Montgomery Co. Maryland |
| *State v. Seldon* | Motion 2002 | Circuit Ct. Anne Arundel, Co. Maryland |

| *US v. Valdez* | 2002 | Superior Court of the District of Columbia |
| *Romjue v. PG County* | 2002 | US District Ct. MD |
| *Lindsay v. D.C.* | 2003 | US District Ct. DC |
| *US v. Harris* | 2003 | US District Ct. WDVA |
| *US v. Hamilton* | 2004 | US District Ct. DC |
| *US v. Taylor* | 2004 | US District Ct. MD |
| *US v. Church* | 2005 | US District Ct. WDVA |
| *Jones v. Jones* | 2006 | Circuit Court, PGCO, Maryland |

## PREPARED OPINIONS AND/OR DEPOSITIONS (6 years)

- *Brewington v. DC* (Civil 1999), opinion, American University Law Clinic (District of Columbia)
- *Butera v. DC* (Civil 2000), opinion & deposition, Peter Grenier (District of Columbia)
- *Skoumal v. MANS T/Force* (Civil 2000), opinion & deposition, Larry Leck (Northern District of Illinois)
- *Heavner v. West Virginia* (Civil 2001), opinion & deposition, Laura Rose (West Virginia Circuit Court)
- *West Virginia v. Rankin* (Criminal 2001), opinion, Laura Rose (Magistrates Court, Martinsburg, W.Va.)
- *Liser v. District of Columbia* (Civil 2001), opinion & deposition, Billy L. Ponds/Steve Kiersch
- *Romjue v. PGCO, Maryland* (Civil 2001), opinion, Andrew Murray
- *Jones v. PGCO, Maryland* , (Civil 2001), opinion & deposition, Rhonda Weaver
- *Lindsey v. District of Columbia* (Civil 2001), opinion & deposition, Gary Kohlman
- *Hayden v. District of Columbia* (Civil 2002), opinion & deposition, James Pressler/Andrea Maldonado
- *Villeda v. PGCO, Maryland* (Civil 2002), opinion, Henry Escoto
- *Stebbins v. District of Columbia* (Civil 2002), opinion, Steve Kiersch
- *US v. Saunders* (Criminal 2002), opinion, Billy L. Ponds, *Eastern District of Virginia*
- *Donahue v. Howard County, Maryland* (Civil 2004), opinion & deposition, Barry Coburn
- *Rivera v. Montgomery County, Maryland* (Civil 2005) opinion & deposition, Ken Robinson
- *Diaz v. MNCPPC* (Civil 2006), opinion & deposition, Clifton Mount

## FEES (06/01/06)

Mr. Bradley requires a retainer in the amount of $5,000.00 to placed in an escrow account and drawn down against hourly rates and expenses.

| Hourly Rates: | $250.00/hour |
| Site visits: | $2,000.00/day |
| Depositions: | $3,500.00/day |
| Trial Testimony: | $2,000.00/day |