# GENERAL ORDER



| | |
|---|---|
| **Title** | |
| **Unbiased Policing** | |
| **Series / Number** | |
| **GO–OPS-304.15** | |
| **Effective Date** | **Distribution** |
| **June 6, 2002** | **A** |

## DISTRICT OF COLUMBIA

I.  Background...................... Page 1
II.  Policy ............................... Page 1
III.  Definitions............. ........ Page 1

IV.  Procedural Guidelines .........Page 2
V   Cross References...............Page 5

## I.    BACKGROUND

According to recent census statistics, more than one quarter billion (250,000,000) persons live in the Unites States. A substantial and growing segment of the population is composed of racial and ethnic minorities. The Metropolitan Police Department (MPD) recognizes that the capacity of law enforcement personnel to provide service and enforce laws in a fair and equitable manner regarding minority groups has been scrutinized, on a national level, in the community, in the media, and in the courtroom. This concern demonstrates a need for a policy that clearly addresses the issue of biased policing (often referred to the more narrow term "racial profiling").

The equal protection of human rights as specified in the District of Columbia Human Rights Act is a fundamental responsibility of law enforcement personnel. As such, clearly defined standards that guide member conduct in all interactions between the police and the public will aid and benefit the member, the Department and community. The Department has established standards of acceptable conduct that are applicable to all interactions between police and the public, including but not limited to, providing assistance to persons who are victims of crime, investigative and enforcement activities. Moreover, these standards seek to advance the goal of law enforcement to maintain the public trust.

## II.   POLICY

The policy of the Metropolitan Police Department is to treat all persons equally, without bias or prejudice. Biased policing, as hereafter defined, is prohibited. (CALEA 1.2.9. a)

III.    DEFINITIONS

When used in this directive, the following terms shall have the meanings designated:

1.    Biased policing - the practice of a law enforcement officer singling out or treating differently any person on the basis of race, color, ethnicity, national origin, religion, age, gender, gender identity, sexual orientation, family responsibilities, disability, educational level, political affiliation, source of income, place of residence or business of an individual. More specifically, this applies when the practice is the determining factor in deciding how to respond to requests for assistance or otherwise to provide services, or in selecting which individuals to subject to routine investigative activities, or in deciding upon the scope and substance of law enforcement activity.  (Biased policing does not include reliance on such characteristics in combination with other identifying factors when the law enforcement member is seeking to apprehend a specific suspect and any of the above characteristics is part of the description of the suspect).

2.    Reasonable suspicion -- A combination of specific facts and circumstances that would justify a reasonable officer to believe that a certain person had committed, is committing, or is about to commit a criminal act; more than a hunch or mere speculation but less than probable cause necessary to arrest.

IV.    PROCEDURAL GUIDELINES

A.    Policing Impartially (CALEA 1.2.9-a)

1.    Members shall use the standard of reasonable suspicion or probable cause, in accordance with the Fourth Amendment of the United States Constitution, (unreasonable search and seizure) as the basis for:

a.    Investigative stops;
b.    Traffic stops;
c.    Arrests;
d.    Searches; and
e.    Property seizures and forfeiture efforts.

2.    Members shall be able to articulate specific facts and circumstances that support reasonable suspicion or probable cause.

3.    Members may take into account the listed characteristics of a specific suspect or suspects based on trustworthy, relevant information that links a person of a specific race/ethnicity to a particular unlawful incident(s).

4.    Except as provided in Part A, 3 herein, members shall not:

    a.    Consider any of the herein listed characteristics in establishing either reasonable suspicion or probable cause.

    b.    Consider any of the listed characteristics in deciding to initiate even those nonconsensual encounters that do not amount to legal detentions or to request consent to search.

    c.    Consider any of the listed characteristics in deciding how to respond to requests for assistance or for the provision of services or otherwise in making law enforcement decisions.

B.    Standards and Conduct

Upon conducting citizen or vehicle stops, members shall comply with the provisions outlined in GO – OPS – 304.10 (Police-Citizen Contacts, Stops, and Frisks) and GO – SPT- 303.1 (Traffic Enforcement); and

1.    Be courteous and professional. Officers are prohibited from using language, or displaying symbols and gestures, that are commonly viewed as offensive to, or are indicative of bias towards any group.

2.    Introduce himself/herself to the citizen (providing name and district/division affiliation) and state the reason for the stop as soon as practical, unless providing this information will compromise officer or public safety. (When conducting vehicle stops, the member shall provide this information before asking the driver for his or her license and registration.)

3.    Ensure that the detention lasts no longer than necessary to take appropriate action for the known or suspected offense, and that the citizen understands the purpose of reasonable delays. If the officer determines that the reasonable suspicion was unfounded, he/she should explain this to the person detained.

4.    Provide his/her name and badge number when requested, in writing or by presenting a business card.

Note: Providing citizens with an explanation for why they were stopped fosters better relations with the community and reduces the perception of bias on the part of police.

C.    Concurrent Jurisdiction with the Office of Citizen Complaint Review (OCCR)

D.C. Law 12-208, (D.C. Official Code § 5-1103 et seq.) established the Office of Citizen Complaint Review for the purpose of independent and effective review of complaints against police officers filed by citizens. D.C. Official Code § 5-1107 establishes the authority of the OCCR to investigate certain citizen complaints, including allegations of biased policing as defined herein. Further, D.C. Official Code § 5-1114 authorizes the MPD to investigate complaints falling under the investigative authority of OCCR in instances when the complaint has not been filed with, or reported to, OCCR.

D.    Office of Professional Responsibility

The Office of Professional Responsibility shall:

1.    Monitor all PD Forms 99 (Citizen Complaint) alleging biased policing.

2.    Track citizen complaints alleging biased policing using the Early Warning Tracking System.

E.    Commanding Officers

Commanders Officers shall:

1.    Ensure that all personnel under his/her command are familiar with this policy.

2.    Ensure that supervising officials observe the conduct of officers to ensure biased policing practices (or racial profiling) are not used.

3.    Ensure that instances of non-compliance with this general order are documented according to GO - PER - 201.20 (Performance Rating Plan for Sworn Members) and incorporated into the affected member's annual performance evaluations where necessary or appropriate.

4.    Ensure that violations of this policy result in disciplinary action as set forth in GO – PER – 120.21 (Disciplinary Procedures and Processes)

F.    Supervisors

Supervising Officials shall:

1.    Familiarize members with the contents of this general order through roll call discussions, PSA team meetings, and in-service training. (CALEA 1.2.9 – b)

    2.      Conduct an immediate investigation into circumstances surrounding instances of biased policing upon observation or report of such an incident.

    3.      Recommend appropriate disciplinary action in accordance with GO-PER –120.21 (Disciplinary Procedures and Processes) (CALEA 1.2.9 – c)

    4.      Counsel members where necessary or appropriate.  (CALEA 1.2.9 – c)

    5.      Document compliance or non-compliance with this general order using PD Form 62-E (Optional Documentation Form) and incorporate the documentation into the affected member's annual performance evaluation as set forth in GO – PER -201.20 where necessary or appropriate.

G.     Training

The Director, Maurice T. Turner, Jr. Institute of Police Science, in consultation with the Senior Executive Director, Office of Organizational Development, shall develop and conduct regular roll call and in-service training for all sworn members on the application of this policy to police practice including all legal aspects of biased based profiling issues.  (CALEA 1.2.9 – b)

## V.    CROSS REFERENCES

    1.      GO – OPS – 304.10 (Police – Citizen Contacts, Stops, and Frisks)

    2.      GO – SPT – 303.1 (Traffic Enforcement)

    3.      GO – SPT – 602.01 (Automobile Searches and Inventories)

    4.      GO – PER – 120.25 (Citizen Complaints)

    5.      SO – 01-01 (Office of Citizen Complaint Review and the Citizen Complaint Review Board)

    6.      SO – 92-18 (Early Warning Tracking System)

**UNBIASED POLICING (GO-OPS-304.15)**    6

7.    GO – PER – 201.20 (Performance Rating Plan for Sworn Members)

8.    GO – PER – 201.26 (Duties, Responsibilities and Conduct of Members of the Department)

Charles H. Ramsey
Chief of Police

CHR:NMJ:MAR:pas

# GENERAL ORDER



| | |
|---|---|
| **Title** | Transportation of Prisoners |
| **Series / Number** | GO - PCR - 502.01 |
| **Effective Date** January 12, 2001 | **Distribution** A |
| **Replaces** | General Order 502.1 (Processing Prisoners) |

## DISTRICT OF COLUMBIA

I. Background ......... Page  1
II. Policy .............. Page  1
III. Definitions .. ...... Page  1-2

IV. Rules .................................. Page  2
V. Regulations ..................... Page  2-3
VI. Procedural Guidelines Page  3- 8

## I.  Background

The majority of successful escapes from police custody occur during the time of transport.  Examination of previous escapes and attempted escapes reveal that prisoners take advantage of the member's failure to adhere to the regulations related to prisoner transportation and handling.  Members in those circumstances may have also relied too heavily on the security of restraining devices.  Adherence to a clear set of procedures will greatly reduce the attempt or successful escape of a prisoner from custody.

## II.  Policy

The policy of the Metropolitan Police Department is that members shall take the necessary precautions while transporting prisoners or those persons otherwise in police custody, in a manner that ensures their safety and that of the member of the community and the person in custody.

## III.  Definitions

A.  **Official** - any member of the Metropolitan Police Department (MPD) the rank of Sergeant or above.

B.  **Members** - sworn police officers of the Metropolitan Police Department.

C.  **Transport Vehicle** - the vehicle used for transporting a prisoner from one point to another.  The transport vehicle is a patrol car equipped with a barrier, or a specially designed prisoner transport vehicle, such as a bus or van.

D.  **Field Search** – the removal of coats, jackets or outer clothing to facilitate the search of these garments and those clothes the prisoner is wearing such as

patting down the prisoner and reaching into and squeezing their pockets and
items within their possession such as handbags, pocket books, book bags, e

**E. Strip Search** - having a prisoner remove or arrange his/her clothing to allow a
visual inspection of the genitals, buttocks, anus, breasts and undergarments.

