**EXHIBIT 1**

40

1   continuing objection to this line of questioning.
2           MR. ANDERSON:  Sure.
3           THE WITNESS:  It was attempted
4   aggravated assault while armed.
5           MR. TISHLER:  If you know.
6           THE WITNESS:  Yeah, I think so.
7   BY MR. ANDERSON:
8       Q.   Attempted aggravated assault while
9   armed.  Was that a felony?
10      A.   Yes.
11          MR. TISHLER:  Objection.
12  BY MR. ANDERSON:
13      Q.   So tell me about that.  What was that
14  about?  What did you plead guilty to?  What
15  happened?
16          MR. TISHLER:  Objection.  That calls
17  for a narrative.  Can you specify a little bit
18  more what you are trying to ask him?
19  BY MR. ANDERSON:
20      Q.   Sure.  The guy who they said had sworn
21  out a warrant, did you say Linwood McCain or
22  something like that?

NIGEL JABOH AUSTIN
Austin v. District of Columbia, et al.                                1/31/2007

46

1    So I left out the building. Linwood
2    was right there. He seen me with the golf club,
3    so he started at rushing me. When he rushed me,
4    he picked up a brick and threw it at me. That
5    time I swung the golf club and missed, and it
6    slipped out my hand.
7    So he charged at me. So the piece of
8    brick he threw, it broke into pieces. I picked it
9    back up and threw it at him. I threw it at his
10   mid-section but he ducked down, ducked right into
11   it and hit him in his head.
12       Q.   Then what happened?
13       A.   He got back up and just started
14   cracking out and then I stepped off, went to my
15   brother's house.
16       Q.   **So that was what you pleaded guilty to,**
17   **assaulting with the cinder block when you threw**
18   **the cinder block at him and it hit him in his**
19   **head?**
20           MR. TISHLER: Objection. I think he
21   had already pled guilty to attempted aggravated
22   assault.

Olender Reporing, Inc.          (888) 445-3376              WORLDWIDE
Washington, D.C.                Baltimore, MD               Ft. Lauderdale, FL

NIGEL JABOH AUSTIN
Austin v. District of Columbia, et al.                                    1/31/2007

47

1   BY MR. ANDERSON:

2       Q.   But that is the factual circumstance

3   that led to your conviction of attempted

4   aggravated assault while armed?

5       A.   Yes.

6       Q.   As a result of pleading guilty, did you

7   get a sentence?

8       A.   They --

9            MR. TISHLER:   Objection.

10           THE WITNESS:   Eighteen months

11  probation.

12  BY MR. ANDERSON:

13      Q.   Eighteen months probation?

14      A.   Yes.

15      Q.   Do you have any other convictions other

16  than this one with Linwood?

17           MR. TISHLER:   Objection.

18           THE WITNESS:   No.

19  BY MR. ANDERSON:

20      Q.   Since you turned 18, had you been

21  arrested any other times other than this

22  particular time?

Olender Reporing, Inc.            (888) 445-3376               WORLDWIDE
Washington, D.C.                  Baltimore, MD                Ft. Lauderdale, FL

NIGEL JABOH AUSTIN
Austin v. District of Columbia, et al.    1/31/2007

72

1  everything was numb. I could not feel nothing.
2        But the second cell, I could feel
3  everything. I kept on -- I was still handcuffed
4  to the back and I was pushing up because I could
5  not push the water fountain in the cell block, so
6  I had to push on my head to get water, so the
7  water squirt out.
8      Q.   Were you in the cell by yourself that
9  time?
10     A.   Yes.
11     Q.   So after about 20 minutes, then you
12 were complaining, what? Constantly or a couple of
13 times?
14     A.   I was complaining constantly until they
15 came and they --
16     Q.   Complaining constantly saying you
17 wanted medical care?
18     A.   Yeah, I kept on complaining until I
19 can't because I fell asleep.
20     Q.   I'm sorry?
21     A.   I fell asleep afterwards in the second
22 cell.

Olender Reporing, Inc.        (888) 445-3376         WORLDWIDE
Washington, D.C.              Baltimore, MD          Ft. Lauderdale, FL

73

1  Q. About how long were you in the second
2 cell?  I guess we are two hours and twenty minutes
3 now from --
4  A. I would say four or five hours.
5  Q. Four or five hours after the incident
6 that you fell asleep?
7  A. No, after I was in the -- after I left
8 the first cell.  I think I was in the second cell
9 for about four or five hours.
10  Q. Then you fell asleep?
11  A. Yes.
12  Q. Other than the conversation with
13 Hawkins and the conversation with Thomas, did you
14 have any other conversation with the police
15 officers while you were in either cell, cell one
16 or cell two?
17  A. No.
18  Q. So they didn't say anything else to
19 you?
20  A. No.
21  Q. But you were what?  Talking to them
22 when they walked by the cell saying I want to go

NIGEL JABOH AUSTIN
Austin v. District of Columbia, et al.                                        1/31/2007

74

1  to the doctor, my jaw hurts?

