## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| | ) |
| **NIGEL AUSTIN,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) **Case No. 05-2219(JDB)** |
| | ) |
| **v.** | ) |
| | ) |
| **THE DISTRICT OF COLUMBIA, et al.** | ) |
| | ) |
| **Defendants.** | ) |

_____)

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT DON THOMAS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Nigel Austin, by and through his counsel, Bode & Grenier, LLP, hereby opposes Defendant Don Thomas' Motion for Partial Summary Judgment (the "Motion").

### SUMMARY OF ARGUMENTS

As set forth more fully herein, this Court should deny the motion for the following reasons:

1.     Defendant Officer Don Thomas ("Officer Thomas") had a duty to obtain immediate medical treatment for Plaintiff Nigel Austin ("Mr. Austin"), and his complete failure to procure the immediate medical treatment, despite being aware that Mr. Austin was bleeding, nearly unconscious, and complaining of a broken jaw, constituted an egregious and conscience shocking act which violated Mr. Austin's Due Process rights.

2.     No reasonable police officer could believe that after unjustifiably – or, for that matter justifiably – striking an individual it was lawful to: 1) place the prone, bleeding and handcuffed individual in a jail cell, rendering him unable to seek medical attention on his own; 2) leave the individual unattended for *several hours* with seeking to

ensure that he received medical attention; and 3) fail to monitor the individual's welfare, despite the individual's obvious injuries and repeated complaints of pain.

## FACTUAL BACKGROUND

On or about August 25, 2005, between 9:00 a.m. and 10:00 a.m., Mr. Austin was arrested pursuant to a warrant arising from an altercation between Mr. Austin and his neighbor, which occurred several days prior to his arrest. *See* Deposition Transcript of Nigel Austin at 37, attached hereto as "Exhibit 1." Following his arrest, Mr. Austin was transported to the 7th District Police station where he was processed, fingerprinted, and photographed. *Id*. at 37-38. Mr. Austin was placed in a holding cell for about an hour, and was then transported to the Central Cell Block ("Central Cell") where, as Mr. Austin had been informed by one of his arresting officers and an officer at the 7th District Station, he would be taken to court, arraigned, and released later that same day. *Id*. at 37, 53-54.

Defendant Don Thomas ("Officer Thomas") was working the 1:00 p.m. to 9:30 p.m. tour of duty at the Central Cell on August 25, 2005. *See* Deposition of Officer Thomas at 37-38, attached hereto as "Exhibit 2." Despite being understaffed by one officer, Officer Thomas' sole duty on August 25, 2005 was to process and fingerprint the prisoners in the Central Cell. *Id*. at 55-57. At some point in the early part of his tour of duty, Officer Thomas retrieved Mr. Austin from his jail cell and brought him to the processing room for the purpose of putting an armband on Mr. Austin. *See* Exhibit 1 at 54-55; Exhibit 2 at 47-48. Officer Thomas did not remember Mr. Austin acting hostile, belligerent or otherwise failing to cooperate with him while being transferred from his cell to the processing room. *See* Exhibit 2 at 49-50. Additionally, Officer Thomas chose

not to place Mr. Austin in handcuffs or leg shackles at the time of the transfer, despite the fact the he could have done so. *Id*. at 50, 60.  Despite Officer Thomas' insinuations in his Motion, Mr. Austin did not appear drunk or high at any point during his interactions with Officer Thomas.  *Id*. at 59.

Upon being brought to the processing room, Officer Thomas left Mr. Austin, alone and unchecked, in the attorney/prisoner interview room which was connected to the processing room, and went to a livescan machine located nearby to input data on a different detainee.  *See* Exhibit 1 at 55; Exhibit 2 at 64, 69-70.  While in the attorney/prisoner interview room, Mr. Austin overheard either Officer Thomas or Officer Rhonda Crowder ("Officer Crowder") (another officer present in the processing room) inform another pre-trial detainee that they would not be going to court that day, and would therefore have to spend the night at the Central Cell.  *See* Exhibit 1 at 55-57.  After learning that he would not be going to court, and subsequently released on August 25, 2005, Mr. Austin became upset and demanded that he be "take[n] back to [his] mother-fucking cell."  *See Id*. at 60.  Officer Thomas approached Mr. Austin and asked him to repeat the statement.  *Id*.  Mr. Austin repeated the statement, at which time Officer Thomas punched Mr. Austin in the face, causing Mr. Austin to fall down the steps outside of the processing room.  *Id.* at 63-4.

It is undisputed that immediately after Officer Thomas struck Mr. Austin, Mr. Austin began to bleed.  All of the MPD employees who witnessed the incident and/or its aftermath observed blood on the ground where the incident occurred.  *See* Exhibit 2 at 109, Deposition of Officer Crowder at 102, attached hereto as "Exhibit 3;" Deposition of Officer George Hawkins at 27, attached hereto as "Exhibit 4;" Deposition of Lynn Lewis

at 13, attached hereto as "Exhibit 5."  Further, Officers Crowder and Hawkins both observed blood on Mr. Austin's clothing immediately after the incident.  *See* Exhibit 3 at 106; Exhibit 4 at 27.

