## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NIGEL AUSTIN,**

   **Plaintiff,**

      v.

**DISTRICT OF COLUMBIA, et al.,**

   **Defendants.**

**Civil Action No. 05-2219 (JDB)**

## MEMORANDUM OPINION

This civil suit arises from plaintiff Nigel Austin's detention at the District of Columbia Metropolitan Police Department ("MPD") Central Cell Block on August 25, 2005. Austin, who had been arrested that morning and was being held at the Central Cell Block, alleges that MPD Officer Don Thomas struck him without provocation, delivering a blow that broke his jaw. According to Austin, Thomas and the other MPD officers present were aware of his injuries but failed to secure medical care for him in a timely manner. The six-count complaint asserts that Thomas violated Austin's constitutional rights and that Thomas and his employer, the District of Columbia ("the District"), committed various torts under District of Columbia law. Pending before the Court at this time are motions for partial summary judgment filed by the District and Officer Thomas, and a cross-motion for partial summary judgment filed by plaintiff Austin. For the reasons set forth below, the Court will grant the District's motion, grant in part and deny in part Thomas's motion, and deny plaintiff's cross-motion.

1

## BACKGROUND

The parties agree on the general factual chronology, but vigorously dispute many of the

relevant details.[1]  Plaintiff Austin was arrested by MPD officers on August 25, 2005, two days

before his twentieth birthday.  Pl.'s Stmt. ¶ 1; Thomas Stmt. ¶ 1.  The arresting officers

transported Austin first to the Seventh District police station, where he was processed,

fingerprinted, and photographed.  Pl.'s Thomas Opp'n, Exh. 1 (Austin Depo.) at 37-38.   He was

then taken to the Central Cell Block at 12:15 p.m., shortly before Officer Thomas commenced

his 1:00 p.m. to 9:30 p.m. shift.  Pl.'s Stmt. ¶¶ 2, 3.  The Central Cell Block was understaffed at

that time.  Thomas Stmt. ¶ 3; Pl.'s Thomas Opp'n, Exh. 2 (Thomas Depo.) at 55.  At

approximately 1:45 p.m., Officer Thomas retrieved Austin from a holding cell to bring him to a

processing room in which he would receive an identifying armband.  Pl.'s Stmt. ¶ 4; Pl.'s Thomas

Opp'n, Exh. 2 at 48.  Thomas temporarily left Austin in an adjacent interview room, where

Austin overheard one of the MPD officers inform another person that the detainees would not be

brought to court that day and would therefore have to spend the night in jail.  Thomas Stmt. ¶ 3;

Pl.'s Thomas Opp'n, Exh. 1, 55-57.  Austin became upset and shouted out loud, "take me back to

---

[1] For ease of reference, the following abbreviations will be used to identify the array of materials submitted by the parties: Plaintiff's Statement of Material Facts Not in Dispute ("Pl.'s Stmt."); Defendant Thomas's Statement of Material Facts as to Which There is No Genuine Issue ("Thomas Stmt."); Plaintiff's Statement in Opposition to Defendant Thomas's Statement of Material Facts ("Pl.'s Opp'n Stmt."); Memorandum in Support of Defendant District of Columbia's Motion for Partial Summary Judgment ("D.C. Mem."); Memorandum in Support of Defendant Thomas's Motion for Partial Summary Judgment ("Thomas Mem."); Memorandum in Support of Plaintiff's Opposition to Defendant District of Columbia's Motion for Partial Summary Judgment ("Pl.'s D.C. Opp'n"); Memorandum in Support of Plaintiff's Opposition to Defendant Thomas's Motion for Partial Summary Judgment ("Pl.'s Thomas Opp'n"); Memorandum in Support of Plaintiff's Cross-Motion for Partial Summary Judgment ("Pl.'s Cross-Mot. Mem."); Defendant District of Columbia's Opposition to Plaintiff's Motion for Partial Summary Judgment ("D.C. Opp'n").

my mother fucking cell."  Thomas Stmt. ¶ 3; Pl.'s Thomas Opp'n, Exh. 1 at 60-61.

The parties' accounts of what transpired next diverge substantially.  According to Austin,

Officer Thomas approached him and asked him to repeat the demand that he had just made.  Pl.'s

Opp'n Stmt. ¶ 6.  When Austin did so, Thomas allegedly swung at him, striking Austin with a

closed right fist on the left side of his face.  Pl.'s Thomas Opp'n, Exh. 1 at 63.  The blow caused

Austin to fall down steps that were behind him.  Id.  At that point, MPD Officers Rhonda

Crowder and George Hawkins assisted Thomas in subduing Austin by pulling his hands behind

his back and placing handcuffs on him.  Id. at 64.  Officers Thomas, Crowder, and Hawkins all

observed blood on the floor at the spot where Austin had been subdued and, once he rose from

the floor, Crowder and Hawkins also observed blood on his light-colored shirt.  Pl.'s Thomas

Opp'n, Exh. 2 at 124; id., Exh. 3 (Crowder Depo.) at 102, 106; id., Exh. 4 (Hawkins Depo.) at 27.

Austin maintains that he was still handcuffed - - and remained so throughout the day - - and that

Officer Thomas dragged him into a cell and told him, "your ass [is] in here for the night."  Id.,

Exh. 1 at 63, 67.  Once in the cell, Austin allegedly began to complain about his pain and

requested medical attention.  He claims to have told Officer Thomas that he believed his jaw was

broken, to which Thomas supposedly responded, "if you can talk, then your jaw is not broken."

Id. at 69.

Officer Thomas paints a strikingly different picture of the events.  In his version, after

demanding to be returned to his cell, Austin repeatedly stepped out of the interview room in

which he was located at that time.  Thomas Stmt. ¶ 3.  When Austin stepped out again and made

a move toward the exit from the room, Thomas believed that he was trying to escape.  Id. ¶ 4;

Thomas Mem., Exh. 3 (Thomas Depo.) at 92.  Thomas followed Austin and grabbed his arm in

order to secure him.  Id. at 94-95.  Austin then allegedly turned and swung at Thomas, who

swung back with his right arm, striking Austin in the face.  Thomas Stmt. ¶ 5.  According to

Thomas, Austin was not dragged back to a cell; rather, he walked to the cell assisted by Thomas

and Hawkins, each of whom supported one of his arms.  Pl.'s Thomas Opp'n, Exh. 3 at 122.  Nor,

Thomas says, did Austin tell him that his jaw was broken.  Id. at 125-126.  But Thomas does

recall that Austin requested medical treatment shortly after being placed in the cell.  Thomas

insists that he referred the request to Officer Hawkins, who was the acting commander for that

shift.  Id. at 126-27; Thomas Stmt. ¶ 6.  Hawkins then contacted a dispatcher and filled out a

required form (a "PD 313") so that Austin could be transported to the hospital.  Thomas Mem.,

Exh. 4 at 32-33.  After placing Austin in the cell, Thomas insists, he had no further interaction

with Austin.  Pl.'s Thomas Opp'n, Exh. 3 at 142.