**F. Squat Search** - having a prisoner crouch or squat while their undergarments and
other clothing are removed, exposing the genital and anal area. This type of
search permits contraband or other material concealed in the genital area to
become visible or dislodged.

**G. Body Cavity Search** - the searching of a prisoner's genital and/or anal cavities *to*
retrieve contraband, weapons or evidence of a crime that may be concealed within
these areas.

**H. Restraining Devices** - equipment used to restrain the movement of a subject, such
as handcuffs, flex-cuffs, ankle chains or restraining straps.

**I. Prisoner** - any person who has been arrested and is in the custody of the MPD

**J. Disabled Prisoner** - a prisoner who has a physical condition that restricts their
movement or mental condition, which hinders their ability to comprehend

**K. Security Risk Prisoners** - prisoners who have a history of attempting suicide
escaping from police custody, under the influence of alcohol or other drugs, as
as those who are violent and self-destructive and in apparent need of mental
observation.

## IV.   RULES

**A.** Members will use the minimum amount of force necessary to restrain a prisoner

**B.** Members who have custody of a prisoner and observe any visible injuries and/or
life-threatening condition will contact an official and immediately arrange for
medical treatment. (See General Order 502.7 Medical Treatment and
Hospitalization of Prisoners)

## V.   REGULATIONS

**A.** Prisoners shall be treated in a humane manner. Members shall not use harsh,
violent. or obscene language toward prisoners.

**B.** Members shall keep the prisoner under continuous observation and stay within a
reasonable distance to maintain constant control when moving the prisoner from
one location to another. until the prisoner has been placed in a cell

**C.** Members shall use restraints, such as handcuffs, to prevent a prisoner from
injuring anyone and escaping. Also, leg restraints and flex cuffs may be used
secure a prisoner who violently resists arrest.

D.   Members transporting a prisoner shall conduct a field of search on the scene for their own safety and the safety of others at the time of arrest, unless the situation warrants immediate transport for the safety of the officer or prisoner. Any weapons, evidence or contraband recovered can be used as evidence. (CALEA 71 1.1)

E.   Transporting Prisoners.

   1.   Members shall thoroughly search the vehicle they are assigned at the beginning and at the end of their tour of duty.  In addition, transport vehicles shall be searched prior to and after each transport assignment  Members finding property and/or contraband will immediately secure it and notify an official.  (CALEA 71.1.2)

   2.   Members shall use caution when transporting suspected mentally ill persons due to the potential threat of destructive and/or dangerous behavior to themselves and/or the transporting members.  The transporting member will be responsible for taking additional safeguards to ensure a safe transition and notify the receiving agency of any medical problems and potential security hazards the prisoner presents. (CALEA 71.1.6-E) (See General Order OPS 308.4 on Handling of the Mentally Ill)

   3.   If the suspected mentally ill person is violent, but not under arrest members shall use discretion in transporting the person in a transport vehicle.  The member should request a transport wagon if the mentally ill person's violent behavior has escalated.

VI.   PROCEDURAL GUIDELINES

A.   Handcuffing a Prisoner.  (CALEA 71.2.1)

   1.   Every person arrested and prisoners, including juveniles, handled by members of this Department shall be handcuffed.  However, for suspected mentally ill person not under arrest, members shall use the minimal restraint necessary to avoid further aggravation or unnecessary injury of the person.  As a general rule curfew violators and truants shall not be handcuffed, members may use restraints to control juveniles who become unruly or violent.

   2.   When handcuffing a prisoner, transport members shall restrain the prisoner's arms by handcuffing them behind his or her back. (The only exception is if the prisoner suffers from a deformity or other disability or if it is apparent that a prisoner has a serious injury, i.e. broken arm or burns to the arm. In such case, a member may use discretion whether to handcuff the prisoner from the front so as not to exacerbate their apparent condition.)

   3.   Members shall apply the handcuffs with the prisoner's palms facing outward and re-check the handcuffs to ensure that the prisoner is secured.

4. Members shall, if practical, double lock the handcuffs. If it is not practical at the time the prisoner is handcuffed, the handcuffs should be double locked as soon as possible to prevent the handcuffs from tightening on the prisoner and causing potential injury.

5. Members shall not remove the handcuffs until the prisoner is in a secure area, prior to placing the prisoner in a cell. (CALEA 71.1.6-b)

6. Members shall not attach handcuffs to leg restraints in such a fashion that forces the legs and hands to be close to one another (ie.- hog-tying), or place a person in a prone position, lying face down. These positions could be contributing factors that could cause a prisoner to suffocate, also referred to as positional asphyxia

7. When processing a prisoner in the station, if necessary, members shall secure them to immovable objects designed for such use.

B. Searches of Prisoners.

1. When ever a members takes control of a subject whether for transporting or processing, he/she shall conduct a field search. It shall not be assumed that another member has searched the prisoner. (CALEA 71.1.1)

2. A "strip" or "squat" search shall be conducted only when the member has reason to suspect that weapons, contraband or evidence are concealed on the person or in the clothing in such a manner that employing a field search technique may not discover them. Suspicion may be formed on facts surrounding the crime or arrest, on the basis of information received about prisoner, or as a result of discoveries during the field search. These searches can be conducted only with the authorization of the Assistant District Commander and in a secure area. A sworn member of the same sex as the prisoner shall conduct the search in a private and secure area.

3. Under no circumstances shall members of this Department perform a "body cavity" search. When probable cause exists that a prisoner has weapons, contraband or evidence secreted in a body cavity, the Assistant District Commander can authorize this search. The search will be conducted at the D.C. General Hospital in a secure and private area, where only a physician can conduct the examination. A sworn member of the same sex as the prisoner shall be present to seize any evidence obtained.

4. The arresting officer shall be responsible for recording the details of strip, squat and/or body cavity searches of prisoners in a log that shall be maintained in the station. The information contained in the logbook shall include, date, time, justification, search type, items recovered, members involved in the search, members witnessing the search, the name of the Assistant District Comma who authorized the search and when applicable, the name of the person no at the Central Cellblock. The Assistant District Commander shall review this information for its accuracy.

5.  When a Body Cavity, Squat or Strip search has been conducted on a prisoner, the station clerk is responsible for notifying members of Central Cellblock that th prisoner was searched and what type of search was conducted. A notation shall be recorded in the district logbook.

6.  An inventory list of the personal property recovered from a prisoner during a search shall be recorded on the Property Book, PD Form 82.  (See General Order 601.1 Recording, Handling and Disposition of Property Coming Into Custody of the Department)

C.  Transport Procedures

1.  Once a prisoner has been placed in a transport vehicle he/she shall be transported directly to the station. No member shall respond "code one" while transporting a prisoner and when practical, the wagon shall be used to transport violent prisoners. All prisoners shall be secured by a seat belt before being transported, when available.

   a.  The prisoner shall be transported in vehicles equipped as transport units

   b.  When a non-transport vehicle is used, two members will be present to transport the prisoner. The prisoner will be seated in the rear seat of the vehicle. The second member shall be seated in the rear seat. so that the gun holster is on the side away from the prisoner. (CALEA 71.1.3)

   c.  When a member transports a prisoner alone, he/she shall use a transport vehicle and get assistance from another officer, when placing or removing a prisoner from the vehicle.  **Also,** the prisoner should be placed in the member's view on the passenger side of the rear seat.

   d.  A prisoner shall not be allowed to communicate with anyone other than department personnel while being transported.  If the prisoner make any substantive comments regarding the case. the information shall be reported to the arresting officer.  (CALEA 71.1.6)

   e.  Members will not stop or interrupt the transport, except for serious medical reasons or safety issues.  (CALEA 71.1.4)

   f.  Upon arrival at a patrol district. the transporting member will contact the station personnel and advise them to open the van port doors.  The van port doors shall be closed prior to removing the prisoner from the transport vehicle.

2.  In the case of mass arrests, prisoners shall be transported as soon as the transport vehicle is filled to capacity provided it is safe to do so.

3.  The transporting officer shall verify the identity of each prisoner and the arrest forms that accompany each prisoner with the station clerk or the arresting officer prior to taking custody of the prisoner. (CALEA 71.5.1-a, b)

4.  All prisoners shall be monitored for the purpose of detecting medical difficulties.   If a member observes or if a prisoner complains about being sick or injured, member shall immediately contact the dispatcher and request medical assistance for the prisoner and to have a district official respond.  (See GO – PCA – 502.07, Medical Treatment and Hospitalization for Prisoners) (CALEA 71.3.1)

5.  Members shall take special precautions when transporting disabled prisoners. (CALEA 71.3.1):

    a.  Prisoners who have a prosthesis, wheelchair or crutches may be transported with the medical equipment, but it shall be in the possession of the member transporting the prisoner.

    b.  Restraining devices shall be used on disabled prisoners, unless it is apparent that their condition will not allow for the use of restraints.

    c.  The prisoners' hands may need to be restrained in the front.  If the prisoner cannot be handcuffed, two members shall be responsible for the transport.

    d.  Any prisoner, including a suspected mentally disturbed person, who displays the potential for violence, he/she shall be transported in a wagon or a transport vehicle.  At the transporting members' request, or upon a supervisor's direction, another member may assist the transporting member. (See General Order OPS – 308.4 on Handling of the Mentally Ill)

6.  Whenever a member transports a prisoner of the opposite sex, she or he shall notify the dispatcher of the beginning mileage and location.  At the conclusion of the transport, the member shall notify the dispatcher of the ending location and mileage. Any prolonged stops or delays during the transport will be voiced to the dispatcher.