2       A.    That was in the first cell, yeah.  The
3  second cell I just kept yelling it out.  But the
4  first cell, I could see people walking back and
5  forth.  I was laying on the ground.  I could see
6  people walking.

7       Q.    So then at some point, then, somebody
8  came to take you to the hospital?

9       A.    Yes.

10      Q.    What happened?

11      A.    On the way out, I got my mouth rinsed
12 out.  Then the 7-D came and the two other officers
13 came and picked me up.

14      Q.    To take you to Greater Southeast?

15      A.    Yes.

16      Q.    You say you rinsed your mouth out there
17 at the central cell block before you left?

18      A.    Yes.

19      Q.    Did they unhandcuff you?

20      A.    Not until I was -- not until I was
21 about to leave.  I believe he gave me a drink, a
22 cup, and let me rinse my mouth out.

```
                                                                    151
 1        Q.    Now, you mentioned there were chairs in
 2   processing area, were there chairs in that little
 3   room?
 4        A.    Yes.
 5        Q.    Is that where the other prisoner was,
 6   not Dunne, but the other prisoner that you are
 7   talking about, is that where he was seated?
 8        A.    Yes.
 9        Q.    And you never sat down?
10        A.    No.
11        Q.    So when Officer Thomas escorted you
12   into the room, what did Officer Thomas do then?
13        A.    Him and Dwayne Dunne, they went further
14   around the corner where I could not see them no
15   more.
16        Q.    The corner to the right or to the left?
17        A.    To the left.
18        Q.    Then what happened?
19        A.    What you mean what happened?
20        Q.    What did you say to anybody?
21        A.    I said, "take me back to my mother
22   fucking cell."
```

NIGEL JABOH AUSTIN
Austin v. District of Columbia, et al.                    1/31/2007

152

1  Q. Who did you say that to?

2  A. I just said it out.

3  Q. How loud did you say it?

4  A. I was pretty loud.

5  Q. Were you yelling?

6  A. Yeah, I wasn't screaming. I said to

7  the top of my voice.

8  Q. What made you believe that you can say

9  that to a police officer or anybody while you are

10 in custody?

11 A. Well, I was not thinking at the time.

12 Q. When you say you were "not thinking at

13 the time," what does that mean?

14 A. I mean, I just -- I was just a little

15 bit upset, and I just yelled it out.

16 Q. Why were you upset?

17 A. Because I wanted to go on back home

18 that day.

19 Q. You wanted to go home that day?

20 A. Yes.

21 Q. But you had known prior to the time you

22 were escorted into the processing room that you

NIGEL JABOH AUSTIN
Austin v. District of Columbia, et al.                                1/31/2007

194

1     Community Hospital in May of 2005 complaining of
2     back pain?
3         A.    2005?
4         Q.    Yes.
5         A.    You saying May?
6         Q.    May.
7         A.    I probably have.
8         Q.    I'm sorry?
9         A.    I believe I have, so -- I mean before
10    the incident, right?
11        Q.    Before the incident.
12        A.    Yeah, I probably did.
13             MR. TISHLER:  Is that a yes or a no?
14             THE WITNESS:  I don't know.  I don't
15    remember going to the ...
16    BY MR. MEHIGAN:
17        Q.    Are you aware that your lab results
18    from the hospital came back positive for
19    marijuana?
20             MR. TISHLER:  Objection.
21             THE WITNESS:  Came -- where?  You say
22    at the hospital?

NIGEL JABOH AUSTIN
Austin v. District of Columbia, et al.                                    1/31/2007

195

```
 1    BY MR. MEHIGAN:
 2         Q.    The lab report from the time you were
 3    in the hospital from 8/26/2005?
 4         A.    No, I didn't know they came back
 5    positive.
 6         Q.    Were you anxious in the hospital on the
 7    morning of 8/26/05?
 8         A.    Did you say was I what?
 9         Q.    Anxious.
10         A.    When I first woke up that morning?  You
11    say in the hospital?
12         Q.    On 8/26/05 at any time?
13         A.    Anxious?  I don't believe so.
14         Q.    I'm going to read you a part of the
15    nursing notes.  This is at 6:55 a.m. the morning
16    of 8/27/05. (sic)
17               Nurse writes, "patient voided last
18    about 0100 this morning; attempted to get urine
19    sample from patient for drug screen; patient still
20    has not given urine sample."
21               Do you know why you would not give a
22    urine sample at that time?
```

Olender Reporing, Inc.           (888) 445-3376                WORLDWIDE
Washington, D.C.                 Baltimore, MD                 Ft. Lauderdale, FL