Despite the fact that Mr. Austin was bleeding, none of the MPD employees administered any first aid, or sought to do anything to determine the extent of Mr. Austin's injury.  Instead, Mr. Austin was physically manhandled and placed in a jail cell bleeding and nearly unconscious.  Exhibit 1 at 66; Exhibit 2 at 109, 118, 122, 124, 129; Exhibit 3 at 102; Exhibit 4 at 22, 27-8; Exhibit 5 at 13, 19.  Further, after depositing Mr. Austin on the floor of the jail cell, which Officer Thomas described as "covered with trash," he informed the nearly unconscious Mr. Austin that "your ass is in here for the night."  *See* Exhibit 1 at 67, Exhibit 2 at 122-3.  Even though he received no such orders to do so, Officer Thomas decided to leave Mr. Austin alone and unattended in the cell with his hands handcuffed *behind his back*.  *See* Exhibit 2 at 122, 135.  Significantly, Officer Thomas was unable to articulate any reason behind his decision to leave Mr. Austin handcuffed in the cell after the incident, and conceded that Mr. Austin was not physically combative at any time after the incident.  *See* Exhibit 2 at 129, 137.  Mr. Austin's hands were handcuffed behind his back for the entire time he was kept in the Central Cell, and as a result, he was unable to go to the bathroom, or even rinse his bloody mouth with water.  *See* Exhibit 1 at 72; Exhibit 2 at 133-4; Exhibit 4 at 97.

After passing out in the jail cell for an extended period of time from blood loss and pain, Mr. Austin was then brought to a second jail cell, where he remained until he was ultimately brought to Greater Southeast Community Hospital.  *See* Exhibit 1 at 71.  Notably, Mr. Austin began requesting medical attention immediately after being placed

in the jail cell, and continuously complained of pain, specifically telling Officer Thomas that his jaw was broken. *See* Exhibit 1 at 68-69. When Mr. Austin told Officer Thomas that his jaw was broken, Officer Thomas responded, "if you can talk, then your jaw is not broken." *Id*. at 68-9. After leaving Mr. Austin alone and bleeding in the jail cell, Officer Thomas returned to the processing room. He made no effort to call for a medical transport, despite Mr. Austin's repeated pleas for medical assistance. Officer Thomas made no further effort to inquire as to Mr. Austin's welfare, or otherwise monitor him while he was in the jail cell. *See* Exhibit 2 at 131, 142. Further, Officer Thomas never asked anyone else to check on Mr. Austin's well-being. *Id*.

Many hours later, Mr. Austin was finally brought to the hospital. Emergency room records from Greater Southeast Community Hospital indicate that Mr. Austin arrived at the hospital at approximately 8:30 p.m. – at least six hours after Officer Thomas punched Mr. Austin – at which time he was diagnosed as sustaining broken jaw. *See* Greater Southeast Community Hospital emergency room records attached hereto as "Exhibit 6."

## ARGUMENT

### I.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, "summary judgment is upheld on appeal only where there is no genuine issue of material fact, and, viewing the evidence in the light most favorable to the nonmoving party, the movant is entitled to prevail as a matter of law." *Abourezk v. New York Airlines, Inc.*, 895 F.2d 1456, 1457 (D.C. Cir. 1990) (internal citations and quotations omitted). Additionally, "the party against whom summary judgment was granted has the benefit of all reasonable

evidentiary inferences that can be drawn in his favor." *Id*. at 1458; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (U.S. 1986) (holding that at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial). Defendant Officer Thomas does not meet this standard. The facts in this action, as well as the expert testimony and other witness testimony, show that there are significant disputed issues of material facts as to whether Officer Thomas' blatant refusal to provide first aid and/or medical treatment to Mr. Austin constituted an egregious and conscience shocking act. In addition, the facts, expert testimony, and witness testimony show that there are significant disputed issues of material facts as to whether such acts would be considered lawful by a reasonable police officer.

## II.     DEFENDANT THOMAS' FAILURE TO OBTAIN IMMEDIATE MEDICAL TREATMENT FOR MR. AUSTIN VIOLATED MR. AUSTIN'S DUE PROCESS RIGHTS

Officer Thomas asks the Court to rule, as a matter of law, that he did not act egregiously or shock the Court's conscience when he intentionally threw Mr. Austin, unattended, into a jail cell with his hands handcuffed behind his back after viciously punching him in the face, despite the fact that Mr. Austin was bleeding profusely, complaining of injury, and repeatedly requesting medical attention. Officer Thomas' argument is completely untenable. Officer Thomas requests that this Court condone his complete abdication of responsibility for the welfare of Mr. Austin, even though Mr. Austin's physical injuries arose solely as a result of the unjustified blow to his face by Officer Thomas. If Officer Thomas' actions do not constitute deliberate indifference to a serious medical need, then Plaintiff cannot imagine what *would*.

It is undisputed that: (1) Officer Thomas struck Mr. Austin in the left side of his face with a closed fist; (2) as a result of the blow, Mr. Austin's jaw was shattered; and (3) despite nearly continuous complaints of pain, Mr. Austin was not taken to receive medical treatment until at least six hours after the incident.  As Officer Thomas was the sole reason why Mr. Austin required medical treatment in the first place, his behavior in failing to ensure that Mr. Austin received prompt and immediate medical treatment can be seen as nothing less than egregious and conscience shocking.  At a minimum, there are disputes as to the material facts that could cause a jury to find Officer Thomas' actions to be egregious and conscience shocking.