Whichever version of the events is to be believed, the parties generally agree that the

requested medical attention was slow in coming.  Austin remained at first in the cell to which he

had been brought after the punch.  Approximately two hours later, Officer Hawkins walked him

over to a second cell, where he fell asleep for a period of time.  Pl.'s Thomas Opp'n, Exh. 1 at 71.

Austin maintains that, while he was awake, he continually complained of his pain and requested

medical treatment.  Id.  Hawkins placed a second phone call requesting transport for Austin at

approximately 7:30 p.m.  Thomas Stmt. ¶ 8; Thomas Mem., Exh. 4 at 32-33; D.C. Opp'n, Exh.

(Hawkins Depo.) at 74.  Police officers from the Seventh District finally arrived to transport

Austin to the hospital shortly after 8:00 p.m.  Hospital records show that a triage nurse attended

to Austin at 8:30 p.m.  Thomas Mem., Exh. 6 (Initial Assessment).  Subsequent tests confirmed

that Austin had suffered a broken jaw.  Pl.'s Thomas Opp'n, Exh. 6 (Emergency Physician

Record).  Austin allegedly underwent surgery two days after the incident, and his jaw was wired

shut for a month and a half.  Compl. ¶¶ 26, 30.

Less than three months after the incident, Austin filed a six-count complaint against the

District of Columbia, Officer Thomas, and various unnamed MPD officers.  Dkt. #1.  Three

counts (I, II, and VI) assert violations of District of Columbia common law and seek recovery in

tort for battery, intentional infliction of emotional distress, and negligence.  The remaining three

counts (III, IV, and V) allege that Officer Thomas violated Austin's constitutional rights by

striking him without provocation, acting with deliberate indifference toward his medical needs,

and conspiring with unnamed officers to deny or deprive him of medical care.  The parties have

engaged in protracted and often contentious discovery in advance of the trial, which is scheduled

for July 2007.  Presently before the Court are cross-motions for partial summary judgment that

seek to narrow the scope of the issues to be tried at that time.


## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by "informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## **DISCUSSION**

There are three motions for partial summary judgment now before the Court. Both Thomas and the District of Columbia seek summary judgment on one aspect of Austin's negligence claim, contending in essence that this claim is a restatement of the battery cause of action alleged in Count I and that such claims are barred under recent case law from the D.C. Court of Appeals. Officer Thomas has also interposed the defense of qualified immunity and seeks summary judgment on Counts IV and V of the Complaint, which allege that he acted with deliberate indifference to Austin's medical needs and conspired with other officers to deprive Austin of his constitutional right to adequate medical treatment. For his part, plaintiff Austin moves for summary judgment as to liability on the portion of his negligence cause of action that

claims that the District of Columbia violated both national and local standards of care when it

failed to secure immediate medical care for him.  The three motions will be addressed in turn.

## A.  Defendants' Motion for Partial Summary Judgment on Count VI

Both the District and Officer Thomas seek partial summary judgment on the portion of

Count VI of the Complaint alleging that Thomas violated local and national standards of care

when he used more force against Austin than was reasonably necessary.  Compl. ¶¶ 84-86, 89,

91.  According to defendants, this portion of Count VI is, at bottom, the mirror image of the

battery cause of action alleged in Count I and must therefore be dismissed under the D.C. Court

of Appeals' decision in District of Columbia v. Chinn, 839 A.2d 701 (D.C. 2003).  Defendants'

motions force the Court to wade through an area of District of Columbia law that the D.C. Court

of Appeals has repeatedly acknowledged is confusing - - namely, the circumstances under which

an alleged victim of excessive force by District police officers can seek recovery under both

assault-and-battery and negligence theories of liability.  See Smith v. District of Columbia, 882

A.2d 778, 787-88 (D.C. 2005); Chinn, 839 A.2d at 706; Holder v. District of Columbia, 700

A.2d 738, 742 (D.C. 1997).

To start with, the D.C. Court of Appeals has confirmed that there are limited situations in

which claims of both battery and negligence arising from the same underlying acts of alleged

police brutality can be submitted to the jury.  See Holder, 700 A.2d at 742 ("[W]here there is

sufficient evidence to submit to a jury the question of assault and battery, there may be, on the

facts of a particular case, sufficient evidence to submit the question of negligence as well.").  The

two causes of action are similar in key ways, since both "fundamentally involve an inquiry into

the reasonableness of the police officer's actions."  Id.; see also Brooks v. District of Columbia,

7

Civ. A. No. 05-352, 2006 WL 3361521, at *5 (D.D.C. Nov. 20, 2006) ("Because each cause of action involves an inquiry into the reasonableness of the police officer's actions, these claims often converge in police brutality suits."). In evaluating a claim for battery, the factfinder considers "whether the officer's conduct was reasonably necessary and thereby privileged; and for negligence the inquiry is whether the officer's conduct violated the standard of care of a reasonably prudent police officer." Holder, 700 A.2d at 742.

It was in Chinn that the D.C. Court of Appeals sought to reconcile "the perhaps somewhat confused and overlapping legal principles relating to police use of force," id., and to articulate "a meaningful distinction between a battery claim based on police use of excessive force and a negligence claim grounded in police use of excessive force." Smith, 882 A.2d at 789. The court discussed at length two lines of excessive-force cases, which the District had argued "uneasily co-exist." Chinn, 839 A.2d at 707. In one line of cases, exemplified most recently by Sabir v. District of Columbia, 755 A.2d 449 (D.C. 2000), the negligence claims failed because the plaintiffs had not specified a negligent act beyond the use of force itself and had not identified a breach of duty that could give rise to liability. They had instead alleged simply that police officers "negligently" arrested, detained, or battered them - - allegations that are insufficient because "it is impossible to negligently commit assault and/or battery [in so far as] the states of mind are separate and incompatible." Chinn, 839 A.2d at 708. In the second line of cases, in contrast, the negligence claim could be submitted to the jury alongside the assault-and-battery claim because the plaintiffs had separately pled negligence, had identified a standard of care distinct from not using excessive force, and had pointed to an act constituting a possible breach of duty. Id. at 708-10 (discussing the White line of cases: District of Columbia v. Downs,

357 A.2d 857 (D.C. 1976), District of Columbia v. White, 442 A.2d 159 (D.C. 1982), Etheredge

v. District of Columbia, 635 A.2d 908 (D.C. 1993), and District of Columbia v. Evans, 644 A.2d

1008 (D.C. 1994)). Each of the cases in this second line had "common characteristics":

> Each involves the use of deadly force. Each invokes a police regulation
> establishing a standard of care with respect thereto that is arguably distinct from
> the excessive force standard. Each involves alternate scenarios in at least one of
> which a distinct act of negligence, a misperception of fact, may have played a part
> in the decision to fire. Each involves a negligent act that precedes the application
> of the relevant force of resort to firearms, i.e., prior to the pulling of the trigger.

Chinn, 839 A.2d at 710-11. The plaintiff in Chinn had alleged not that the officers misperceived

him as a threat or mistakenly believed that he was armed, but rather that they had "continuously

assaulted him without provocation." Id. at 711. These allegations, the court held, were

analogous to those in the Sabir line of cases and distinct from those in the White line. Id. The

plaintiff's negligence claim therefore should not have been submitted to the jury.