7.  When a member requests a transport for a juvenile held in police custody, he/she shall inform the dispatcher that the subject is a juvenile and request a transport vehicle, rather than a patrol wagon, if available.

    a.  The member detaining the juvenile shall further ensure that:

        (1)  Male and female juveniles are not transported in the same compartment of a transport vehicle; and

        (2)  The juvenile is not transported with an adult prisoner.

    b.  Additional transport assistance shall be requested as necessary to avoid either of the above situations.

    c.  Members who transport a child under the age of thirteen (13) years of a child "at risk" to court, while court is in session, shall take the child to the risk" room at the Superior Court, where the child shall be turned over to a

Department of Human Services representative (any questions concerning the location of the "at risk" room shall be directed to the Youth Services/Youth Division officer processing the case)

    d. Transporting officers shall not remain with the child unless the child is violent and/or the court Social Services representative requests the member's continued presence.

    e. When court is not in session, children under the age of 13 years and children "at risk" who are being referred to court and cannot be released to a parent or guardian shall be taken to the Receiving Home for Children.

    f. Prior to the transport, the Youth Services/Youth Division officer processing the case shall notify the Receiving Home for Children and obtain the name of the person notified.

8. If a prisoner is retained in a transport vehicle in excess of 30 minutes, the transporting member(s) may open the rear doors of the transport vehicle or a single rear door of the wagon to allow fresh air into the vehicle provided that two members or more are in the area and the prisoner is secured to the seat by a seat belt and remains handcuffed.

9. The members of the Fugitive Unit shall be responsible for coordinating the arrangements for the return of suspects from outside jurisdictions to the District of Columbia, who are wanted on outstanding arrest warrants. (See G.O. PCA 502.08, Transport of Prisoners Aboard an Aircraft)

Handling of Transmittals and Arrest Forms

1. The transporting member shall ensure that a transmittal that lists the name of each prisoner and all appropriate arrest forms are provided to a member of the receiving unit. (CALEA 71.1.6-c)

2. Before leaving the facility, the transporting member shall obtain the signature from a member of the receiving unit on the transmittal and return the signed transmittal to the Desk Sergeant of his/her element. (CALEA 71.1.6-d)

E. Prisoner Escapes.

1. In the event of a prisoner escape from police custody, members shall be guided by the following procedures:

    a. Immediately notify Communications Division by broadcasting a priority lookout and giving a complete description of the prisoner and method and route of escape.

    b. Begin a canvass of the immediate area and notify other jurisdictions by teletype, if necessary.

    c. A district official from the member's district and district of occurrence shall **be**

H.   Municipal Center/Court Transports

1.   Members who have prisoners in custody shall not use the Indiana Avenue entrance.  Unless impracticable to do so, they shall enter through the basement and use either the cellblock elevator or an express public elevator. Prisoners who must be transported between the Municipal Center and the various courts shall be moved in transport vehicle that shall enter and leave by way of the basement.

2.   Building elevators shall be used to transport prisoners in the order of preference listed below:

    a.   Cell block elevator.

    b.   Regular building elevators on the east and west ends of the building when it is impracticable to utilize the cellblock elevator, between 0800 and 1700 hours, Monday through Friday.

    c.   Indiana Avenue elevators may be used between 1700 and 0800 hours, Monday through Friday and on weekends, when it is impracticable to use the cellblock elevator.

    d.   In all instances where an elevator other than the cell block elevator is used, only law enforcement officers and their passengers will be admitted to the elevator.

    e.   Prisoners who are moved about the headquarters building shall be handcuffed and under the actual physical control of at least one member.

I.   Removal of Prisoners from the Superior Court Cellblock

1.   Members who remove a prisoner from the D. C. Courthouse for investigative purposes shall first obtain the proper court order and present it to the **U.S.** Marshal's Office. Any request for escort of prisoners for attorneys shall be directed or referred to the Director of the Court Liaison Division or the Department's Office of the General Counsel.

2.   Once the court order has been obtained, members shall take custody of the prisoner at the U.S. Marshal's Prisoner Loading Dock only.  Removal from the premises shall be done by Department transport vehicle only, under no circumstances shall a prisoner be walked from the courthouse.

3.   Members shall immediately return the prisoner upon completion of the business for which he was removed, in the same manner prescribed.

4.   Members shall immediately notify the U.S. Marshal's Office should a prisoner become sick or injured while in his or her custody.

5.   Should a member have reason to retain a prisoner after 2000 hours, he shall then notify the supervisor of the U.S. Marshals Office of the D.C. Superior Court Cell Block on (202) 616 - 8590.



**VII.   CROSS REFERENCES**

   A.   Related Directives.

   1.   GO – SPT – 601.01, Recording, Handling, and Disposition of Property Coming into the Custody of the Department
   2.   GO – SPT – 602.01, Automobile Searches and Inventories
   3.   GO – PCA – 502.07, Medical Treatment and Hospitalization for Prisoners
   4.   GO – PCA – 502.08, Transportation of Prisoners Aboard Aircraft
   5.   Standard Operating Procedures for Holding Facilities


                                                            H.
                                                            Chief of Police

CHR:NMJ:wds



notified through a dispatcher to respond to the scene to supervise the search. (CALEA 71.1.7-a)

d. The Assistant District Commander in the district of occurrence shall be notified by the supervisor on the scene and kept informed as to the progress of the search. (CALEA 71.1.7-a)

e. If the prisoner is apprehended, the supervisor on the scene shall make the appropriate notifications and the prisoner shall be transported to the nearest holding facility where additional reports shall be prepared by the transporting officer concerning the escape. (CALEA 71.1.7-b)

f. If the prisoner is not apprehended, the arresting member shall be notified, the supervising official shall ensure that the appropriate reports are completed and apply for an arrest warrant. (CALEA 71.1.7-b)

g. The Assistant District Commander of the member, who is in control of the prisoner at the time of the escape, shall be responsible for investigating the incident, and recording the information regarding the escape shall be on the Tour of Duty Supervisor's Report P. D. Form 150. (CALEA 71.1.7-a, b & c)

F. Handling Security Risk Prisoners.

1. Prisoners who are suicidal or have any other medical problems shall be the attention of transporting officer by the arresting officer. The security risk information, such as the prisoner's escape potential, shall be documented on the appropriate forms on all arrest paperwork in the prisoner's arrest package. (CALEA 71.5.1-c)

2. The transporting member will be responsible for taking additional safeguards for prisoners that present a security risk. Any time a prisoner is turned over to another facility, the transporting member shall provide the member of receiving agency with information regarding any medical problems and potential security hazards the prisoner presents to ensure a safe transition. (CALEA 71.1.6-e and 71.1.8)

G. Station Procedures.

1. All prisoners brought to a police facility shall immediately be presented to the station clerk to be booked.

2. All members who are involved with processing the prisoner, the arresting officer and station clerk, shall store their service weapons in a compartment specifically designated for securing weapons, before entering the prisoner's processing area. (CALEA 72.4.1 and 71.1.6-a)



| | 502 | 7 | January 17, 1975 |
|---|---|---|---|

SUBJ
Medical treatment and
Hospitalization for Prisoners

TIOM
A

UNIT

The purpose of this order is to establish the policy and procedures to be used in the medical treatment and/or hospitalization of prisoners. This order consists of the following parts:

PART I      Responsibilities and Procedures for Members of the Department

PART II     Responsibilities and Procedures for Special Assignment Personnel

PART III    Responsibilities and Procedures for Supervisory and Command Personnel

PART I

A.    Medical Treatment.

1.    Persons held in departmental confinement facilities who claim a need for medical treatment due to **any** injury or disease shall be immediately transported to **D.C.** General Hospital for examination and treatment.

2.    When a prisoner is brought to a police station suffering from a recent injury, such prisoner shall he Immediately taken to D.C. General Hospital **for** examination and treatment.  A report on PD Form 313 (Arrestee's Injury or Illness Report and Request for Examination and Treatment) shall be prepared **noting** all the facts in the case, including a notation of all cuts, bruises, or other injuries visible to the officer at the time the person was arrested, as well as the results of the examination by the doctor.  The same complaint number **obtained** from the arrest report shall be utilized when preparing PD Form 313.

3.    A prisoner who has been taken to D.C. General Hospital for medical treatment and returned to the station and confined in a cell and who again complains of being ill shall be returned to the hospital

- 2 -

for further examination and treatment.  A separate and
complete PD Form 313, utilizing the original complaint
number, for each such report, shall be made of each
medical examination and treatment given a prisoner.
If the prisoner is taken to a hospital for treatment
and for some reason does not receive treatment, this
fact shall be noted in the "Hospital Report" section on
PD Form 313.

    4.    prisoners requiring medical or surgical
attention or examination shall be transported only to
D.C. General Hospital.  Prior to the transportation of
the prisoner to the hospital, the element having custody
of the prisoner shall execute a PD Form 313, entering
sufficient Information to indicate clearly to the hos-
pital authorities the need for treatment or examination.

    5.    A prisoner transported to D.C. General
Hospital with a PD Form 313 shall first be taken to the
main admitting office for proccesing, examination, and/or
treatment.  If violent or agitated, he shall not be re-
moved from the transporting vehicle, but the physician
on duty at the admitting office shall be notified and he
shall respond and examine the prisoner in the vehicle.

    6.    Connected with the admitting office at
D.C. General Hospital is a detention room where a member
of the D.C. Department of Corrections is stationed on a
24-hour basis.  Male prisoners transported to that hos-.
pital for examination or treatment shall be remanded to
the custody of the detention room officer.  The trans-
porting officer shall give to the detention room officer
such infromation as will enable his to complete his
records and those of the hospital.  The transporting
officer shall then return to his regular duty assignment
unless a physician is available to give the prisoner
immediate treatment and certifies his Immediate return
to the element responsible for his custody.  In the
latter Instance, the transporting officer shall not
remand the prisoner to the custody of the detention room
officer, but shall furnish that officer with all infor-
mation necessary for his records and those of the hos-
pital, and then return to his element with the prisoner
and the PD Form 313 containing the hospital's  report.

- 3 -

B.    Security of Female Prisoners.

    1.    Female prisoners shall be accompanied by a
female-officer at all times while undergoing examination
at a hospital.  As necessary, a female officer shall be
dispatched to the hospital for this purpose when the trans-
porting vehicle is manned by male members.