NIGEL JABOH AUSTIN
Austin v. District of Columbia, et al.                                  1/31/2007

```
                                                                    196
 1       A.    I don't remember that.  I don't
 2  remember unless I could not got to the bathroom.
 3  I don't know.
 4       Q.    Did you deliberately avoid giving a
 5  urine sample to the nurse?
 6            MR. TISHLER:  Objection.
 7            THE WITNESS:  No.  I don't know why,
 8  though.  I don't know.  I don't remember that.
 9  BY MR. MEHIGAN:
10       Q.    On August 26, 2005, at 11:00 in the
11  morning, the nurse writes, among other things,
12  "patient alert and uncooperative at this time."
13  Do you recall being uncooperative to the nurse in
14  the hospital?
15            MR. TISHLER:  Objection.
16            THE WITNESS:  I don't recall that, no.
17  BY MR. MEHIGAN:
18       Q.    Do you know why you would have been
19  uncooperative?
20            MR. TISHLER:  Objection.
21            THE WITNESS:  I just can't think why I
22  would not give them my urine, why -- no, I don't
```

197

1   remember.

2           MR. TISHLER:  That is not what he is

3   asking.  He is asking whether or not -- how do you

4   know why you were not being uncooperative.

5           THE WITNESS:  Probably uncomfortable.

6   BY MR. MEHIGAN:

7       Q.  At any time in the hospital, were you

8   uncooperative?

9       A.  I don't remember.

10      Q.  It is possible, or you just don't think

11  it happened?

12      A.  I mean, a lady said -- I said I

13  something to her about -- I know it was

14  something -- I don't remember.

15      Q.  May I see that book please.

16          Now, I'm not going to mark this, but

17  I'm looking at pictures that your attorney

18  produced in connection with his demand package,

19  settlement demand package.

20          If you familiar with these pictures?

21      A.  Yes.

22      Q.  Do you see the picture I'm looking at?

**EXHIBIT 2**

JAMES E. BRADLEY, Jr.
Austin v. District of Columbia, et al.                          1/30/2007

112

1   Q    There we go.  Yeah.

2   A    Great.

3   Q    Do the General Orders require that the
4   -- I think we have covered that.  The General
5   Orders do require that the supervisor complete
6   the 313?

7   A    Correct.

8   Q    What time did the incident happen in
9   this case?

10  A    I'll have to look back.  I know that
11  Thomas came to work at 13:00 hours, I believe he
12  was working that tour of duty.  I believe I have
13  it in my notes.  Arrested at 9:55, arrived at
14  cell block 12:15; 13:45 hours.  1:45.

15  Q    And how did you figure that out?

16  A    These are notes that I took from the --
17  from the investigation.

18  Q    Where in the investigation does it say
19  it happened at --

20  A    All of --

21  Q    But you said it happened at 1:15?
22  1:45?  Can you figure out in what context it

JAMES E. BRADLEY, Jr.
Austin v. District of Columbia, et al.                                    1/30/2007

```
                                                              113
 1   was written down?
 2        A    13:45 hours, retrieved from the cell by
 3   Thomas.
 4        Q    Well, but Thomas said he waited around
 5   in the room a little while, didn't he?
 6        A    Okay.  A few minutes after that.
 7   Remember, he was multi-tasking.
 8        Q    A few minutes after 1:45 it happened?
 9        A    Right.
10        Q    And where did you get that from?
11        A    From the **, the incident, the
12   investigation, the FIT report --
13        Q    Can you remember how you figured out
14   the time that it happened?
15        A    It was written down.
16        Q    Can you figure out in what context it
17   was written down?
18        A    Approximately 13:45 hours, Thomas
19   retrieved -- from the cell by Thomas.  I did the
20   same thing you did -- Austin retrieved from the
21   cell by Thomas.
22             MR. GRENIER:  Correction.
```

JAMES E. BRADLEY, Jr.
Austin v. District of Columbia, et al.                              1/30/2007

155

1    Q    Oh, okay. But if Hawkins had called
2    for medical care, and was notified by Thomas
3    that Austin was wanting medical care, then
4    Thomas had fulfilled his responsibility to get
5    medical care for Austin, correct?
6    A    Hypothetically, except for the failure
7    to render first aid.
8    Q    That is correct?
9    A    Yes, sir.
10        MR. GRENIER: Mr. Anderson, just so
11   we're clear, you do represent the District of
12   Columbia, correct?
13        MR. MEHIGAN: He's doing a fine job.
14        MR. GRENIER: No, I just want to make
15   sure I understand, and we can all stipulate that
16   Hawkins was acting in the scope of his
17   employment with the District at the time.
18        MR. ANDERSON: We're not making --
19        MR. MEHIGAN: -- that question off my
20   outline, it's okay.
21        MR. ANDERSON: We're not making
22   stipulations, here, we're doing this deposition.