As an initial matter, Mr. Austin enjoyed the constitutional right to receive prompt medical care while he was in Defendants' custody.  *See Estelle v. Gamble*, 429 U.S. 97 (1976), *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243 (U.S. 1983); *Loe v. Armistead*, 582 F.2d 1291 (4th Cir. 1978).  Apart from his constitutional right, and addressed more fully below, the MPD General Orders required Mr. Austin receive immediate medical treatment as soon as he complained of his injuries.  *See* MPD General Order 502.7, attached hereto as "Exhibit 7;" MPD General Order 901.07, attached hereto as "Exhibit 8;" and MPD General Order 901.08, attached hereto as "Exhibit 9."

### a.    Officer Thomas Did Not Notify Anyone of Mr. Austin's Need for Medical Care

Despite cursory claims otherwise, Officer Thomas had a duty to provide immediate medical treatment to Mr. Austin under case law and numerous MPD General Orders.

Despite Officer Thomas' claims otherwise, Officer Hawkins testified that Officer Thomas never informed him that Mr. Austin required immediate medical treatment.  *See*

Exhibit 4 at 47-8.  Obviously, this testimony completely undercuts any claim by Officer Thomas that he fulfilled his duty to obtain immediate medical treatment by notifying Officer Hawkins.

      **b.**      **Even if Officer Thomas Notified His Supervisory Officer, He Violated His Independent, Primary Duty to Procure Medical Treatment for Mr. Austin**

Regardless of Officer Thomas' purported "notification" of Officer Hawkins, the MPD General Orders require immediate medical treatment for injured prisoners, and can in no way be interpreted to read that the duty to obtain immediate medical treatment for injured prisoners is satisfied by merely notifying a supervising officer.

MPD General Order 502.7 succinctly states that "persons held in departmental confinement facilities who claim a need for medical treatment due to any injury shall be immediately transported for examination and treatment."  *See* Exhibit 7.  Nowhere in this order does it say that the obligation for immediate medical treatment is met by notifying an official that a prisoner requires medical attention.  In fact, this obligation is not met by even calling for medical transport.  *Id*.

Further, MPD General Order 901.07 (V)(A) states that when any level of force is used "medical assistance shall be summoned immediately if a person is physically injured in any way, complains of pain, or demonstrates life-threatening injuries."  *See* Exhibit 8.  Once again, *nowhere* in this order does it say that notifying a supervisor is the equivalent of obtaining immediate medical attention.

Similarly, MPD General Order 901.08 (V)(A) states that when a *MPD member* becomes involved in a use of force incident, a subject shall be immediately taken to the hospital for examination and/or treatment if there are any complaints of injury.  *See*

Exhibit 9.  Once again, the general order clearly states that each member (which includes Officer Thomas) has an independent obligation to obtain immediate medical treatment for an injured subject, not to merely notify a supervisory officer that a subject is injured. Officer Thomas was charged with knowing these general orders, was subject to each and every one of them at the time of the incident, and subsequently was in breach of all of them by failing to make any effort to ensure that Mr. Austin received immediate medical treatment.

James E. Bradley, Jr., Mr. Austin's police procedures expert, repeatedly testified at his deposition that Officer Thomas was responsible for ensuring that Mr. Austin received medical treatment, and, accordingly, *did not* fulfill his obligation to obtain medical treatment for Mr. Austin by merely notifying his watch commander that Mr. Austin was injured.  *See* Deposition of James Bradley at 81-2, 153, 204-5, attached hereto as "Exhibit 10."

Mr. Bradley testified that if a prisoner is injured in the presence of a police officer, it is that police officer's responsibility to ensure that the proper paperwork is completed, and that the prisoner receives immediate medical attention.  *Id*. at 78.  Mr. Bradley laid this responsibility solely on Officer Thomas, stating that since Officer Thomas broke Mr. Austin's jaw, he was responsible for taking care of Mr. Austin and ensuring that Mr. Austin was taken to the hospital, regardless of whether a supervisor was present at the scene or not.  *Id*. at 81-4.

In fact, even if Officer Thomas had informed Officer Hawkins that Mr. Austin had been injured, and Officer Hawkins had ordered a medical transport, Officer Thomas was still responsible for arranging immediate medical transport if the transport ordered by

Hawkins was not immediately forthcoming.  *Id.* at 204-5.  Officer Thomas was under an obligation to obtain immediate medical treatment even in the event that Officer Hawkins, his supervising officer, specifically ordered him to continue his duties.  *Id.*  at 205.  It is undisputed that despite his repeated complaints of injury, and requests to receive medical attention, Mr. Austin was forced to languish bleeding in multiple jail cells for at least six hours.  Throughout this entire time, Officer Thomas had a duty to ensure that Mr. Austin received immediate medical treatment, which he wholly ignored.