In so concluding, the D.C. Court of Appeals in Chinn articulated a standard that controls

the resolution of the pending motions in this case. For a negligence count to be submitted to the

jury in a case involving the intentional use of force by police officers, the court explained, "that

negligence must be distinctly pled and based upon at least one factual scenario that presents an

aspect of negligence apart from the use of excessive force itself and violative of a distinct

standard of care." Id.; see id. at 707 ("What is required to justify [a negligence] instruction is at

least one distinct element, involving an independent breach of a standard of care beyond that of

not using excessive force in making an arrest, which may properly be analyzed and considered by

the jury on its own terms apart from the intentional tort of battery and the defense of privilege.").

Although this case implicates neither the use of a firearm nor the use of deadly force, Austin has

satisfied two of the basic requirements imposed in Chinn. First, his negligence claim is distinctly

9

pled in Count VI of the Complaint.  Second, the parties present conflicting accounts of the facts,

in one of which a possible "misperception of fact" - - Officer Thomas's belief that Austin was

swinging at him - - "may have played a part" in Thomas's decision to use force.  See id. at 711.

These two factors indicate, as Austin contends, some similarity between this suit and the line of

cases in which both battery and negligence claims have properly been submitted to the jury.

Nevertheless, Austin has failed to establish the crucial third element repeated three times

by the Chinn court: violation of a standard of care "that is arguably distinct from the excessive

force standard."  Id.; see id. at 707 ("a standard of care beyond that of not using excessive force);

id. at 711 ("violative of a distinct standard of care").  "It is tautological," the D.C. Court of

Appeals explained,

> to speak of the standard of care as being the duty not to use excessive force; that is
> the precise boundary line of the privilege itself, and it matters not whether it is
> exceeded because of the deliberate intention of the officer or through a mistake as
> to the limit of objectively reasonable allowable force.

Id.  Austin alleges in his Complaint, and repeats in his opposition to the District's motion, that the

applicable standard of care is provided by MPD General Order 901.7.  Compl. ¶¶ 85-86; Pl.'s

D.C. Opp'n at 8; id., Exh. 11 (General Order 901.7).  The operative portions of the General Order

cited by Austin are those announcing the MPD's policy that "an officer shall use only that force

which is reasonably necessary to bring an incident under control," and shall "use non-deadly

force only when such force is necessary to protect [the officer] or another from physical harm, to

restrain or subdue a resistant individual, or to bring an unlawful situation safely and effectively

under control."  Compl. ¶¶ 85-86; see Pl.'s D.C. Opp'n, Exh. 11 at 2, 6.[2]  Austin is certainly

correct that MPD regulations may constitute evidence of a specific standard or care.  See Chinn,

839 A.2d at 709 (discussing the White line of cases).  But the MPD policy embodied in General

Order 901.7 is not "distinct from the excessive force standard."  Id. at 711.  To the contrary, the

policy explains the circumstances under which the use of force is permissible, or, put differently,

when the force used by officers will not be excessive.  Allowing Austin to proceed on both

theories of liability here would be "not only doctrinally unsound but a potential source of jury

confusion," and would run the risk that a jury could credit Officer Thomas's account of the

incident, conclude that no battery occurred, and yet still find "that some undefined negligence

was present for which relief of some sort is justified."  Id. at 707.[3]  This is precisely the

anomalous - - and confusing - - result that the rule enunciated in Chinn seeks to avoid.

    Finally, Austin attempts to limit Chinn to situations in which "a battery [that is] lawful in

its inception escalates into alleged excessive force," such as during an arrest.  Pl.'s D.C. Opp'n at

12-13.  That effort is unavailing.  Chinn itself arose in such a context, and Austin is correct that

---

   [2] Austin also refers to the deposition testimony of expert James Bradley as establishing
the relevant national standard of care with respect to the use of force.  Pl.'s D.C. Opp'n at 8; id.,
Exh. 12 (Bradley Depo.).  Bradley's testimony, however, diverges from General Order 901.7 only
in so far as Bradley, despite counsel's efforts to focus his responses, repeatedly described the
standard of care governing the use of force during arrests.

   [3] One other aspect of Chinn is noteworthy.  The court there took pains to clarify at the
end of its opinion that claims of negligence in excessive-force cases cannot be based on a
provision of the D.C. Code - - now § 5-123.02, formerly § 4-176 - - that criminalizes the use of
"unnecessary and wanton severity in arresting or imprisoning" someone.  "No rational jury," the
court explained, "could find no battery by a police officer (that is, no use of excessive force) and
yet find 'negligence' on the basis of the statute alone."  839 A.2d at 712.  That reasoning applies
with equal force to the MPD General Orders invoked by Austin, since those Orders, like § 5-
123.02, fail to articulate a standard of care "distinct" from the definition of excessive force itself.
See id.; Smith, 882 A.2d at 792-93.

the court early in its opinion described as "identical" the battery and negligence inquiries in

circumstances where "a battery, lawful in its inception, escalates into alleged excessive force."

839 A.2d at 707.  Elsewhere, however, the court spoke in general terms and gave every

indication that it was announcing a rule of more general applicability.  See id.; id. at 711.  Indeed,

both the D.C. Court of Appeals and another judge on this court have understood Chinn as

announcing just such a rule, and have thus applied its analytical framework outside of the arrest

context.  See Smith, 882 A.2d at 781, 792 (officer's alleged use of a choke hold in breaking up a

fight); Reed v. District of Columbia, 474 F. Supp. 2d 163, 174 (D.D.C. 2007) (officer's use of

deadly force upon entering a building).  The analysis set forth in Chinn therefore governs here,

and that analysis leads to the conclusion that the aspect of plaintiff's negligence claim arising

from the use of force cannot be submitted to the jury.[4]  Accordingly, the motion for partial

summary judgment filed by the District, and joined by Officer Thomas, will be granted.