    2.    Upon arrival at the hospital, female pris-
oners shall be taken to the Emergency Room for examination
and treatment.  The transporting member shall furnish the
Department of Corrections Officer on duty a properly pre-
pared PD Form 313.  However, the Department of Corrections
Officer **will not** take custody of the female prisoner until
she is admitted to the hospital.  Until such time as the
female prisoner is remanded to the custody of the Department
of Corrections Officer, or is returned to the organizational
element, two police officers (at least one of whom **shall**
be female) shall remain at the hospital with the prisoner.
These officers **shall** be mutually responsible for the
security of the prisoner until such time as she is relieved
from their custody.

C.    Admissions to D.C. General Hospital.

    1.    Prisoners charged with misdemeanors who
are admitted to the hospital for treatment will be placed
in medical wards without a guard, unless directed other-
vise by the Field Operations Officer or the night super-
visor.  The medical wards at D.C. General Hospital are
equipped with detention rooms in which hospital personnel
will place a misdemeanant if they are aware of the need
for such measures.  Therefore, in unusual cases where
special security measures should be provided, this fact
should be indicated on the back of the PD Form 313.

    2.    Violent or agitated prisoners to be admitted
to The psychiatric building at the direction of the physician
on duty at the admitting office shall be delivered to the
psychiatric building by the transporting officer.

    3.    There is a "strongroom" at D.C. General
Hospital used for detaining prisoners charged with felonies
while undergoing medical or surgical treatment.  While

General Order No. 302.7
(Revised 11/24/76)

- 4 -

this facility is in use, a D.C. Department of Corrections Officer is detailed to guard the prisoners confined there in.

a.  officers responding to the scene of a felony and arresting a perpetrator who is in need of hospitalization shall make arrangements to transport the prisoner under guard to D.C. General . Hospital for subsequent confinement in the strongroom. The prisoner shall be processed through the admitting office; and if after preliminary treat-ment, he is to be admitted to the hos-pital, he shall be transferred under guard to the strongroom. The guard on duty at the strongroom will assume cus-tody of the prisoner.

b.  Prisoners charged with felonies, and admitted to D.C. General Hospital who are placed other than in the strong-room will also be guarded by officers of the D. C. Department of Corrections

D.   admissions to Hospitals Other than D.C. General.

1.   If a prisoner's condition is so grave as to necessitate his removal to a hospital other than D.C. General Hospital and the prisoner is admitted to that hos-pital, the arresting officer will immediately notify the official then in charge of his element and a guard detail shall be instituted by that official.

2.   At the beginning of each tour of duty, officers assigned to guard duty at hospitals shall complete PD Form 312 (Daily Report of prisoners Guarded at Hospital Proper entries shall be made as are required for each tour of duty. An officer reporting as a relief for this detail shall personally contact the officer he is re-lieving Both officers shall make bed checks of all priso-ners udner guard Each prisoner shall be identified by name and the charge(s) on which he is being held. special infor-

- 5 -

mation concerning the prisoner shall be relayed to the relieving officer. When the relieving officer is satisfied that each prisoner is present and accounted for, he shall sign the daily report certifying the receipt of the prisoner(s). He shall then be responsible for the prisoner(s) until relieved in the same manner at the expiration of his tour of duty. Officers on guard detail at hospitals shall not leave their post at the expiration of his tour of duty until properly relieved. An officer on duty guarding a prisoner, upon receiving a telephone call from an official of the district in which the hospital is located advising him that he is relieved, shall not be considered officially relieved until he personally returns the telephone call to that district and verifies the order from the same official.

3. Officers detailed to guard prisoners at hospitals shall exercise every precaution to prevent the escape of such prisoners; and, should it become necessary for an officer to leave the immediate vicinity of the room for any purpose, it shall be his duty, and he shall be held personally responsible, for seeing that all measures are taken to prevent the escape of any prisoner. If a guard over a prisoner must be relieved during his tour of duty for any reason and before the time when his relief is scheduled to report, the officer shall so advise a supervising official of the district in which the hospital is located, and that official shall make arrangements for his relief.

4. Officers detailed to guard prisoners at any hospital shall retain and wear their service revolvers.

5. It shall be the responsibility of the officer on guard duty at the hospital to follow up cases of prisoners under guard in order to determine when the prisoner can be taken to court. When the prisoner can be taken to court, this officer shall immediately notify an official of the district in which the hospital is located, who shall notify the field operations Bureau and the organizational element to which the arresting officer is assigned, as soon as possible.

E.  Juveniles.

A juvenile prisoner transported to D.C. General hospital or elsewhere for examination and/or treatment shall be processed in the same manner as an adult, except

- 6 -

that such juvenile shall not be placed in the detention
room at D.C. General Hospital or under police guard with
out the express approval of the Field Operations Officer,
a deputy chief of this department, or an inspector (night
supervisor  In all juvenile CASES a PD Form 379 shall
be prepared and forwarded to the Youth Division.

PART II

Station Clerks.

        In cases where a prisoner who shows indications of
wounds or injuries of fairly recent origin is brought to a
police station or confined therein, the station clerk shall
immediately advise the official then in command.  Prior to
transporting a prisoner to D.C. General Hospital, the station
clerk of the organizational element having custody of the
prisoner shall be responsible for the execution of PD Form
313, utilizing the same complaint number as obtained for
the arrest report.  (When initiated at a district station
an original and one copy shall be prepared.  The copy shall
be held in the element's file upon completion of all sections.
When initiated in the Central Cellblock, an original only
of PD Form 313 need be prepared.)  Upon completion of all
sections of the form, PD Form 313 (original copy) shall be
forwarded to the Identification and Records Division to be
filed with the original report of arrest.  (NOTE: The
execution of PD Form 251 is no longer necessary in cases
involving medical treatment or hospitalization of prisoners.)

PART III

A.   Prisoners Showing Sign of Recent Injury.

        Upon being notified by the station clerk of a
prisoner who shows indications of a recent wound or injury,
the official in command of the organizational element shall
initiate an immediate investigation into how the injury was
sustained.  A summary of this preliminary investigation shall
then be entered in the "Supervisory Official's Report" section
on PD Form 313.  Completion of this report shall in no way

– 7 –

delay transporting the prisoner to a hospital (NOTE: prisoners need not be transported to a hospital unless obviously in need of medical treatment or unless the prisoner requests to be taken to a hospital.)

**B.**    hospitalization of Prisoners.

1.    When the examining physician at D.C. General Hospital decides to order the prisoner hospitalized in another section of the hospital (other than the strongroom for specialized treatment it will be the responsibility of the official then in charge of the arresting officer's organizational element to temporarily provide the necessary guard detail until other' arrangements can be made to comply with the provisions of this order.

2.    When a prisoner is admitted to a hospital other than D.C. General Hospital, the official in charge of the arresting officer's organizational element shall establish a guard detail at that hospital. If the hospital is located in a district other than his own he shall notify the official then in charge of the appropriate district to provide the necessary supervision of the guard detail. The official from the arresting officer's element will see that the attending physician is consulted daily with a view toward effecting the removal of the prisoner to D.C. General hospital If the attending physician after preliminary treatment, advises that the prisoner should by hospitalized and can be moved to D.C. General hospital without adversely affecting his physical condition, the prisoner shall immediately be transported under guard to D.C. General hospital

3.    A sergeant assigned to the district where a prisoner is under guard at a hospital shall visit such location at least once during each tour of duty. All sergeants making such required visits will personally record time of their visits on the reverse side of the PD Form 312 (Daily Report of Prisoners Guarded). A midnight sergeant on duty at the district shall then collect the PD Form 312 from the officer on the guard detail, check it for accuracy, and convey it to his district to be forwarded to headquarters with the district's morning papers

**GENERAL ORDER**

| | 601 | 2 | 26. 1972 |

SUBJECT:

Preservation of **Potentially** Discoverable Material

Recent court decisions have ruled that there is a duty to preserve all material which may constitute evidence, or might otherwise be pertinent in a subsequent criminal judicial proceeding. The purpose of this order is to establish guidelines for the preservation of all such evidence, not presently required to be preserved pursuant to existing departmental orders, which may be required to be produced in such a proceeding. This order consists of the following parts:

PART I   **Responsibilities** and Procedures for Members of the Department

    A.   General.
    B.   Definitions.
    C.   Procedures and Explanations.

PART II   Responsibilities and Procedures for Supervisory and Command Personnel

    Commanding Officers.

## PART I

  A.   <u>General.</u>

In addition to materials which are required to be preserved pursuant to existing departmental orders, such as fingerprints preserved by the Identification and Records Division, or items which are required to be turned over to the Property Clerk and listed on the property book, members of the department shall preserve all potentially discoverable material, including any such material which might prove favorable to an accused.

  B.   Definitions.

Potentially discoverable material Includes, but is not necessarily limited to, such Items as tangible documents, reports, tapes, transcripts of tapes, and photographs. The following are examples:

    1.  Any written statement made by a witness defendant, or codefendant, and signed or otherwise adopted or approved by him;

    2.  Any stenographic, mechanical, electrical, or other recording, or transcription thereof, which is a substantially verbatim recital of an oral statement made by a prospective witness or defendant which is recorded contemporaneously with such oral statement;

    3.  Any notes taken by a member of the department which are a substantially verbatim recital of an oral statement made by a prospective witness or defendant which are recorded contemporaneously with the making of the oral statement (this includes an officer's rough notes of the description of the perpetrator of a crime given by the victim or witness prior to the arrest of a suspect.);

General Order No. 601.2

-2-

4.   Any results or reports of physical or mental examinations or of scientific or medical tests or experiments made in connection with a particular case, or copies thereof, which are in the possession of or have been turned over to a member of the department, (members of the department who request outside agencies to conduct any such tests shall request that the results of such tests be turned over to the department, and if they are, shall preserve such results in accordance with the terms of this order).