Additionally, Jerry Wilson, Defendant District's police procedures expert, testified that after Officer Thomas informed Officer Hawkins that Mr. Austin needed medical treatment, if an hour or two passed without such treatment, Officer Thomas had a responsibility to circumvent his superior and obtain immediate medical treatment for Mr. Austin.  *See* Deposition of Jerry Wilson at 80-1, attached hereto as "Exhibit 11." Similarly, Detective Christopher Coles, FIT investigator for the incident, stated that if Mr. Austin was not getting immediate medical treatment, Officer Thomas could be held accountable for such a failure.  *See* Deposition of Christopher Coles at 448, attached hereto as "Exhibit 12."

Any testimony by Officer Thomas' expert witness, Paul Mazzei, with regard to medical treatment should be completely disregarded.  Officer Thomas' expert disclosures under Federal Rule 26(a)(2) stated that Mr. Mazzei was being presented solely on the issue of the reasonableness of Officer Thomas' use of force, and *not* to address, or set forth any opinion, with regard to medical treatment of Mr. Austin.  In fact, at his deposition, Mr. Mazzei unambiguously stated that he was not qualified to render an opinion on medical treatment.  *See* Deposition of Paul Mazzei at 79, attached hereto as

"Exhibit 13."

    **c.**    **Officer Thomas' Failure to Procure Medical Care for Mr. Austin Was Egregious and Conscience Shocking**

Having shown that Officer Thomas had a duty to provide immediate medical treatment for Mr. Austin, Mr. Austin has provided a sufficient factual basis to show that Officer Thomas' actions were egregious and conscience shocking, and constitute a Due Process violation. Apart from intentional actions by an official, deliberately indifferent conduct may also serve as a basis for a Due Process violation. *See Sacramento v. Lewis*, 523 U.S. 833, 850 (1997); *FOP v. Williams*, 375 F.3d 1141, 1146 (D.C. Cir. 2004); *Jenkins v. D.C.*, 1996 U.S. Dist. LEXIS 10650 (D.D.C. 1996); *Caldwell v. District of Columbia*, 901 F. Supp. 7 (D.D.C. 1995); *Green v. District of Columbia*, 1991 U.S. Dist. LEXIS 16190 (D.D.C. 1991). This lower threshold for meeting the "shock the conscience" test applies in situations where the State has a heightened obligation toward the individual – such as situations involving a prisoner or a pretrial detainee's claims of inadequate medical treatment. *See Lewis*, 523 U.S. at 850; *FOP*, 375 F.3d at 1146, *see also Barrie v. Grand County, Utah*, 119 F.3d 862, 867 (10th Cir. 1997); *Weyant v. Okst*, 101 F.3d 845, 856 (2nd Cir. 1996).

Deliberate indifference may be shown by evidence that the official acted with reckless disregard for the substantial risk posed by the detainee's serious medical condition. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (holding that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk); *Murphy v. United States*, 653 F.2d 637, 644-45 (D.C. Cir. 1981) (holding that deliberate indifference can be inferred from evidence that danger was sufficiently obvious to apprise officials of need

11

for protective measures and that officials failed to take such measures); *Powers-Bunce v. Dist. Of Columbia*, 2007 U.S. Distr. LEXIS 21778 (D.C. Cir., March 28, 2007).

In order to establish deliberate indifference, a plaintiff must show "something more than mere negligence;" but proof of intent is not required, for the deliberate-indifference standard "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.; see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

There can be no doubt that Officer Thomas' actions were at the very least deliberately indifferent to Mr. Austin's safety and well-being. After brutally striking Mr. Austin and observing blood on the ground where the incident occurred, Officer Thomas still persisted in placing the handcuffed[1] and nearly unconscious Mr. Austin in a jail cell alone and unattended. Officer Thomas made absolutely no effort to ensure that Mr. Austin obtained medical treatment, despite Mr. Austin's constant complaints of pain and injury. *See* Exhibit 1 at 66, 68-9; Exhibit 2 at 109, 117-8, 126. After placing Mr. Austin in the cell, Officer Thomas made no further effort to monitor Mr. Austin's physical well-being or otherwise ensure his welfare, despite his knowledge that Mr. Austin was bleeding, complaining of a broken jaw, and laying on the ground in the cell handcuffed and unattended. *See* Exhibit 2 at 142. Pictures of Mr. Austin's clothing taken immediately after he was released from custody clearly depict the enormous amount of blood that he lost while waiting for his "immediate" medical transport. These gruesome photographs also call into question Officer Thomas' claim that Mr. Austin's medical

---

[1] Apparently the handcuffs were not even necessary as Mr. Austin was by no means physically combative when he was taken from the scene of the incident to the initial jail cell. *See* Exhibit 2 at 137.

condition was "stable."  *See* Exhibit 14.

Mr. Austin was a pretrial detainee in the custody of Defendants, and therefore unable to care for himself.  Officer Thomas owed Mr. Austin the duty to assume responsibility for Mr. Austin's safety and well-being (especially in light of the fact that Officer Thomas' actions proximately caused Mr. Austin's injuries), a duty which Officer Thomas completely and utterly abdicated.  *See DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  In fact, Officer Hawkins' testimony that Officer Thomas did not even tell him that Mr. Austin required immediate medical transport leaves one to wonder what, if anything, Officer Thomas did to ensure that Mr. Austin received the much needed medical treatment.  *See* Exhibit 4 at 47-8.