**B. Officer Thomas's Qualified Immunity Defense**

Counts IV and V of plaintiff's Complaint seek relief against Officer Thomas pursuant to

42 U.S.C. § 1983, which allows suits for money damages against state and D.C. government

officials acting under the color of law.  These officials may, however, invoke the defense of

---

[4] Other judges on this court have applied the Chinn framework in excessive-force cases and have, with only one exception of which this Court is aware, concluded that the plaintiffs' negligence claims could not be submitted to the jury.  See Brooks v. District of Columbia, Civ. A. No. 05-352, 2006 WL 3361521, at *5-*6 (D.D.C. Nov. 20, 2006); Tafler v. District of Columbia, Civ. A. No. 05-1563, 2006 WL 3254491, at *9 (D.D.C. Nov. 8, 2006); Ryan v. Jaffe, 457 F. Supp. 2d 22, 25 (D.D.C. 2006); Kivanc v. Ramsey, 407 F. Supp. 2d 270, 277 (D.D.C. 2006); Hudson v. District of Columbia, Civ. A. No. 02-2217, 2005 WL 1378905, at *5 (D.D.C. June 9, 2005).  The one exception is the recent decision in Reed, which involved two starkly contrasting versions of what took place and the use of deadly force - - two features that the Chinn court identified as common to all of the cases in which both battery and negligence claims had properly been submitted to the jury.  See 474 F. Supp. 2d at 174 (citing Chinn, 839 A.2d at 711).

qualified immunity.  "Qualified immunity under section 1983 shields a state or local official from personal liability unless his action violated a 'clearly established statutory or constitutional right[] of which a reasonable person would have known.'"  Estate of Phillips v. District of Columbia, 455 F.3d 397, 402 (D.C. Cir. 2006) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Courts faced with a claim of qualified immunity conduct a two-step inquiry.  They first ask whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]"  Saucier v. Katz, 533 U.S. 194, 201 (2001); see also Scott v. Harris, 550 U.S. __, Slip. Op. at 3-4 (April 30, 2007).  If so, the court must then determine whether that constitutional right was "clearly established," Saucier, 533 U.S. at 201, or, as the Supreme Court clarified in a later case, whether the state of the law at the time of the challenged conduct gave the officers "fair warning that their alleged treatment of [the plaintiff] was unconstitutional."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).  The second step of this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201; see Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

In Count IV of his Complaint, Austin alleges that Officer Thomas - - through action or inaction - - denied him the established right of pre-trial detainees to adequate medical treatment.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  Thomas correctly characterizes the constitutional right at issue as based in the substantive component of the Fifth Amendment's Due Process Clause.  But the relevant constitutional standard is not, as Thomas submits, that Austin can prove a violation only by showing that Thomas's conduct "shocks the

conscience" of the Court. Rather, Austin can establish a constitutional violation in this setting by

demonstrating that Thomas acted with deliberate indifference to his medical needs. See County

of Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998); see also Fraternal Order of Police Dep't of

Corrections Labor Comm. v. Williams, 375 F.3d 1141, 1146 (D.C. Cir. 2004) (explaining that

deliberate indifference satisfies the "shocks the conscience" test in "circumstances where the

State has a heightened obligation toward individuals," such as where "the State takes a person

into its custody and holds him there against his will") (citations and quotation marks omitted);

O.K. v. Bush, 344 F. Supp. 2d 44, 61 & n.23 (D.D.C. 2004).[5] Austin must therefore allege in his

complaint and support with competent evidence that Officer Thomas knew of Austin's serious

medical condition and disregarded the risk that condition posed to Austin's health or safety. See

Farmer v. Brennan, 511 U.S. 825, 837 (1994); Baker v. District of Columbia, 326 F.3d 1302,

---

[5] The Court is aware that there is some division among the federal courts of appeals as to the standard governing claims by pretrial detainees asserting their right to medical care while in police custody. After the parties submitted their memoranda of law in support of the pending motions, the Supreme Court declined the opportunity to resolve what one party seeking review had characterized as a five-to-five circuit split as to the appropriate standard. See Petition for a Writ of Certiorari, Butler v. Fletcher, 465 F.3d 340 (8th Cir. 2006) (No. 06-955), cert. denied, - - S. Ct. - - , 2007 WL 120288 (April 30, 2007), available at 2007 WL 98147. This Court has previously relied on the deliberate-indifference case law in the analogous (albeit unique) context of challenges brought by detainees at the Guantanamo Bay Naval Station. See Al-Ghizzawi v. Bush, Civ. A. No. 05-2378, 2006 WL 2844781, at *4 & n.8 (D.D.C. Oct. 2, 2006); O.K., 344 F. Supp. 2d at 61 & n.23. That reliance finds strong support in existing Supreme Court precedent, which indicates that, because deliberately indifferent conduct suffices to establish liability under the Eighth Amendment, such "conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial." Lewis, 523 U.S. at 850. Furthermore, because plaintiff's constitutional claims survive even under this admittedly more defendant-friendly standard, neither party will suffer any prejudice if the Supreme Court or the D.C. Circuit ultimately concludes that the governing standard is not deliberate indifference, but is instead one derived from Bell v. Wolfish, 441 U.S. 520, 538-39 (1979), which requires courts to ask whether there is an intent to punish, and, absent such an intent, to determine whether a condition of pretrial detention is reasonably related to a legitimate, nonpunitive objective or is excessive in relation to such an end.

1306 (D.C. Cir. 2003).

Applying this standard and taking the facts "in the light most favorable to the party asserting the injury," Saucier, 533 U.S. at 201, the Court concludes that a jury could reasonably find that Thomas acted with deliberate indifference to Austin's serious medical needs. The undisputed record evidence demonstrates that Thomas struck Austin with his closed fist, that the blow caused Austin to bleed, that Austin requested medical attention shortly thereafter, that Austin was locked in a cell with his hands cuffed, that Austin remained in one of two cells for approximately six hours without any medical treatment, and that tests performed at the hospital confirmed that his jaw had in fact been broken. Austin also alleges (1) that he told Officer Thomas that his jaw was broken shortly after the altercation, and (2) that his injuries required major surgery, thus underscoring the seriousness of those injuries. Furthermore, Officer Hawkins, who ultimately called for transport for Austin, has testified that he does not recall Thomas ever telling him that Austin needed medical assistance. Pl.'s Thomas Opp'n, Exh. 4 at 47-48. Given these facts, a reasonable factfinder could conclude that Thomas "had subjective knowledge" that Austin had serious medical needs. See Baker, 326 F.3d at 1306. A reasonable factfinder could also conclude that Thomas's inaction - - his decision not to inform Officer Hawkins of Austin's request or at least to follow up with Hawkins as to Austin's condition - - constituted a reckless disregard of the risks that the injuries posed to Austin's health. See id. In sum, Austin has alleged sufficient facts, and supported those allegations with competent evidence, for a jury to find that Officer Thomas violated his constitutional rights.

At the second step of the inquiry, the Court asks whether the contours of the right at issue were clear enough to give Officer Thomas fair warning that his conduct violated the Constitution.

15

See Hope, 536 U.S. at 741; Saucier, 533 U.S. at 201; Anderson, 483 U.S. at 640. The question in this case is whether a reasonable police officer in Thomas's position would have known in 2005 that failing to secure timely medical treatment for a pre-trial detainee who had been punched, bled from his injuries, and complained of a broken jaw violated the Constitution. Although there were not any cases directly on point in the D.C. Circuit as of 2005, both the consistent case law from other federal appellate courts and the unambiguous language of MPD General Orders should have placed a reasonable officer on notice that inaction under the circumstances of this case amounted to a constitutional violation.