5.   Any photographs, photograph books, papers, documents or tangible objects which are relevant to a particular case;

6.   All other materials which reasonably may be expected to be relevant in a criminal judicial proceeding.   Any doubt as to whether a particular item may be relevant and therefore preservable shall be resolved in favor of preservation pursuant to the terms of this order.

C.   Procedures and explanations

1.   All potentially discoverable material, not otherwise required to be preserved according to existing departmental orders, shall be maintained in an investigative jacket or case folder when practicable   Each investigative jacket or case folder shall be preserved in a secure file cabinet

2.   all potentially discoverable material, not otherwise required to he preserved according to existing departmental orders, which cannot practicably be maintained in an investigative jacket or case folder (or if no investigative jacket or case folder exists) shall be placed in an envelope or other appropriate container.   The container shall be logged in a control book kept for that purpose.   The entry in the book shall be given a control number.   this number shall be placed on the envelope or container and shall also be noted in the Investigative jacket or case folder (if any) as a reminder that the material has been safeguarded.   The Investigative jacket or case folder shall also Indicate the location of the container   The container shall then be turned over to the unit's administrative lieutenant who will maintain It in a secure file cabinet kept for this purpose.

3.   all potentially discoverable material required to be preserved pursuant to the terms of this order shall be preserved until the particular criminal case to which the material may be relevant is finally concluded.   If no criminal judicial procedding has been initiated the material shall be preserved for a period of three years from the date such material war first obtained, except communications Division magnetic radio recording tapes which shall be preserved for a period of two years from the date such tapes are recorded.

4.   All tape recordings of incoming 911 calls and communications Division administrative calls shall be preserved for a period of one year.

5.   To ensure the integrity of investigative jackets and case folders, potentially discoverable material which becomes part of an investigative jacket or case folder shall be preserved until the entire investigative jacket or case folder is disposed of.

General Order No. 601.2
(Revised June 24,

-3-

6.    This order is not intended to limit the use of potentially discoverable material. This material may be used as necessary.

Photographs and photograph books may be used for identification purposes as outlined in General Order No. 304.7.    This order anticipates that a record of the photographs shown will be preserved in an investigative jacket or case folder, and that the photograph book will be preserved in an appropriate file cabinet.

7.    This order does not anticipate that new or consolidated facilities must be provided where existing facilities and procedures conform to the requirements of this order.

8.    This order supplements any existing departmental orders not inconsistent with the provisions herein.  In cases of inconsistencies, the provisions of this order shall control.

PART II

Commanding Officers.

Commanding Officers shall:

Initiate procedures to ensure that all potentially discoverable material is preserved in the manner prescribed in paragraphs IC of this order, so that such material may be readily located and produced if necessary.

Maurice T. Turner, Jr.
Chief of Police

MTT:MFB:jtu

General Order No. 601.2

# Metropolitan Police Department    Washington, D.C.

## GENERAL *ORDER*

| Subject: | | Series | Number | Distribution | Change Number |
|---|---|---|---|---|---|
| *Courts* and Hearings | | 701 | 1 | A | 1 |
| | | 25, 1991 | | | |

The purpose of this order is to establish the responsibilities and procedures to be followed by members of the department when attending judicial or administrative courts, hearings, and proceedings. Situations which arise that are not covered by this order shall be brought to the attention of an official of the Court Liaison Division for resolution. This order consists of the following parts:

PART I    Responsibilities and Procedures for
Members of the Department

A.    Policy.
B.    Court System.
C.    Reporting Court Appearances.
D.    Initial and Subsequent Court Appearances.
E.    Prosecution of Adult Criminal Cases.
F.    Municipal Agency Hearings.
G.    Traffic Cases (Criminal) and D.C. Municipal
Regulations Violations.
H.    Criminal Records for Court.
I.    Witnesses.
J.    Witness Fees.
K.    Summons/Subpoenas.
L.    Court Travel and Parking.

PART II    Responsibilities and Procedures for
Special Assignment Personnel

A.    Court Liaison Division Personnel.
B.    Career Criminal and Career Narcotic
Unit Personnel.
C.    Time and Attendance Clerks.
D.    Element Case Monitors.

PART III    Responsibilities and Procedures for
Supervisory and Command Personnel

A.    Element Supervisors.

| General Order No. 701.1 | July 25, 1991 | 1 | 2 of 26 |

A.    Policy.

    1.    An appearance in court is a duty assignment and members shall remain at such duty assignment until appropriately relieved of duty.

    2.    Members shall appear at various court proceedings when required, with the necessary witnesses, evidence, records, and other material, and, when applicable, shall be prepared to testify (see Attachment A).

    3.    Members attending the various proceedings, unless otherwise indicated by this order, shall check in and out at the Court Liaison Division (CLD), located in Superior Court, and shall complete a PD Form 140 (Court Attendance Record).

    4.    When attending the various proceedings, whether in uniform or civilian dress, members shall attire themselves as outlined in General Order No. 1101.1 (Personal Appearance, Uniforms and Equipment).

    5.    Upon entering the various court buildings, members shall be guided by the security regulations established for that court building, or as instructed by the Court Security Officer on duty.

    6.    Members shall request property/evidence needed for court in accordance with the provisions outlined in General Order No. 601.1 (Recording, Handling and Disposition of Property Coming into the Custody of the Department).

    7.    Members who experience difficulty in having a case papered and believe the case merits papering shall promptly contact an official of the Case Review Branch, CLD, for assistance and guidance.

    8.    Members waiting for trials to be called shall, after checking in, promptly respond to the appropriate witness room or prosecuting attorney's office and remain there until their case is called and assigned to a court room for trial.

        a.    If required to leave at any time after checking in, other than as directed by an official of the court or the department, members shall notify the liaison officer or administrative assistant in the respective witness room or prosecuting attorney's office of their destination and the estimated time of their return.

| General Order No. 701.1 | July 25, 1991 | 1 | **3** of 26 |

b. The sign-out sheet located in the U.S. Attorney's misdemeanor witness room shall be completed by members who leave to handle other matters.

B. **Court System.**

1. The Court System of the District of Columbia is composed of the following:

a. District of Columbia Superior Court,

b. District of Columbia Court of Appeals,

c. U.S. District Court for the District of Columbia, and

d. United States Court of Appeals for the District of Columbia Circuit.

2. Members are primarily concerned with the District of Columbia Superior Court and the United States District Court as well as the various administrative agencies.

3. The District of Columbia Superior Court has jurisdiction over all criminal cases (felonies and misdemeanors) arising under the D.C. Code, D.C. Municipal Regulations (DCMR), major traffic offenses which are criminalized, and all juvenile matters. Superior Court convictions are appealable to the District of Columbia Court of Appeals.

4. The U.S. District Court handles federal jurisdiction cases, which arise primarily from violations of Title 18 of the United States Code. District Court convictions are appealable to the U.S. Court of Appeals for this circuit.

5. In some instances a violation of the U.S. Code is also a violation of the D.C. Code. If concurrent jurisdiction exists, a determination will be made by the Grand Jury Section, United States Attorney's Office, as to which court to prosecute the case.

C. **Reporting Court Appearances.**

1. Members appearing for court, traffic or other municipal hearings, line-up, or departmental administrative hearings shall:

a. Report in sufficient time to complete a PD Form **140** and be checked in by the scheduled appearance time; and

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order No. 701.1 | July 25, 1991 | 1 | 4 of 26 |

    b.      Submit their own PD Form 140 for time stamping when arriving and departing.

   2.     Members checking into court for first appearances in multiple traffic cases or mass arrest cases may complete a PD Form 140-A (Traffic Court Attendance Record) in lieu of a PD Form 140 and shall process the form in the same manner as the PD Form 140.

   3.     Members shall have each prosecuting attorney or appropriate agency representative complete the applicable portions of the PD Form 140 or 140-A at the conclusion of their business. False or unauthorized signatures and/or deliberately inaccurate times on the PD Form 140 or 140-A shall be viewed as serious infractions and may subject members to disciplinary action and/or possible criminal sanctions.

   4.     Members shall not be permitted to check in at CLD for U.S. District Court or Superior Court criminal trials, grand jury matters, or witness conferences unless they have:

    a.      Received a Computer Assisted Notification System (CANS) notice:

    b.      Received a subpoena;

    c.      Been instructed to appear by a CLD official;

    d.      Been notified by their unit official that their attendance has been requested by a CLD official;

    e.      Received notification that the case is in trial and continuing from day to day; or

    f.      Received notification from a member of CLD when checking in or out of court that there are additional matters pending which need to be handled by the member.

   5.     If a prosecuting attorney should personally contact a member and request the member's appearance for a U.S. District Court or Superior Court criminal trial, grand jury, or witness conference, the member shall advise the attorney to promptly file a Court Notification Form (CNF) with a CLD official or through the Witness Assistance Unit in the U.S. Attorney's Office.

    a.      If the requested date of appearance is within three days, CLD may not send the message to the member's unit via computer; however, the CNF will be retained within the Court Liaison Office for the member so that his/her appearance can be authorized.

| General Order No. 701.1 | July 25, 1991 | 1 | **5** of **26** |

      b.    Members so contacted by prosecuting attorneys shall contact CLD. prior to honoring the attorney's request **to** *appear* to ensure that the CNF has been filed.

      c.    Members failing to contact CLD. who find that no CNF has been filed. will not be allowed to check in until such time as the responsible attorney or member of his/her staff has **personally** delivered the CNF to a CLD official.

    6.    All grand jury hearings and witness conferences in adult cases will be held at the U.S. Attorney's Office. Members scheduled to appear for any of these type **proceedings** shall:

      a.    Initially check in with CLD, then check in with a **CLD** official in the Grand Jury Section, or the CLD official in the Felony Trial Section, or both, if appropriate;

      b.    Respond to the appropriate location where the **hearing/witness** conference is scheduled to be conducted;

      c.    Under no circumstances wait **longer** than two hours **from the** scheduled arrival time for the attorney, without receiving approval from a CLD official; **and**

      d.    When leaving a prosecuting attorney's **office**, for any reason, such as responding to Superior Court to paper a case **or** to testify in a court hearing, advise the attorney or his/her staff as to what location they are responding, and when they expect to return.