The record is rife with further examples of Officer Thomas' egregious and conscience shocking behavior regarding his complete failure to obtain medical treatment for Mr. Austin.  *See Lewis*, 523 U.S. at 847; *Butera v. D.C.*, 235 F.3d 637, 651 (D.C. Cir. 2001); *FOP*, 375 F.3d at 1144.   Mr. Austin testified that immediately after the incident, Officer Thomas dragged him to a cell while he was still bleeding, and threw him, handcuffed and bleeding, into a cell that Officer Thomas unflatteringly described as having "worn paint over a concrete floor" with "trash on the ground."  *See* Exhibit 1 at 66-7; Exhibit 2 at 122-3.  Following this, Officer Thomas informed the prone and bleeding Mr. Austin that "your ass is in here tonight."  *See* Exhibit 1 at 67.  Notably, Mr. Austin was told this *after* he had requested immediate medical attention for his jaw.

At no time prior to leaving Mr. Austin alone and unattended in the jail cell did Officer Thomas make any attempt to determine the extent of Mr. Austin's injuries, or render any first aid.  *See Andujar v. Rodriguez,* 2007 U.S. App. LEXIS 6089 (11th Cir.

2007); *see also* Exhibit 2 at 127.  As set forth above, Mr. Austin's injuries were so severe that he passed out as a result of blood loss and pain for an extended period of time while he was in the first jail cell. In spite of this, Officer Thomas did *nothing* to ensure that Mr. Austin received prompt medical treatment.  *See* Exhibit 1 at 71.  Further, in his handcuffed position, Mr. Austin was not able to use the toilet, nor was he able to use the sink to rinse the blood out of his mouth.  *See* Exhibit 1 at 72; Exhibit 2 at 133-4; Exhibit 4 at 97.  There was simply no excuse for Officer Thomas treating Mr. Austin like a caged animal.

Officer Thomas' actions in placing Mr. Austin in an unattended and filthy jail cell after brutally assaulting him, and leaving him handcuffed and laying on jail cell floor, despite being aware that Mr. Austin was severely injured and bleeding, clearly rise to the level of egregious and conscience shocking behavior required for a Constitutional violation.  At the very least, there are genuine issues of material facts as to whether Officer Thomas' actions were egregious and conscience shocking.  Accordingly, Officer Thomas' Motion should be denied.

## III.    OFFICER THOMAS IS NOT PROTECTED BY QUALIFIED IMMUNITY

As related in the previous section, Officer Thomas' egregious and conscience shocking actions clearly render laughable any claim of qualified immunity.  Officer Thomas argues that after unjustifiably striking Mr. Austin, a reasonable officer would believe it lawful to: (1)  place a prone, bleeding, and handcuffed individual in a jail cell, rendering him unable to seek medical attention on his own; (2) leave the individual unattended for *several hours* without seeking to ensure that he received immediate medical attention; and (3) failing to monitor the individual's welfare, despite the

individual's obvious injuries and repeated complaints of pain.  This assertion borders on sanctionable under Rule 11.

Qualified immunity shields government officials from Constitutional torts unless they knew, or were unreasonable in not knowing, that their behavior violated the Constitution.  *See Anderson v. Creighton*, 483 U.S. 635, 639; *Harris v. District of Columbia*, 932 F.2d 10, 13 (D.C. Cir. 1991).  As the controlling standard in *DeGraff v. District of Columbia*, 120 F.3d 298 (D.C. Cir. 1997), states, a motion for summary judgment must be denied if material factual issues exist as to whether the Constitutional violation is sufficiently apparent for a reasonable police officer to have recognized its unlawfulness. *Id*. at 301.  The Fourth Circuit succinctly stresses that "disputed facts are treated no differently in . . . [the] qualified immunity analysis than in any other context." *Vathekan v. Prince George's County*, 154 F.3d 173, 180 (4th Cir. 1998) (quoting *Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir. 1995)).  "[S]ummary judgment on qualified immunity grounds is improper as long as there remains *any* material factual dispute regarding the actual conduct of the defendants." *Vathekan*, 154 F.3d at 180 (quoting *Buonocore*, 65 F.3d at 359-60 (emphasis added)).

Thus, if the facts of record (and all reasonable inferences from them, viewed favorably to Mr. Austin) describe police conduct that a jury *could* conclude to be so plainly unlawful that no reasonable officer could have believed to be lawful, it is for the jury to decide that issue – as the D.C. Circuit, and many other Circuit Courts of Appeal, have confirmed in a battery of recent decisions.[2]  To the extent that the egregious

---

[2] *See e.g., DeGraff*, 120 F.3d at 301 (reversing entry of summary judgment in favor of police officers on qualified immunity issue in connection with allegations of

undisputed facts do not compel a complete denial of Officer Thomas' motion outright, there are, at the very least, an abundance of "disputed facts that control the answer to the question" of whether Officer Thomas is entitled to summary judgment on qualified immunity grounds.