Turning first to the cases, federal courts have widely held that a delay in providing medical treatment can constitute deliberate indifference. The Eleventh Circuit has succinctly explained that "'[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours.'" Farrow v. West, 320 F.3d 1235, 1246 (11th Cir. 2003) (citation omitted); see also Kikumura v. Osagie, 461 F.3d 1269, 1292 (10th Cir. 2006); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). In such a situation, "the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." Farrow, 320 F.3d at 1246 (citations and quotation marks omitted). "A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference." Harris v. Coweta County, 21 F.3d 388, 394 (11th Cir. 1994); see also Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[A] deliberate delay on the order of hours in providing care for a serious and painful broken foot is sufficient to state a constitutional claim."); Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978) (holding than an

16

eleven-hour delay in examining pre-trial detainee's painfully swollen and obviously broken arm

stated a valid substantive-due-process claim).  The case law establishes, in short, that a broken

bone is a serious medical need and that failure to attend to that need - - even for just a few hours

- - may rise to the level of deliberate indifference.[6]

Even if this consistent case law alone did not suffice to give Officer Thomas fair warning

that his conduct (as alleged) was unconstitutional, at least two MPD General Orders should have

placed him on notice that he was required to secure medical treatment for Austin.  See Hope, 536

U.S. at 741, 743-44 (examining a state correctional regulation in determining whether officials

had fair warning that their conduct was unconstitutional); Toms v. Taft, 338 F.3d 519, 527-28 &

n.5 (6th Cir. 2003) (following Hope and doing the same).  Under MPD General Order 502.7,

which has been on the books since 1975, "[p]ersons held in departmental confinement facilities

who claim a need for medical treatment due to any injury or disease shall be immediately

transported to [the hospital] for examination and treatment."  Pl.'s Thomas Opp'n, Exh. 7.  Two

of the Order's terms - - "any injury" and "immediately" - - signal that care should have been

provided for Austin regardless of whether his jaw was actually broken and that such care should

have been provided "without delay," or instantly.  See Black's Law Dictionary 751 (7th ed. 1999)

(defining the word "immediate").  Thomas, who is a veteran of the police force, should have been

---

[6] The Court recognizes that some circuits have held in the Eighth Amendment context that "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  Napier v. Madison County, 238 F.3d 739, 742 (6th Cir. 2001) (collecting cases) (citation and quotation marks omitted).  That is not yet the law in the D.C. Circuit.  Nor is this issue even raised in Thomas's summary judgment motion.  See Thomas Mem. at 4-5.  Plaintiff cannot be expected to "place verifying medical evidence in the record" when the D.C. Circuit has not yet articulated such a requirement and defendants have not raised the need for such evidence.

aware of this requirement.  He was also presumably familiar with MPD General Order

901.07(V)(A), which has been in effect since 2002.  This General Order requires that, "[w]hen

any level of force is used, . . . [m]edical assistance shall be summoned immediately if a person is

physically injured in any way, complains of pain, or demonstrates life-threatening symptoms."

Pl.'s Thomas Opp'n, Exh. 8 at 5.  A reasonable jury could conclude that the language of this

Order, which refers to <u>any</u> level of force and <u>any</u> injury and uses the mandatory term "shall,"

would likewise have alerted a reasonable officer in Thomas's position that he was required to do

something more than simply notify his commanding officer.

Indeed, Thomas cannot secure qualified immunity on the ground that he satisfied his

obligations simply by informing Hawkins of Austin's injuries and counting on Hawkins to

request medical treatment.  In support of this argument, Thomas cites out-of-context snippets

from the deposition testimony of two experts in police procedures.  Thomas Mem., Exh. 2

(Bradley Depo.) at 155; <u>id.</u>, Exh. 5 (Mezzei Depo.) at 118-121.[7]  But that expert testimony is

neither factually nor legally persuasive.  For one thing, Mezzei testified only that Thomas had

complied with a portion of General Order 901.08(V)(A) that defines the "<u>initial</u> responsibilities"

of officers involved in the use of force as "ensur[ing] that the scene is safe, render[ing] first aid if

applicable, secur[ing] the scene's integrity, and notify[ing] a supervisor."  Pl.'s Cross-Mot. Mem.,

Exh. 17 at 4 (emphasis added).  The very next bulleted section (901.08(V)(A)(2)) cross-

references General Order 502.7 and echoes its language, requiring that a detainee who suffers

---

[7] Even if it tends to exculpate Thomas, Mezzei's testimony quite clearly inculpates Officer
Hawkins.  The Court notes in this regard that, although Austin has not pursued such a theory,
supervisory officials may be held liable under § 1983 where they exhibit deliberate indifference
to others' rights by failing to act on information indicating that unconstitutional acts are
occurring.  <u>See, e.g.</u>, <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995).

"from or complains of injuries . . . be immediately taken to the Hospital." Id. It is thus clear from the face of the General Order that the responsibilities of an officer on the scene are not limited to the four "initial" ones set forth in 901.08(V)(A)(1). Consequently, Thomas's possible compliance with one subsection of one General Order does not speak to whether he obeyed other relevant MPD regulations or whether those regulations would have given him fair warning that notifying a supervisor of an injured detainee's predicament was only one of his "initial responsibilities." When combined with the fact that the testimony of Mezzei has not yet been subjected to cross-examination and diverges from Bradley's expert testimony on the issue of providing first-aid care, Mezzei's testimony does little to bolster the factual basis for Thomas's qualified-immunity defense.

The expert testimony likewise has little relevance to the constitutional standard of deliberate indifference. Although the decision of a police officer or a prison guard to inform a supervisor of a detainee's medical needs or to make an initial request for medical treatment may weigh against a finding of deliberate indifference, see Alsina-Ortiz v. Laboy, 400 F.3d 77, 83 (1st Cir. 2005), simply taking such action will not automatically absolve the officer of any further responsibility. See, e.g., Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (rejecting defendant officers' argument that they satisfied their constitutional duty by calling paramedics, and concluding that the plaintiff's "manifest symptoms" and "[c]ontinued complaints" should "have put defendants on notice that additional care was required"); Wood v. Worachek, 618 F.2d 1225, 1233 (7th Cir. 1980) (upholding jury verdict for plaintiff against two officers where (a) the officers requested but did obtain ambulance for obviously injured pretrial detainee, (b) the officers informed colleagues on the next shift of the pending request, and (c) three hours passed

before plaintiff was taken to the hospital). Here, as discussed above, Austin has presented

sufficient evidence for a reasonable jury to find that Thomas caused him serious injuries, knew

that he was bleeding and that his jaw was possibly broken, yet did nothing more than notify

Hawkins of the situation. A jury could also conclude that these efforts by the very officer who

caused the injuries evinced a reckless disregard of the risks to Austin's health, and thus rose to

the level of deliberate indifference. After a complete airing of the evidence, Thomas may well

convince a jury that he did all that he had to do and that the only person to ignore Austin's

medical needs was Hawkins. The Court cannot say at this juncture, however, that the jury would

be unreasonable in reaching the opposite conclusion or in determining that Thomas had fair

warning that he was obliged to do more than simply pass the matter off to Hawkins.