    7.    Members scheduled to appear *for* the following proceedings with no other Court **commitments** on the same day shall report directly to the required location and complete *a* **PD** Form 140:

      a.    Line-up.

      b.    Adverse Action and Trial board hearings, and

      c.    Municipal hearings:

          (1)    Alcoholic Beverage Control (ABC) Board, and

          (2)    Civilian Complaint Review Board.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order No. 701.1 | July 25, 1991 | 1 | 6 of 26 |

8.    Certain administrative or investigative functions (see Attachment **B**) do not in themselves constitute COURT appearances within the legislative intent of **public law** 89-282.  Therefore, when responding to COURT to handle such matters, **members are** not required to **check** in with CID unless they are directed to do so by their element **supervisor.**

a.    Members designated as the "lead **officer** (see Part    )" shall handle those court-related administrative or investigative functions identified in Attachment B.

b.    Whenever possible, lead officers shall schedule court-related **ad**ministrative and investigative matters during their **on-duty time.**

c.    Lead officers who handle such matters while in an off-duty status shall:

(1)    Not receive any compensation, unless it is approved by the official in charge of their element prior to responding to court; and

(2)    Normally perform such work on a day designated by that official, and which is a regularly scheduled work day of the member.

d.    Lead officers involved in cases which require the handling of administrative or investigative matters on their day-off shall **re**ceive advance authorization from their district or division commander in order to be compensated.

e.    Off-duty lead officers checking into court to perform administrative or investigative court-related duties **shall** place a zero in the block calling for the "Appearance Number on the **PD Form 140** and the name of the approving official in the 'Remarks'    section of the form.

f.    Lead officers earning compensation (monetary compensation **or** compensatory time as a result of a prior approved court-related administrative or investigative appearance shall complete a Standard Form 1130 (Time and Attendance Report) **for** each such appearance.

| General Order No. 701.1 | July 25, 1991 | 1 | 7 of 26 |

(1)  The SF 1130 shall contain a justification for the work performed while the member was off-duty and the signature of the official who authorized the member to perform and be compensated for handling the administrative or investigative task while off-duty.

(2)  A copy of the member's PD Form 140 shall be attached if the member checked in with CLD.

**D.    Initial and Subsequent Court Appearances.**

1.    Members shall have at their disposal an up-to-date projection of their next five daywork tours of duty.

2.    When criminal cases are prepared for the initial court appearance, members shall furnish the Assistant United States Attorney or the Assistant Corporation Counsel preparing the case with a projected schedule indicating the member's next five day-work tours in which he/she will be available for appearances in court.

3.    Procedures for the processing of criminal cases in court, which also involve a member's use of serious or deadly force, shall be in accordance with the guidelines set forth in General Order No. 901.1 (Use of Firearms and Other Service Weapons).

4.    In adult 'lock-up' cases the prisoner will be presented/arraigned on the next court day (court is closed on Sunday). Members shall not remain in COURT for this proceeding, unless specifically instructed to be present by an official of CLD.

5.    In bond cases members shall:

a.    Set the defendant's court appearance date for the morning following the arrest, except that appearances shall not be set for a Sunday, Monday, Saturday, or holiday;

b.    Schedule weekend arrests, including those made after the close of court business on Friday for court presentment/arraignment on the following Tuesday, except as listed below:

(1)  If there is a co-defendant who remains incarcerated, the defendant who is released on bond will be required to come to COURT and be presented/arraigned along with the 'locked-up' co-defendant on the next day COURT is in session; and

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order No. 701.1 | July 25, 1991 | 1 | 8 of 26 |

   (2) If Tuesday is a holiday, the case will be held over **until** Wednesday or the next day court is in session;

  c. Advise defendants who are released on bond of the date, time, and location of their ~~scheduled~~ court appearance; ~~and~~

  d. Respond to paper bond cases on the day the case is presented/ arraigned in court.

   (1 If the case is being held over to Tuesday, and the **member** is scheduled to be off-duty during the daywork tour, the case may be papered on Saturday or Monday between 0800 and 1300 hours.

   (2) If the member chooses to paper the case on Saturday or Monday, in lieu of Tuesday, he/she shall advise the papering attorney that he/she is papering only and then notify an official of CLD.

 6. In citation release cases members shall:

  a. Set citation dates for arraignments on Tuesdays through Fridays and in accordance with the guidelines in General Order No. 502.6 (Citation Release Program);

  b. In cases where there is a co-defendant who is not eligible for the Citation Release Program, schedule all defendants (e.g., citation release, bond, and lock-up) to appear on the next court business day for arraignment; and

  c. Contact CLD and the Pretrial Services Agency in all mass arrest situations prior to setting citation release dates.

 7. To expedite the receipt of disposition information for trials and hearings, **members shall:**

  a. After checking in at CLD, proceed to the appropriate witness room or prosecuting attorney's office and sign-in;

  b. If handling multiple cases and unable to report in person to each waiting attorney, contact each attorney to advise each one concerning their status, location, and estimated time of arrival;

| | Change Number | Page Number |
|---|---|---|
| **General Order No. 701.1** | July 25, 1991 | 1 | 9 of 26 |

      c.    While awaiting case dispositions, inquire of the appropriate prosecuting attorney(s), their staff, or CLD official at least **hourly** as to the **status** of pending **cases**;

      d.    If required to attend multiple court *proceedings*, immediately check for all available dispositions of pending cases after attending each proceeding. If a trial or hearing is disposed of while the member is attending a different COUrt proceeding, the disposition time for the unattended trial or hearing shall be the member's check-out time; and

      e.    After concluding business with one prosecuting attorney and then learning of the disposition of another case, check out as soon as possible with the prosecuting attorney or the appropriate staff member in the witness room. If neither of these officials are available, members shall check out with an official of CLD.

**8.**    Compensation for COUrt appearances will stop 15 minutes **after** the disposition of the final proceeding, unless a legitimate extension request is made.

      a.    An extension request shall be made by the prosecuting attorney immediately following the disposition of the case.

      b.    All extension requests shall require the approval of a **CLD** official, and each member's status will be evaluated on an individual basis.

**E.**    **Prosecution of Adult Criminal Cases.**

    **1.**    **Court Papering.**

      a.    COUrt papering is the initial presentation of a member's case to the prosecuting attorney.

         (1)    It is the responsibility of the arresting member to present the case, or ensure that another member who is equally familiar with the case presents it at papering.

         (2)    The papering member shall then be designated as the lead officer for those court-related administrative or investigative functions identified in Attachment B, except in those cases handled by the Criminal Investigations Division, where branch commanders **shall** be responsible for ensuring that a lead officer is designated for each case.

| blication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order No. 701 1 | July 25, 1991 | 1 | 10 of 26 |

      (3)   In warrant situations, the arresting member may not have been the one who obtained the warrant. In such cases, members shall adhere to the requirements outlined in General Order No. 702.1 (Arrest and Bench Warrants).

    b.   Under no circumstances shall a member paper another member's case simply because he/she was on the scene and is also required to appear in court on an unrelated matter.

    c.   An official who makes an arrest shall present his/her own case at papering, unless there is another member available who is equally familiar with the facts of the case.

    d.   When reporting to paper a case, the papering member shall bring all necessary police reports, notes, witness statements, lab numbers, evidence which may be helpful at the papering stage, and the witnesses required by the prosecuting attorneys (see Attachments C and D).

**2.**   Members shall not appear for the following proceedings unless authorized to by an official of CLD:

    **a.**   Presentment/Arraignment,

    b.   Status Hearings, and

    c.   Sentencings.

**3.**   Preliminary Hearings.

    a.   A preliminary hearing is a formal hearing at which a United States Magistrate, a Commissioner, or a Judge decides whether or not there is probable cause to believe that the charged offense occurred, that the defendant committed the charged offense, and that it occurred in the District of Columbia.

    b.   The preliminary hearing date is set by the court at presentment.

        (1)   The preliminary hearing will be scheduled within **10 days** (including Saturdays, Sundays, and holidays) of presentment on lock-up and bond cases, except Career Criminal Unit cases which are held within five consecutive days.

    c.    It shall be the responsibility of the papering member to obtain the preliminary hearing    and to handle it.

    d.    Members shall not depend on the Computer Assisted Notification System (CANS) or teletype for the preliminary hearing date.

    e.    Members shall obtain the preliminary hearing date by utilizing the procedures outlined in General Order No. 701.6 (Court Appearance Notifications).

4.    Grand Jury.

    a.    Most felony cases which do not involve drugs move from presentment to preliminary hearing where, after a finding of probable cause, they are bound over to the Grand Jury.

    b.    The initial Grand Jury date is selected by the papering member and attorney at papering.

    c.    It is the papering member's responsibility to either handle the Grand Jury or ensure that it is handled.

    d.    'Same Day Presentment' is a procedure where a member presents the case to the Grand Jury immediately after papering.

5.    Motion Hearings.

    a.    Motion hearings generally occur just prior to the trial. The primary purpose of such proceedings is to determine the admissibility of evidence.

    b.    These hearings are usually held before the trial judge prior to the jury selection process.

6.    Witness Conferences.

    The purpose of the witness conference is to review the facts and circumstances of a case, the physical evidence, the testimony of civilian witnesses, and general trial preparation.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order No. 701.1 | July 25, 1991 | 4 | 12 of 26 |

      a.    Members shall make every effort to set witness conferences during on duty hours by providing prosecuting attorneys with a schedule of their tours of duty.

      b.    If a prosecuting attorney schedules a witness *conference on* the member's day off, the member shall contact the attorney to arrange for rescheduling of the conference for an on-duty day.