### a.    Officer Thomas Had "Fair Warning" That His Actions Were Unlawful

Initially, Officer Thomas had "fair warning" that failing to provide Mr. Austin with medical treatment was unlawful. *See Anderson-Bey v. District of Columbia*, 466 F. Supp. 2d 51 (D.D.C. 2006) (holding that before an officer is subject to suit, he must have

excessive force during arrest, because question as to whether reasonable officer would have found force used to be lawful was material fact question for jury to decide); *Martin v. Malhoyt*, 830 F.2d 237-263 (D.C. Cir. 1987) ("[w]ithout resolving the factual dispute as to what actually transpired between [officer] Martin and [arrestee] Malhoyt, we cannot say that Malhoyt has established the requisite objective reasonableness of his actions" regarding alleged lack of probable cause, requiring denial of summary judgment on qualified immunity defense); *Vathekan*, 154 F.3d at 180 (in action against police officer arising out of injuries caused to occupant of house by released police dog, summary judgment on qualified immunity denied, as "factual issue critical to resolution of this issue is contested," namely the conduct of what the police officer "actually did in the search of Vathekan's home"); *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (in view of disputed material facts, "the issue of excessive force [by police officer] also was for the jury, whose unique task it was to determine the amount of force used, and injuries suffered, *and the objective reasonableness of the officer's conduct*," precluding summary judgment on qualified immunity); *Bass v. Robinson*, 167 F.3d 1041, 1051 (6th Cir. 1999) ("Defendants are not entitled to qualified immunity . . . because a question of fact exists as to whether Defendants used excessive force and thus violated rights that were clearly established at the time."); *Thomas v. Gomez*, 143 F.3d 1246, 1249 (9th Cir. 1998) (correctional officers held not entitled to summary judgment on qualified immunity defense to prisoner's § 1983 action – alleging pointing of loaded rifle at him unnecessarily violated his right to be free from cruel and unusual punishment – as "the resolution of this issue involves disputed issues of material fact that need to be resolved by a jury."); *Goff v. Bise*, 173 F.3d 1068 (8th Cir. 1999) (even though mayor and police chief "offered evidence tending to support a contrary conclusion," Plaintiff's eyewitness and medical evidence indicating use of unnecessary and excessive force during arrest required denial of summary judgment on qualified immunity defense); *DuFour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998) (denying summary judgment where "facts are in hot dispute," and observing that "raising a defense of qualified immunity in the face of disputed facts that control the answer to the question is a waste of everybody's time").

fair warning that his conduct is unlawful). Officer Thomas' fair warning is premised on the myriad of cases that have held it unconstitutional to refuse and/or delay medical treatment to injured prisoners/pre-trial detainees.

In *Hope v. Pelzer*, 536 U.S. 730 (2002), the Supreme Court found that an Alabama prison was on notice that the use of a hitching post to punish inmates was unlawful because a previous Eleventh circuit case (*Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981)) found it unconstitutional to shackle prisoners to fences or cells for long periods of time, forcing them to sustain uncomfortable and awkward positions. *Hope,* 536 U.S. at 742; *see also Anderson-Bey*, 466 F. Supp. 2d at 64. Additionally, in *Hope*, the Supreme Court noted that the "fair warning" was buttressed by Alabama Department of Corrections regulations regarding the constitutionality of the hitching post. *Hope*, 536 U.S. at 741.

Similarly, in this instance there are many cases, all of which were decided well before the date of the incident, holding that it is a Constitutional violation to fail to provide medical treatment. *See Estelle v. Gamble*, 429 U.S. 97 (1976); *Baker v. District of Columbia*, 356 U.S. App. D.C. 47 (D.C. Cir. 2003); *Franklin v. District of Columbia*, 333 U.S. App. D.C. 334 (D.C. Cir. 1998); *Ashford v. Distict of Columbia*, 306 F. Supp. 2d 8 (D.D.C. 2004); *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243 (U.S. 1983); *Loe v. Armistead*, 582 F.2d 1291 (4th Cir. 1978). Further, much like the *Hope* case, the medical treatment requirement is "buttressed" by multiple MPD general orders regarding the necessity for medical treatment. *See* Exhibits 7, 8, and 9.

     **b.    No Reasonable Officer Would Believe that Officer Thomas' Complete Failure to Procure Medical Care for Mr. Austin Was Lawful**

A jury could clearly find that no reasonable officer would believe Officer

Thomas' actions to be lawful.[3]  Contrary to Officer Thomas' assertion that he had communicated to Officer Hawkins, his supervisor, that Mr. Austin required medical attention, Officer Hawkins explicitly testified as follows:

> Q:    Did Officer Thomas ever tell you that Mr. Austin needed prompt medical assistance?
>
> A:    I don't recall that, sir.  *No, sir.*

*See* Exhibit 4 at 47-8 (emphasis added).  As a result, there is a question of fact as to whether Officer Thomas even bothered to inform his supervising officer that Mr. Austin required medical attention.  Clearly, if Officer Thomas never informed Officer Hawkins that Mr. Austin required medical attention, it would be completely unreasonable to expect that Officer Hawkins was medically managing Mr. Austin, and would call into question whether his actions were lawful.  By brutally assaulting Mr. Austin, placing him handcuffed and bleeding in a locked cell alone and unsupervised, and failing to report to his supervising officer that Mr. Austin required medical assistance, a jury could surely find that Officer Thomas acted in a way that no reasonable officer could believe was lawful.