      To sum up, the consistent federal case law establishing that a substantial delay in treating

a broken bone can amount to a constitutional violation, when combined with the straightforward

language of the relevant MPD General Orders, could have provided "fair warning" to a

reasonable officer in Thomas's position that failing to secure medical treatment violated Austin's

rights. See Hope, 536 U.S. at 741; Anderson, 483 U.S. at 640. The Supreme Court has made

clear that "officials can still be on notice that their conduct violated established law even in novel

factual circumstances." Hope, 536 U.S. at 741. The fact that some minor delays in medical

treatment have been deemed insufficient to support constitutional claims based on deliberate

indifference, e.g., Murphy v. Walker, 51 F.3d 714, 717 (7th Cir. 1995) (per curiam) (holding that

two-hour delay in treating broken hand did not constitute deliberate indifference), does not render

the circumstances of this case so "novel" as to shield Officer Thomas from liability at this stage

of the proceedings. Accordingly, Officer Thomas is not entitled to summary judgment based on

qualified immunity as to Count IV of the Complaint.

Officer Thomas has also moved for summary judgment on Count V of the Complaint, which alleges that he conspired with unnamed MPD officers to deprive Austin of his right to medical care while in pre-trial detention.  In his supporting memorandum, however, Thomas does not advance any argument as to why, if Count IV survives a motion for summary judgment, Count V would not also survive.  Ostensibly because Thomas makes no argument on this point, neither does plaintiff in his opposition.  At a Status Conference on May 9, 2007, the Court therefore gave the parties the opportunity to address whether Counts IV and V of the Complaint stand or fall together, such that, if the Court grants or denies qualified immunity as to the former, the same result follows with respect to the latter.[8]  Although the parties are correct that there are distinctions between the elements of the two causes of action, the Court finds in this case that the outcome with respect to Counts IV and V is in fact the same: Officer Thomas is not entitled to qualified immunity on either count.

"To establish a civil conspiracy under § 1983, [Austin] must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [Austin's] deprivation of a constitutional right." See Hinkle v. City

---

[8] Counsel for the District mentioned at that Status Conference the possibility that Count V of the Complaint could be barred under the so-called "intracorporate conspiracy doctrine" because both Thomas and the unnamed officers with whom he would have conspired are all District of Columbia employees.  Thomas has not raised this defense, which is not necessarily a winner under the law of this circuit.  Indeed, another judge on this court, in declining "to adopt a categorical policy that it is legally impossible for one police officer to conspire with another to deprive an individual of his rights under Section 1983," also noted that the D.C. Circuit had not addressed the question and that he had "failed to find a ruling by any court of appeals applying the intracorporate conspiracy doctrine to Section 1983 actions." Kivanc v. Ramsey, 407 F. Supp. 2d 270, 276 & n.4 (D.D.C. 2006).  This Court has similarly found no such cases. See also Kinkus v. Vill. of Yorkville, 476 F. Supp. 2d 829, 840-41 (N.D. Ohio 2007).

of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996); accord Pangburn v. Culbertson, 200 F.3d 65, 72

(2d Cir. 1999) ("To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between

two or more state actors or between a state actor and a private entity; (2) to act in concert to

inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing

damages.").  The Fourth Circuit has explained that, while a plaintiff alleging a civil conspiracy

pursuant to § 1983 "need not produce direct evidence of a meeting of the minds," the plaintiff

must supply "specific circumstantial evidence that each member of the alleged conspiracy shared

the same conspiratorial objective," and this evidence must "reasonably lead to the inference that

[the defendants] positively or tacitly came to a mutual understanding to try to accomplish a

common and unlawful plan."  Hinkle, 81 F.3d at 421 (citations omitted).

　　　　Applying this framework and construing the record evidence in the light most favorable

to Austin, the Court concludes that summary judgment is inappropriate on Count V.  The

preceding paragraphs suffice to show why a reasonable jury could find that the failure of the

MPD officers to obtain timely medical care for Austin deprived him of a constitutional right and

why Thomas had fair warning that failing to obtain such care was unconstitutional at the time of

the incident.  Austin further alleges that Thomas and unnamed MPD officers "conspired to delay

and deny [him] medical care."  Compl. ¶ 79.  Although Austin has alleged relatively few facts

relating to the agreement that the police officers would have had to reach, he is not required to

"produce direct evidence of a meeting of the minds."  See Hinckle, 81 F.3d at 421.  A jury could

reasonably infer from the "specific circumstantial evidence" already in the record that Thomas

and another officer on duty that day - - Officer Hawkins, for instance - - "tacitly" came to agree

that providing medical care for Austin would not be a priority, perhaps in retaliation for what

they might have perceived as his disrespectful and unruly conduct toward them.  See id.

Likewise, a reasonable jury could conclude that the "overt act" requirement is satisfied under

Austin's version of events.  See id.; Pangburn, 200 F.3d at 72.  An overt act need not be criminal

in nature, and indeed may consist of entirely innocent conduct that nonetheless demonstrates that

the conspiracy is at work.  See Yates v. United States, 354 U.S. 298, 334 (1957); United States v.

Trie, 23 F. Supp. 2d 55, 62 (D.D.C. 1998).  An action such as moving Austin from one cell to

another, while possibly innocent in nature, could therefore suffice to show that the parties shared

a common objective and acted in concert.  Finally, just as a reasonable jury could find that it was

clearly established that denying medical care under the circumstances of this case violated the

Constitution, that same jury could also find that the defendant officers had fair warning that

conspiring to deprive someone of those same rights would be unconstitutional.  The Court

therefore concludes that Thomas is not entitled to summary judgment on qualified-immunity

grounds with respect to Count V of the Complaint.

## C.  Plaintiff's Cross-Motion for Partial Summary Judgment

Austin has moved for partial summary judgment as to liability on the portion of his

negligence claim that alleges that the District breached the applicable standard of care by failing

to provide him with timely access to medical care.  Compl. ¶ 87; see Fed. R. Civ. P. 56(c) ("A

summary judgment, interlocutory in character, may be rendered on the issue of liability alone

although there is a genuine issue as to the amount of damages.").  To establish defendant's

liability for negligence, Austin bears the burden of proving the applicable standard of care, that

the District of Columbia breached that standard, and that there was a causal connection between

the breach and the plaintiff's injuries.  See Varner v. District of Columbia, 891 A.2d 260, 265

23

(D.C. 2006).  At the summary judgment stage, the Court will need to determine whether genuine issues of material fact are in dispute regarding (1) the existence of a duty, (2) the contours of any such duty, (3) assuming that a duty exists, whether the District of Columbia breached that duty, and (4) whether there was a causal relationship between any breach and plaintiff's injuries.  But before making this determination, the Court must first address a procedural point arising out of one of the parties' numerous discovery battles.

Austin argues that, for purposes of his partial summary judgment motion, all of the facts and assertions included in the requests for admission ("RFAs") that he served on the District of Columbia should be deemed admitted.  This is so, Austin contends, because the District filed its responses to his RFAs one day beyond the twenty-one-day deadline established by this Court's Minute Order dated January 17, 2007.  As Austin reads Rule 36 of the Federal Rules of Civil Procedure and a D.C. Circuit case interpreting that rule, this Court would commit a "legal error" if it failed to accept the RFAs as admitted.  Pl.'s Cross-Mot. Mem. at 6 (citing Rainbolt v. Johnson, 669 F.2d 767, 768 (D.C. Cir. 1981)).  The District, for its part, acknowledges that it filed the responses one day late, chalks up the failure to mere administrative oversight, and has filed a belated motion for a one-day extension of time to file its responses.  Neither Rule 36 nor the Rainbolt decision, the District insists, demonstrate that it would be "legal error" to grant a one-day extension of time and decline to treat plaintiff's RFAs as admitted.