7.    Trials.

    The trial is the formal examination of the facts and circumstances of the case, and in most criminal cases it requires the presence of all essential witnesses. Members shall:

      a.    Contact all essential witnesses to ensure their availability;

      b.    Report to the prosecuting attorney's office, witness room, or proper court room on the appropriate date and scheduled time; and

      c.    Bring all necessary documents and order or bring applicable articles of evidence as required for the trial.

**F.    Municipal Agency Hearings.**

1.    Department of Public Works, Bureau of Traffic Adjudication.

      a.    The Department of Public Works, Bureau of Traffic Adjudication (BTA), conducts hearings with regard to minor traffic offenses.

      b.    Members shall check the traffic printouts posted in their elements daily for upcoming BTA hearings.

      c.    Members scheduled to attend hearings at BTA with no other court commitments on the same day shall:

          (1)    Report directly to BTA;

          (2)    Prepare a PD Form 140-A;

          (3)    Sign in with the scheduling clerk;

          (4)    Upon completion of all BTA hearings, sign out with the scheduling clerk; and

| General Order No. 701.1 | July 25, 1991 | 1 | 13 of 26 |
| --- | --- | --- | --- |

      d.    Members scheduled to attend hearings at BTA with other court commitments on the same day shall:

          (1)    Check in at CLD; and

          (2)    Be guided by the directions of a CLD official in regard to the BTA hearing.

      e.    When a BTA hearing is scheduled on a Notice of Infraction (NOI) which resulted from an accident, members shall:

          (1)    Contact all witnesses and request that they be present at the hearing; and

          (2)    Bring a copy of the PD Form 10 (Traffic Accident Report) with them.

      f.    Members attending BTA hearings shall:

          (1)    Remain in the prescribed area set aside for **police** officer while waiting for cases to be called; and

          (2)    Be guided by the instructions of the scheduling clerk with regard to hearing room locations and procedures to follow when defendants fail to appear.

**2.**    Department of Public Works, Bureau of Motor Vehicle Services (BMVS).

      a.    The Department of Public Works, Bureau of Motor Vehicle Services (BMVS), conducts hearings with regard to permit and driving privileges.

      b.    Members who are notified of BMVS hearings through a CANS notice shall:

          (1)    Check in at CLD;

          (2)    Complete a PD Form 140;

**e-**

| General Order No. 701.1 | July 25, 1991 | 1 | 14 of 26 |

      (3)      proceed to *the agency* hearing;

      (4)      Have the agency note the time of departure on the **origi-nal** copy of the PD form 140; **and**

      (5)      Check out at CID.

3.    District of Columbia Taxicab Commission

    a.    The District of Columbia Taxicab Commission conducts hear-ings in cases involving violations of DCMR Title **15A** (Taxicabs and Vehicles for Hire).

    b.    Members scheduled to attend hearings at the Taxicab Commis-sion with no other court commitments on **the same** day shall:

      (1)      Report directly to the office of the Taxicab Commission;

      (2)      Prepare a PD Form 140 and sign in with the **clerk/recep-**tionist; and

      (3)      Upon completing all commission hearings, sign out with the clerk/receptionist and return to their unit if still on duty.

    c.    Members scheduled to attend hearings at the Taxicab Commis-sion with other court commitments on the **same** day shall:

      (1)      Report to CLD;

      (2)      Prepare a PD Form 140; and

      (3)      *Be* guided by the directions of a CLD **official** in regard to the commission hearing.

    d.    Members issuing an NOI for a hacker violation shall not enter a hearing availability date in the 'Officer's Availability Date' section of the NOI. Members will be notified of scheduled hearings through CANS.

| General Order No. 701.1 | July 25, 1991 | 1 | 15 of 26 |
| --- | --- | --- | --- |

4.  Department of Human Services.

   a.  The Department of Human Services holds mental health hearings when a member either initiates an action or assists in handling an incident involving an actual or suspected mentally i person, and that person is contesting continued treatment.

   b.  Members shall follow the procedures outlined in General Order No. 308.4 (Processing of Suspected Mentally Disturbed Persons).

   c.  Generally, these hearings and trials are conducted in the Superior Court and members will be notified through CANS.

   d.  St. Elizabeth's Hospital mental competency hearings and trials are also conducted in Superior Court, and members shall check in with CANS.

5.  Other Municipal Hearings.

   Members who are required to attend other municipal hearings relative to their official duties shall:

   a.  Not be required to check in at CLD;

   b.  Turn in a completed PD Form 140 to the time and attendance clerk in their unit following the completion of their responsibilities; and

   c.  Ensure that their time of arrival and departure is noted on the PD Form 140.

      (1)  Most agencies holding hearings have a time-date stamp machine, which shall be used whenever possible.

      (2)  If a machine is not available, members shall have the entry and departure times initialed by the agency receptionist.

| General Order No. **701.1** | Effective July 25, 1991 | 1 | **16 of 26** |
|---|---|---|---|

6. Citizens Complaint Center Hearings.

    a. The Citizens Complaint Center is staffed primarily by members of the U.S. Attorney's Office and the Corporation Counsel's Office. It is the location where individuals may appear for hearings in an effort to resolve criminal type matters where arrest might not be the best alternative, pursue warrants, and obtain Temporary Protection Orders (TPO) or Civil Protection Orders (CPO).

    b. Members may refer citizens to the Citizens Complaint Center when the above remedies are appropriate.

    c. Members shall also have the authority to schedule hearings with the Citizens Complaint Center for such matters, and, when scheduling hearings, shall appear with the complainant(s) and/or respondent(s) at the time(s) they schedule.

    d. Members shall utilize the PD Form 30 (Notice to Appear), and refer to the times of operation of the Citizens Complaint Center when scheduling appearances (see Attachment F).

## G. Traffic Cases (Criminal) & D.C. Municipal Regulations Violations.

1. Traffic cases (criminal) and D.C. Municipal Regulations violations are handled by the Office of the Corporation Counsel.

2. In such cases members shall:

    a. Follow procedures outlined for misdemeanor cases;

    b. In traffic cases, retain the original Notice of Infraction (NOI) and obtain traffic records from the Bureau of Motor Vehicle Services which are to be included at papering.

## H. Criminal Records for Cases.

In all cases, the arresting officer shall contact the Criminal History Section, Identification and Records Division (IRD), and request a criminal history check which shall then be recorded appropriately on the PD Form 163 (Prosecution Report).

| General Order No. 701.1 | July 25, 1991 | 1 | **18** of 26 |
|---|---|---|---|

        **d.**    Apprise the prosecuting attorney of the status of the witnesses and be guided by his/her instructions.

**J.**    **Witness Fees.**

      **1.**    Whenever a member is called upon to testify as a witness in private litigation arising from his/her official capacity, he/she shall request the authorized witness fee for each appearance (regardless of whether he/she has given testimony).  The authorized witness fee will include the authorized allowance for expenses of travel and subsistence.

      **2.**    A member who testifies, while on duty, in private litigation shall  turn over all witness fees to his/her administrative lieutenant as soon as possible.

      **3.**    A member who testifies, while off duty, as a result of his/her official capacity, **shall** turn in all witness fees to his/her administrative lieutenant in exchange for compensatory time or time and one-half pay as required by D.C. Code 4-1104.

      **4.**    When a member testifies in civil litigation in a non-official capacity, while in an off-duty status, he/she shall appear in civilian attire.

**K.**    **Summons/Subpoena.**

      **1.**    Members who receive a summons or subpoena shall **report** to the appropriate location at the time specified in the court document.

      **2.**    When a member intends to testify for the defense in any criminal case before the court or a hearing held by a municipal agency, or is questioned by the defense about the merits of a matter before the court or agency, he/she shall immediately advise the Assistant United States Attorney or the Assistant Corporation Counsel prosecuting the case that **he/she has** discussed the case with the defense attorney or **a** defense investigator, so as to prevent any possible surprise, or inadequate trial preparation.

            **a.**    It is solely the member's individual choice whether he/she wants to discuss the case with a defense attorney or defense investigator.

            **b.**    The member is not under any obligation to speak with the defense attorney, neither is the member restricted in the *exercise of free choice*.

| General **Order** No. 701.1 | July 25, 1991 | 1 | **17** of |
|---|---|---|---|

I.     **Witnesses.**

  **t**  Members reporting to court to paper a new *case* *shall* ensure that all witnesses are notified and available as required in Attachments C and D of this order.

  **2.**  Members shall be responsible for notifying complainants **and** witnesses of the proper location, time, and date their presence is required.

  **3.**  If the case is one that has been set for misdemeanor trial, members **shall:**

    **a.**  Contact all witnesses for the government three days preceding the court date;

    **b.**  Request that they report to the Witness Room, Criminal Division, Superior Court no later than 0900 hours on the court date; and

    **c.**  Confirm their appearance or notify the prosecutor when witnesses do not appear.

  **4.**  In those cases where a witness has requested to be placed on 'standby,' or the prosecuting attorney has requested that a witness be placed in a 'standby' status, the member handling the case shall:

    **a.**  Contact the witness three days prior to the trial date to confirm the availability of the witness on the court date; and

    **b.**  obtain a means of communicating with him/her should **his/her** appearance be required.

  **5.**  After checking in and obtaining the **calendar** number in U.S. misdemeanor **cases** or courtroom number in felony and Corporation Counsel **cases,** members shall:

    **a.**  Check to see if all witnesses are present in the witness lounge or U.S. Attorney's office;

    **b.**  If any witness is not present by 0900 hours, attempt to contact the witness by telephone or other means;

    **c.**  Confirm the availability of witnesses on **standby;** and

| General Order No. 701.7 | July 25, 1991 | 1 | 19 of 26 |
|---|---|---|---|

**L.    Court Travel and Parking.**

1.    Members attending court may utilize designated parking areas after obtaining an official court parking permit.

2.    permits will be issued by the members organizational element or, when not available, members may obtain a permit from the Traffic Enforcement Branch. **Permits** issued by the Traffic Enforcement Branch shall be returned to that element immediately upon leaving court (This requirement does not apply to personnel assigned to the Traffic Enforcement Branch).

a.    Court parking permits shall be issued by a desk sergeant, acting desk sergeant, or other supervisory official.   Issuing officials shall make appropriate entries in the **court** Parking Permit Logbook and indicate the date the court parking permit is to be returned (see Attachment E).

b.    Prior to being issued a court parking permit, members shall provide documentation of their court commitment (a CANS notice, subpoena, proof of arrest, or on-going investigation, etc.).

c.    Permits shall not be issued to **individual** members on a permanent basis, but shall be kept at the organizational element so that all members may use them in connection with their attendance in court for official duties.

d.    If responding to court from their **residences** members shall be permitted to obtain the necessary permit **on the day** prior to appearing in court.

e.    When on duty, members shall **make all possible efforts** to use public transportation (i.e., Metro-Bus Metro-Train, and D.C. Government Shuttle Bus) when responding to **court**.

f.    Members shall obtain permission from an **official** prior to using their private vehicle to respond to court.

g.    Permits issued by the member's element shall be returned to the issuing element immediately upon departing **from** court unless the member is scheduled to **return** to duty **within the** next 24 hours, at which time he/she shall **return** the permit.