### c.    No Reasonable Officer Would Believe That A Six-Hour Delay in Treating a Bleeding, Unconscious Inmate Was Lawful

Further, as related above in Section II, it is hardly "undisputed" that a "delay of six hours, where a detainee is not in any acute medical emergency" is not egregious.  It is equally disputed that such a delay presents a set of facts where a reasonable officer could only conclude that he was committing a lawful act.   The facts as related by Officer

---

[3] As an aside, Plaintiff's police procedure's expert, James Bradley, who served on the Metropolitan Police Department for approximately twenty-five years, and who is a "reasonable officer," did not think that Officer Thomas' actions were lawful.  *See* Exhibit 10 at 81-4.

Thomas and Mr. Austin with regard to the delay in medical treatment are hardly in agreement. In his Motion, Officer Thomas seeks to portray Mr. Austin's injuries as minor, and his delay in medical treatment as little more than an inconvenience. Needless to say, because Mr. Austin sustained a broken jaw which required surgery and the insertion of eight (8) screws due Officer Thomas' actions, Mr. Austin paints a significantly different picture with regard to his time in the Central Cell prior to being transported to Greater Southeast.

Immediately after Officer Thomas struck Mr. Austin in the mouth, Mr. Austin was dragged to a jail cell where he was deposited, bleeding and handcuffed.[4] *See* Exhibit 1 at 65, 67. As Mr. Austin lay on the floor of the cell bleeding, Officer Thomas informed him that "your ass is here for tonight." *Id*. at 67. After about twenty minutes, Mr. Austin told Officer Thomas that he thought his jaw was broken, to which Officer Thomas responded "if your jaw was broke, you would not be able to talk."[5] *Id*. at 69. Mr. Austin's injuries were so severe that he briefly lost consciousness while he was lying on the floor in the first cell, and lost "a lot of blood in both cells." [6] *Id*. at 179. In fact, Mr. Austin literally "thought [he] was going to die in one of the cells." *Id*. at 178. Notably, after being told that Mr. Austin's jaw was broken and directly witnessing his severe injuries, Officer Thomas left Mr. Austin in his cell, alone and unattended, made no effort to monitor him, and certainly made no effort to obtain prompt medical treatment.

---

[4] Officer Thomas has never been able to articulate why Mr. Austin was placed in the jail while still handcuffed. *See* Exhibit 2 at 129.

[5] Officer Thomas denies that Mr. Austin ever told him his jaw was broken, presenting yet another disputed issue of material fact. *See* Exhibit 2 at 125-6.

[6] In fact, Mr. Austin lost so much blood in the first cell that he had to be moved to a second cell so that the first cell could be mopped clean. *See* Exhibit 1 at 104.

As a result, when presented with Mr. Austin's facts regarding his injuries, a jury could easily find that Officer Thomas acted in a way that no reasonable officer would consider lawful – namely by leaving a bleeding, restrained and unconscious individual alone in a jail cell.  As a result of the above factual disputes, Officer Thomas should not be found to be protected by qualified immunity, and his Motion should be denied.

**IV.  PLAINTIFF HAS DISTINCTLY STATED A SEPARATE CLAIM FOR NEGLIGENCE AND BATTERY**

For the sake of brevity, Plaintiff incorporates by reference all of the facts and arguments contained in his Memorandum in Opposition to Defendant District of Columbia's Motion for Partial Summary Judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Nigel Austin requests that the Court deny the Defendant's Motion for Partial Summary Judgment. A proposed Order is attached hereto.

Respectfully submitted,

BODE & GRENIER, LLP

_____*Peter C. Grenier /s/*_____
Peter C. Grenier, #418570
1150 Connecticut Ave., N.W.
Ninth Floor
Washington, D.C. 20036
(202) 862-4311
*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of  April 2007, I served a true and accurate copy of Plaintiff's Memorandum in Opposition to Defendant Thomas' Motion for Partial Summary Judgment by electronic case filing and U.S. Mail, postage-prepaid upon:

> Steven J. Anderson, Esquire
> Assistant General Counsel
> 441 4th Street, N.W.
> 6th Floor North
> Washington, DC 20001
> *Attorney for Defendant*
> *District of Columbia*


> James Pressler, Esquire
> PRESSLER & SENFTLE, P.C.
> 927 15th Street, N.W.
> Twelfth Floor
> Washington, D.C. 20005
> *Counsel for Defendant*
> *Officer Don Thomas*



_____*Peter C. Grenier /s/*_____
                Peter C. Grenier

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
**NIGEL AUSTIN,**                               )
                                                )
                                                )
        **Plaintiff,**                          )    **Case No. 05-2219(JDB)**
                                                )
        **v.**                                  )
                                                )
**THE DISTRICT OF COLUMBIA, et al.**            )
                                                )
        **Defendants.**                         )
_____)

### <u>PLAINTIFF'S STATEMENT OF GENUINE ISSUES IN OPPOSITION TO DEFENDANT THOMAS' STATEMENT OF MATERIAL FACTS</u>

In accordance with LCvR 7(h), Plaintiff Nigel Austin ("Mr. Austin") submits this statement of genuine issues in opposition to Defendant Thomas' statement of material facts.

1.      **Defendant's alleged "fact:"** In August 2005 the Plaintiff Nigel Austin (Austin) was involved in a neighborhood altercation.  Austin swung a golf club at his neighbor, but missed.  Ultimately, Austin threw a brick and struck his neighbor in the head."