The District has the better of this latest squabble.  Rainbolt did hold, as Austin highlights, that the district court in that case had "erred in failing to give binding and conclusive effect to . . . unanswered requests for admissions."  669 F.2d at 768 (emphasis added).  But that case dealt with a scenario in which the defendants never responded to the plaintiff's RFAs and then sought

24

to withdraw the requested admissions after a hearing before the Auditor-Master to whom the district judge had referred the case. Id. The D.C. Circuit found no support in Rule 36 or case law since the Rule's enactment for the notion that deemed admissions could be withdrawn "after the conclusion of trial." Id. at 769. Indeed, Rainbolt has come to "stand[] for the proposition that there is no support for withdrawal of deemed admissions after the conclusion of a trial [because] it would result in prejudice to the opposing party." Rabil v. Swafford, 128 F.R.D. 1, 3 (D.D.C. 1989); see also Brook Vill. North Assocs. v. Gen. Elec. Co., 686 F.2d 66, 73 (1st Cir. 1982) (emphasizing the pre-trial/trial distinction at the heart of Rainbolt). Rule 36 is not so "wooden[]" as to require that responses filed any time after the 30-day (or other court-ordered) deadline be discarded and that the RFAs be deemed admitted. See Banks v. Office of Senate Sergeant-at-Arms and Doorkeeper, 226 F.R.D. 113, 118 (D.D.C. 2005) ("[F]ederal courts have permitted a party to answer the requests after the 30-day deadline has passed."). A leading treatise thus explains that courts have "the power to allow additional time for a response to a request for admissions even after the time fixed by the rule has expired," and can, "in [their] discretion, permit what would otherwise be an untimely answer." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2257, at 541 (2d ed. 1994).

In deciding whether to exercise this discretion, courts generally apply a test identical to the one that Fed. R. Civ. P. 36(b) prescribes for withdrawal of admissions. Id. § 2257, at 543. An untimely response should be accepted under that test when doing so "will aid in the presentation of the merits of the action and will not prejudice the party who made the request." Id. This inquiry makes sense in the run of cases because allowing a party to file belated responses has the same effect as permitting that party to withdraw admissions already made - -

admissions on which an opposing party may already have come to rely.  Here, in contrast, the District missed the governing deadline for serving its responses by one day.  This minor lapse is analogous to the situation, all too familiar to this Court, in which a party misses a filing deadline and seeks an extension of time after the deadline has passed.  <u>See</u> Fed. R. Civ. P. 6(b).  Under such circumstances, the extension may be granted upon a showing of "excusable neglect."  <u>Id.</u>; <u>see</u> <u>Yesudian ex rel. United States v. Howard Univ.</u>, 270 F.3d 969, 971 (D.C. Cir. 2002). Whether the opposing party will be prejudiced is one factor in the excusable-neglect inquiry, and where a delay is "brief, and there is no suggestion that it had a material effect on the proceedings," the opposing party cannot have suffered any prejudice.  <u>Id.</u>  Such is the case here.

But even assuming that the more stringent test for withdrawing admissions under Rule 36(b) applies, Austin's RFAs need not be deemed admitted.  The RFAs, although considerably narrowed from earlier versions, still encompass a broad cross-section of the issues in this case, both disputed and undisputed.  For example, RFAs 87-94 essentially ask the District to admit that three of its police officers - - Thomas, Hawkins, and Crowder - - violated two of the MPD's General Orders.  If the General Orders are determined to evidence a standard of care for providing detainees with medical treatment, then these admissions may well suffice to prove a breach of the standard of care, which is the second element of Austin's negligence claim.  The admissions "effectively would bar [the District] from presenting its case on its merits" by depriving it of the ability to contest one of the essential elements of Austin's claim.  <u>See</u> <u>Baker v. Potter</u>, 212 F.R.D. 8, 13 (D.D.C. 2002).  Moreover, allowing the District to file its responses one day late would not prejudice the party who made the request.  Austin's only basis for showing

prejudice - - the possibility that he would have to call more witnesses at trial[9] - - is undercut by his assertion that the facts and conclusions he asked the District to admit "are independently corroborated by the other evidence" in the summary judgment record.  See Pl.'s Cross-Mot. Mem. at 7 n.2.  If that is true, then Austin already has all of the information that he needs to establish his claims, and will suffer no prejudice if he is required to put that information before the factfinder to substantiate his theories of liability.  Because the District's one-day-late responses to Austin's RFAs will likely aid in the presentation of the merits of this case, and because declining to deem the RFAs admitted will cause Austin no prejudice, the Court will grant the District's motion for a one-day extension of time and accept its responses as timely.

That leaves the substance of Austin's cross-motion for partial summary judgment.  As explained above, to prevail on his negligence claim, Austin must prove the applicable standard of care, that the District breached that standard, and that the breach caused him injury.  See Varner, 891 A.2d at 265.  The evidence and supporting memorandum submitted by Austin, as well as the District's cursory opposition, focus exclusively on the first two of these elements, about which there appears to be little dispute.  Austin has attempted to establish the applicable standard of care by reference to a series of MPD General Orders and the expert testimony of James Bradley. As the District correctly observes, violation of these General Orders does not, in and of itself, demonstrate breach of a binding standard of care.  D.C. Opp'n at 3 (citing Abney v. District of Columbia, 580 A.2d 1036, 1040-41 (D.C. 1990)); see also District of Columbia v. Walker, 689 A.2d 40, 47 n.13 (D.C. 1997).  Showing that an officer failed to comply with the terms of a General Order does not, in other words, suffice under a negligence per se theory of liability.  But

---

[9] This alleged prejudice would exist to some extent in every instance of the withdrawal of admissions - - if not admitted, facts must be proven.

that is not the theory advanced by Austin, who relies instead on the proposition that General Orders - - like other evidence of proper police procedures - - may constitute part of the proof used to establish the governing local and national standards of care.  See Butera v. District of Columbia, 235 F.3d 637, 659 (D.C. Cir. 2001); Walker, 689 A.2d at 47 n.13.

Austin has introduced uncontradicted evidence tending to establish the applicable standard of care and that the District breached that standard.  The language of the General Orders at issue - - 502.7(a)(1), 901.07(V)(A), and 901.08(V)(A)(2) - - states quite plainly that medical care must be provided (or at the very least requested) immediately.  Pl.'s Cross-Mot. Mem., Exhs. 15, 16.  In addition, Bradley explained in his deposition testimony that the General Orders are "in line with" the national standard of care, which requires officers faced with an injured prisoner to "[m]ake sure that he receives proper medical attention; not when you feel like, not when it's convenient - - immediately."  Id., Exh. 14 at 85.  Bradley further indicated that the term "immediately" means "right away," or "[a]s quickly as possible."  Id., Exh. 14 at 86; see also Black's Law Dictionary 751 (7th ed. 1999) (defining "immediate" as "without delay").  The District has offered nothing in response to this evidence, and indeed has not even submitted a separate statement, as required by the local rules, pointing to the "material facts as to which it is contended there exists a genuine issue necessary to be litigated."  LCvR 7(h), 56.1; see also Fed. R. Civ. P. 56(e).  As such, the uncontested evidence in the record establishes that the governing standard of care was that the officers were required to seek and provide medical care for Austin immediately upon learning of his alleged injury.