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General** Order No. 701.1 | July 25, 1991 | 1 | of 26 |

**3.** Court parking permits shall be maintained in a locked cabinet or drawer and **shall** be accessible 24 hours a day by personnel authorized to issue them.

**4.** Members shall utilize these permits only in a manner that is consistent with this directive and Section 2420.2 of DCMR Title 18 (Vehicles and Traffic), which prohibits the use of official parking permits within two blocks of any building in which an individual is employed.

**5.** Members shall comply with section 1.2e above, and not use department vehicles to travel to and from court, unless authorized by a sergeant or above. If authorization to utilize a department vehicle is granted, members shall report the name of the authorizing official to the dispatcher.

**PART II**

**A.** **Court Liaison Division Personnel**

Court Liaison Division personnel shall be responsible for:

**1.** Recording the arrival and departure of all members having business in the various courts;

**2.** Recording the names of members who have changes in their court commitments;

**3.** Recording the names of members carried in a "standby" status;

**4.** Validating the court appearance recorded on the original copy of each member's PD Form 140 or 140-A, prior to forwarding the form to the time and attendance clerk at the member's assigned organizational element;

**5.** Monitoring members checked into court to ensure that they **are** complying with **the provisions** of this order and other applicable court procedures;

**6.** Visiting the various courts and offices for the purpose of observing the manner in which cases are presented for trial and the appearance of members while in the court complex;

**7.** Reviewing all PD Forms 163 prior to their presentation to prosecutors for papering and reviewing prosecutor case jackets;

**8.** Determining if proper procedures are being followed and that applicable forms are correctly prepared;

| General Order No. 701. I- | Date: July 25, 1991 | 1 | 21 of 2 |
|---|---|---|---|

9.    Monitoring for inadequacies or improper actions on the pan of the members responsible for the presentation of cases;

10.    Determining the basic cause(s) of existing problems or improper actions by prosecution personnel or members of the department;

11.    Bringing to the attention of members any deficiencies noted in individual reports or case jackets; and

12.    Identifying patterns of error by organizational elements, and notifying the concerned commander or director, in writing, indicating the type of errors or discrepancies involved and corrective action recommended.

B.    Career Criminal and Career Narcotic Unit Personnel

Career Criminal and Career Narcotic Unit personnel shall be responsible for:

1.    Reviewing, each morning, police paperwork prepared in connection with the Superior Court's lock-up list and identifying those defendants who qualify for career criminal or career narcotic status; and

2.    Assisting the arresting member or member handling the case in Court with the gathering of evidence, the identification and location of potential witnesses, and in other ways that would strengthen the pre-indictment investigation.

C.    Time and Attendance Clerks.

Time and attendance clerks shall be responsible for:

1.    Reviewing all incoming PD Forms 140 to ensure that:

a    Members are compensated for attending court when the notation "zero appearance" is located on the form, only when a Standard Form 1130, signed by the authorizing official, accompanies the PD Form 140;

b.    The CLD Monitoring Branch has reviewed each PD Form 140 i evidenced by the monitor's stamp on the lower portion of the form. PD Forms 140 lacking this validation will not be acted upon without the expressed approval of the Director, Court Liaison Division; and

c.    Appearance dates, continued claim, etc., as indicated by the member, are accurate.



| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order No. 701.1 | July 25, 1991 | 1 | 22 of 26 |

2.    Reviewing the prior court attendance slips to ensure that a properly **prepared** PD **Form** 140 is on file whenever any member attends court in a second **or** subsequent appearance other than while working his/her tour of duty;

3.    Reporting discrepancies discovered in the preparation of a PD **Form** 140 to the member's immediate supervisor for review and appropriate action; and

4.    Contacting a CLD official when patterns of questionable court appearances are noted

**D.    Element Case Monitors.**

Element case monitors shall:

1.    Review the element's OANS file and randomly select a minimum of five cases to monitor each business day

2.    Ensure that three of the selected cases **are** witness conferences or grand jury appearances;

3.    Personally check with each member and/or the prosecuting attorney who has the case to ascertain its status; and

4.    When the member is no longer needed at court notify a **CLD** official, who will then sign the member out of court if the attorney has not already done so.

**PART III**

**A.    Element Supervisors.**

Element supervisors shall:

1.    Be responsible for investigating non-compliance with court procedures and irregular actions noted in the court appearance of members under their supervision.

      a.    A complete investigation shall be conducted to determine the reason a member, assigned under their supervision, failed to comply with the procedures outlined in this order.

      b.    A written investigative report for each infraction **shall** be submitted by the element supervisor to the official in charge of his/her unit;



(2)    The name of the court attended,

(3)    *The* date(s) of appearance(s), and

(4)    The name(s) of the principals involved in the case;

b.    The witness fee in check form is endorsed by the member;

c.    The member is given a copy of the PD Form 196A for his/her records. The PD Form 196A shall serve as the documentation of a member's attendance in civil court and as the receipt for the witness fee being turned over to the department for deposit; and

d.    The witness fee is turned over to the D.C. Treasurer in accordance with General Order No. 404.1 (Deposits with the D.C. Treasurer).

C.    **Commanding Officers.**

commanding officers shall:

1.    Assign each member of their command one day of the week, excluding Saturdays and Sundays, on which all BTA traffic cases shall be scheduled (Patrol Operations Bureau elements only).

a.    These assignments shall be equally distributed among the members within each section (i.e., 20% of the section will be assigned Mondays, 20% Tuesdays, etc.).

b.    A list of the assigned BTA days shall be maintained in the elements Office of the Station Clerk.

2.    In an effort to equalize the number of assigned personnel attending **BTA** hearings each **day,** take into consideration the assignment of members and the number of tickets they usually write;

3.    Upon receipt of case review reports, ensure that any corrective action is completed and the necessary returns are made within the time limits specified in the **report**

4.    When the need for instruction of all members within an organizational element is indicated **by** a court case review report, arrange for the necessary instruction, **and** notify CLD, in writing, of the steps taken and the date such instruction **was** pleted;

| General | No. 701.1 | July 25, 1991 | Number 1 | 25 of 26 |
|---------|-----------|---------------|----------|----------|

5.    Designate a daywork sergeant as the element's case monitor to monitor activities of a select number of members who check into court

6.    Ensure that all witness fees, received by members of their testifying in civil litigation, are turned over to the D.C. Treasurer in accordance with General Order No. 404.1 (Deposits with the D.C. Treasurer);

7.    Take appropriate corrective/disciplinary action against members of their command who are discovered using a court parking permit other than for legitimate appearances in court.

8.    Designate an administrative official to check the status of each court parking permit on a daily basis and to submit a report to the commanding officer when violations are discovered:

9.    When assigned to elements that issue parking permits, maintain a **Court** Parking Permit Logbook at their element utilizing an 8 by 14 inch record book.  The book shall be prepared with a rubber stamp designed for the purpose of titling each log page (see Attachment ½

10.    Maintain controls over requests for members of their command who respond to court for administrative and investigative court related activities on their off duty time or day-off;

11.    Review investigative reports involving members of their command who have failed to comply with the procedures outlined in this order or related court orders and procedures.

        a.    The report(s) with recommendations, shall be forwarded through channels to the Administrative Services Officer for consideration; and

        b.    A copy shall also be forwarded to the Director, CLD; and

12.    Forward copies of all reports requesting that a matter be referred to the Grand Jury to the Director, Court Liaison Division, for review and forwarding.  This procedure shall not apply to Internal Affairs Division cases.

D.    **Director, Field Inspections Division.**

The Director, Field Inspections Division, shall ensure that auditors period-**ically :**

| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| General Order No. 701.1 | July 25, 1991 | 1 | 26 of 26 |

      1.    Inspect PD Forms 140 on a random basis to obtain the number of multiple **appearances** by a member in a single case;

      2.    Compare **PD** Forms 163 with CANS notices, in order to confirm the actual involvement of members in a case; and

      3.    Assist CLD in monitoring the activities of members attending the various courts, particularly witness conferences and grand jury appearances.

  E.    **Director, Court      Division.**

The Director, Court Liaison Division, shall be responsible for:

      1.    Providing liaison between the various courts, the United States Attorney's Office, the Corporation Counsel's Office, other criminal justice agencies, and members of the department;

      .2.    Identifying problems in the criminal justice system which have **an** impact on the            and it's members, and taking steps to develop solutions to those problems;

      3.    Ensuring that Court Liaison Division officials monitor members checked into court to make certain that they are complying with the provisions of this order and other applicable court procedures;

      4.    Identifying patterns of errors or deficiencies in reports or case jackets submitted by members and notifying the organizational elements concerning the identified problem areas;

      5    Reviewing and forwarding Grand Jury referral cases received from commanding officers; and

      6.    Identifying and resolving any problems that may arise as a result of activities relative to the compliance of this order.

Isaac Fulwood
Chief of Police

Attachments

IF:ABW:jtp