**Genuine issue:** Plaintiff denies that the above description of the incident between Nigel and his neighbor is complete, but does not dispute the facts stated. *See* Exhibit 1 at 44-6.

2.      **Defendant's alleged "fact:"** "Within days of the altercation, the Metropolitan police arrested Austin who was charged with assault with a deadly weapon. Austin pled guilty to attempted aggravated assault while armed and received 18 months probation."

**Response:** Plaintiff does not dispute the facts stated.

3.      **Defendant's alleged "fact:"** "On August 25, 2005, at approximately 1:45 p.m. the Defendant Thomas was processing Austin in the Central Cell block which was under-staffed at the time."

**Response:** Plaintiff does not dispute the fact stated.

4.      **Defendant's alleged "fact:"** "Just before the occurrence, Austin learned that he would be spending the night in jail because he was too late for a court appearance that day.  Austin began shouting "take me back to my mother fucking cell" and started to repeatedly step out of a [sic] interview room."

**Genuine issue:** Plaintiff denies that he repeatedly stepped out of an interview room after learning he would not be going to court.  *See* Exhibit 1 at 60-1.

5.      **Defendant's alleged "fact:"** "At one point Austin stepped out of the interview room again, and started to move right towards the exit, leading Defendant Thomas to believe that Austin was trying to escape."

**Genuine issue:** Plaintiff denies that he stepped out of the interview room and started to move towards the exit.  *See* Exhibit 1 at 60-1.

6.      **Defendant's alleged "fact:"** "Thomas followed Austin and grabbed his arm.  Austin then swung at Thomas who swung back, in self defense, striking Austin in the face."

**Genuine issue:** Plaintiff denies this fact in its entirety.  After Plaintiff asked to be returned to his cell, Defendant Thomas approached Plaintiff and asked him to repeat what he had said.  After Plaintiff repeated himself, Defendant Thomas struck Plaintiff in the face.  *See* Exhibit 1 at 60, 63-4.

7. **Defendant's alleged "fact:"** "Soon thereafter, once Austin was secured, Thomas advised his acting watch commander that Austin had requested medical transport.  The watch commander requested medical transport within ten minutes."

**Genuine issue:**  Plaintiff denies that Defendant Thomas advised his acting watch commander that Plaintiff required medical transport.  *See* Exhibit 4 at 47.  Plaintiff denies that the watch commander requested medical transport within ten minutes."  *See Id*. at 32.

8. **Defendant's alleged "fact:"** "The watch commander had to recall transport who did not arrive at the cell block until approximately 8:00 p.m."

**Genuine issue:** Plaintiff does not dispute the facts stated.

9. **Defendant's alleged "fact:"** "Delays in the arrival of the transport were not caused by Thomas who had fulfilled his duty upon notifying the watch commander."

**Genuine issue:**  Plaintiff denies that Defendant Thomas had fulfilled his duty by notifying his watch commander.  *See* Exhibits 7, 8, 9; Exhibit 10 at 78, 81-4, 153, 204-5; Exhibit 11 at 80-1; Exhibit 12 at 448.

10. **Defendant's alleged "fact:"** "While waiting for transport, Austin was placed in a holding cell where he fell asleep for a couple of hours."

**Genuine issue:** Plaintiff denies that the above description is complete, but does not dispute the facts stated.  *See* Exhibit 1 at 67, 69, 178-79.

11. **Defendant's alleged "fact:"** "Police officers from the Seventh District ultimately arrived and transported Austin to Greater Southeast Community Hospital emergency room.  A triage nurse evaluated Austin by 8:30 p.m."

**Genuine issue:** Plaintiff does not dispute the facts stated.

12. **Defendant's alleged "fact:"** "Hospital lab tests of August 26 and 27,

2005, revealed that Austin was positive for marijuana (i.e. tetrahydrocannabinol or

"THC")."

      **Genuine issue**: Plaintiff does not dispute the fact stated.


      Respectfully submitted,

      BODE &GRENIER, LLP

      *Peter C. Grenier /s/*_____
      Peter C. Grenier (D.C. Bar No. 418570)
      Bode & Grenier, L.L.P.
      1150 Connecticut Avenue, N.W.
      Ninth Floor
      Washington, D.C.  20036
      (202) 828-4100
      (202) 828-4130 (fax)
      *Counsel for Plaintiff*

Dated: April 6, 2007

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of April 2007, I served a true and accurate copy of Statement of Genuine Issues in Opposition to Defendant's Statement of Material Facts by electronic case filing and U.S. Mail, postage-prepaid upon:

Philip Lattimore III, Esquire
Chief, General Litigation Sec. III
Steven J. Anderson, Esquire
Assistant General Counsel
441 4th Street, N.W.
6th Floor North
Washington, DC 20001
*Attorney for Defendant District of Columbia*

James Pressler, Esquire
PRESSLER & SENFTLE, P.C.
927 15th Street, N.W.
Twelfth Floor
Washington, D.C. 20005
*Counsel for Defendant*
*Officer Don Thomas*


_____*Peter C. Grenier /s/*_____
                 Peter C. Grenier