Austin's evidence is similarly strong with respect to the second element: breach of the applicable standard of care.  Taking the evidence in the light most favorable to defendants,

Thomas struck Austin no later than 5:00 p.m. on August 25, 2005. See Pl.'s Cross-Mot. Mem.,

Exh. 3 (Hawkins Depo.) at 48. Officer Hawkins has testified under oath that he first requested

transportation to the hospital a few minutes after Austin was placed in a cell. Pressed for a more

exact measure of time, Hawkins stated that more than five minutes but less than ten minutes

likely passed. D.C. Opp'n, Exh. (Hawkins Depo.) at 32-33. Hawkins placed a second call for

transportation at 7:30 p.m., the requested unit arrived shortly after 8:00 p.m., and Austin arrived

at the hospital at 8:30 p.m. Id. at 74; Pl.'s Cross-Mot. Mem., Exh. 18; Thomas Mem., Exh. 6

(Initial Assessment). The undisputed evidence in the record thus demonstrates that well over

three hours passed between the altercation and Austin's arrival at the hospital. Even if Hawkins's

initial request could be considered to have occurred "immediately" after the incident, no

reasonable juror could conclude that Austin received medical attention "right away," "as quickly

as possible," or "without delay." Indeed, the passage of three hours between injury and treatment

means by definition that medical care was not provided "without delay."

Despite the one-sidedness of the record evidence with respect to these two elements, the

Court cannot grant Austin's motion for partial summary judgment because he has neither

advanced any argument nor proffered any evidence as to the required third element: a causal

relationship between the District's breach of the standard of care and Austin's injuries. See

Varner, 891 A.2d at 265. In his Complaint, Austin alleges that, "[a]s a direct and proximate

result of the Defendant's negligence," he suffered "severe pain, mental anguish and distress," and

has incurred "economic damages, including but not limited to, expenses for hospital care,

surgery, rehabilitation, as well as expenses for future medical care, rehabilitation and/or surgery."

Compl. ¶ 92. But the "negligence" in that paragraph refers without distinction to both the

District's failure to provide medical care and the alleged failure of Officer Thomas to use a

reasonable amount of force against Austin.  The Court has granted summary judgment for

defendants on this latter theory of liability, and Austin has not proffered any evidence

demonstrating that either the physical or pecuniary injuries that he has allegedly suffered were

due to the absence of timely medical care, as opposed to the initial blow itself.  There is no

medical evidence, for instance, suggesting that Austin would not have had to undergo painful and

costly surgery had he arrived at the hospital a few hours earlier.  Put another way, the record

evidence does not demonstrate that the District's failure to provide immediate medical treatment

for Austin <u>caused</u> any of the injuries asserted in the Complaint.  Absent such evidence, a

reasonable juror might well conclude that Austin has not met his burden with respect to the third

element of the tort.  Accordingly, Austin is not entitled to partial summary judgment as to

liability on the portion of his negligence claim arising from the denial of timely medical care.

The only remaining question, then, is whether, given the foregoing analysis of the first

two elements of Austin's negligence claim, the Court should render a "partial summary

adjudication" pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.  Rule 56(d)

"permits a court that 'finds that summary judgment cannot be granted because there are genuine

issues of material fact to be tried, . . . to issue an order that specifies the facts that appear without

substantial controversy,' and thus 'to salvage some results from the effort involved in the denial

of a motion for summary judgment.'"  <u>Beaty v. Republic of Iraq</u>, - - F. Supp. 2d - - , 2007 WL

836804, at *39 (D.D.C. March 20, 2007) (quoting 10B Charles Alan Wright, Arthur Miller &

Mary Kay Kane, Federal Practice and Procedure § 2737, at 324 (3d ed. 1998)).  The rule, this

Court has observed, "has the salutary purpose of empowering courts 'to withdraw sham issues

from the case and to specify those facts that really cannot be controverted.'" Id. (quoting 10B Wright, Miller & Kane § 2737, at 318). In one sense, the mandatory "shall" in Rule 56(d) suggests that a court that finds certain facts to exist "without substantial controversy" has the obligation to enter an order deeming those facts established for purposes of trial or further proceedings. See Christianson v. Gaines, 174 F.2d 534, 536 (D.C. Cir. 1949); SFM Corp. v. Sundstrand Corp., 102 F.R.D. 555, 559 (N.D. Ill. 1984). On the other hand, the qualifier "if practicable" unmistakably affords district courts at least some discretion. See Powell v. Radkins, 506 F.2d 763, 765 (5th Cir. 1975) (pointing to the "if practicable language," and explaining that "[a] court, in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation"). Hence, courts and commentators have recognized that if the trial court determines that entering a partial summary adjudication by identifying the facts that may no longer be disputed would not materially expedite the adjudicative process, then the court may decline to do so. See Arkansas-Best Freight Sys., Inc. v. Youngblood, 61 F.R.D. 565, 571 (W.D. Ark. 1974); 10B Wright, Miller & Kane § 2737, at 319-20.

      This is a case in which deeming certain aspects of Austin's negligence claim established for purposes of the trial would not materially expedite the adjudicative process. Although granting partial summary adjudication might modestly reduce the length or breadth of witness testimony, it would not likely reduce the number of witnesses who will need to testify. Plaintiff and Officers Thomas and Hawkins, as well as the parties' expert witnesses, will still have to testify at length, both about the delay in providing medical care, which is the subject of Counts IV, V, and VI of the Complaint, and also about the allegations of battery, intentional infliction of

emotional distress, and unconstitutionally excessive force made in Counts I, II, and III. These latter counts, on which none of the parties has sought summary judgment, will have to be fully developed at trial through documentary evidence and the testimony of witnesses whose demeanor and credibility the jury will assess. This is a case, in short, that would benefit from a complete and orderly presentation to a jury, whose determinations as to the credibility of witnesses will play a critical if not decisive role in the outcome. Granting partial summary adjudication as to certain facts might well short-circuit that presentation by placing some salient topics off-limits, and could thus hinder rather than facilitate the just resolution of this case. Accordingly, the Court will exercise its discretion and decline to grant partial summary adjudication as to the first two elements of Austin's surviving negligence claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court grants the District's motion for partial summary judgment, grants in part and denies in part Officer Thomas's motion for partial summary judgment, and denies plaintiff Austin's cross-motion for partial summary judgment. A separate order has been posted on this date.

  /s/     John D. Bates          
JOHN D. BATES
United States District Judge

Dated:   May 11, 2007