DEPOSITION OF JERRY WILSON
CONDUCTED ON TUESDAY, JANUARY 30, 2007

1 (Pages 1 to 4)

---

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - x
NIGEL AUSTIN,
    Plaintiff
    v.    CA No. 05-2219 (JDB)
THE DISTRICT OF COLUMBIA, et al.,
    Defendants
- - - - - - - - - - - - - - - x

Deposition of JERRY WILSON
Washington, D.C.
Tuesday, January 30, 2007
2:38 p.m.

Job No. 1-95967
Pages 1 - 140
Reported By: Cindy L. Wilmoth, RPR

---

**Page 2**

Deposition of JERRY WILSON, held at the offices of:

Office of the Attorney General
1 Judiciary Square
6th Floor North
441 4th Street, Northwest
Washington, D.C. 20001
(202) 727-3500

Pursuant to agreement, before Cindy L. Wilmoth, Registered Professional Reporter and Notary Public of the District of Columbia.

---

**Page 3**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
    PETER C. GRENIER, ESQUIRE
    Bode & Grenier, L.L.P.
    9th Floor
    1150 Connecticut Avenue, Northwest
    Washington, D.C. 20036-4192
    (202) 828-4100

ON BEHALF OF THE DEFENDANT DISTRICT OF COLUMBIA:
    STEVEN J. ANDERSON, ESQUIRE
    Office of the Attorney General
    1 Judiciary Square
    6th Floor North
    441 4th Street, Northwest
    Washington, D.C. 20001
    (202) 727-3500

---

**Page 4**

ON BEHALF OF THE DEFENDANT OFFICER THOMAS
    JAMES C. MEHIGAN, ESQUIRE
    Pressler & Senftle, P.C.
    Three McPherson Square, 12th Floor
    927 15th Street, Northwest
    Washington, D.C. 20005
    (202) 822-8384

Page 29

1  beyond the standard of care. Let me say --
2  Q. So your -- I understand. I'm sorry.
3  A. -- that I say that based on still unresolved
4  issues with regard to the timing, but that the timing
5  was longer than would be appropriate under the standard
6  of care.
7  Q. So would your opinion be then that there was
8  a breach of the standard of care with respect to the
9  provision of medical treatment to Mr. Austin?
10 A. I would say that the transportation of
11 plaintiff to the hospital was delayed longer than the
12 standard of care would permit.
13 Q. So would that be yes, it's a breach of the
14 standard of care?
15 A. Yes.
16 Q. What is your understanding as to the
17 approximate time that the incident occurred? And when
18 I say "the incident," the injury being caused.
19 A. I have been unable to resolve that in my own
20 mind. I mean, I don't know, but I'll assume that it
21 was before 2:00 o'clock.
22 Q. P.M.?

Page 30

1  A. P.M., yes. I mean, I will assume that, but I
2  say that without being able to fix it in any way.
3  Q. Now, are you aware that Mr. Austin was not
4  picked up to be transported to the hospital until
5  8:10 p.m.?
6  A. Yes.
7  Q. And are you aware that the hospital reflects
8  Mr. Austin as arriving at approximately 8:30 p.m.?
9  A. Yes. And let me add that I failed to say
10 that I have reviewed the hospital records for
11 Mr. Austin.
12 Q. Okay. Do you have any question as to the
13 validity of the registered nurse's entry in the
14 emergency department triage initial assessment form to
15 the effect that Mr. Austin arrived at 8:30 p.m.?
16 A. No.
17 Q. And that he was triaged at 8:35 p.m., do you
18 challenge that?
19 A. I don't challenge it, no.
20 Q. Was there a particular general order or
21 general orders that you believe anyone violated with
22 respect to the timing of the provision of medical care

Page 31

1  to Mr. Austin?
2  A. Well, it's not clear that they violated the
3  order the testimony is, as I understand it, and bear in
4  mind that I have not seen Mr. Hawkins' deposition, but
5  I understand that he stated and I believe he stated in
6  his statement that he became aware of the injury, that
7  he called for transport for plaintiff to the hospital,
8  and that subsequently he called again for transport for
9  the transport of the subject to the hospital, and it
10 took longer than it should have.
11    I don't think that -- so far as I can tell
12 based on that, I don't see that acting Sergeant Hawkins
13 violated the standard of care. I think he took the
14 action that he should have taken. The department for
15 whatever reason, and it's not clear why it took so
16 long, I mean, that hasn't been clarified for the court,
17 to respond and transport the plaintiff to the hospital.
18 Q. Should Officer Thomas have done anything with
19 respect to rendering first aid to Mr. Austin after
20 Mr. Austin was injured?
21 A. In my opinion, Officer Thomas did his duty
22 and reported it to his superior officer, acting

Page 32

1  Sergeant Hawkins.
2  Q. So is it your testimony that Officer Thomas
3  was not required to render first aid?
4  A. Under these circumstances, no. If first aid
5  were required, then it was up to acting Sergeant
6  Hawkins to arrange for first aid.
7  Q. Have you ever reviewed the FIT December 1,
8  2001 Organizational Plan and Operations Manual?
9  A. I don't think so, but I don't want to say
10 that I haven't because I may have. Was it a part of
11 the file in this case? I don't think so. I don't
12 think I've seen it. I don't think so.
13 Q. Okay. I'm just asking whether you --
14 A. I'm going to say I don't think so, but I
15 don't want to prolong looking through files for it.
16 Q. During Detective Coles' deposition -- have
17 you ever read Detective Coles' deposition?
18 A. No.
19 Q. Have you ever read Officer Thomas's
20 deposition?
21 A. No.
22 Q. At Detective Coles' deposition, we

### Page 33

1  discussed -- and just for the record, I'm at page 16 of
2  the December 1, 2001 FIT Organizational Plan and
3  Operations Manual. We talked about less lethal force
4  investigations, and I just want to read you a quote and
5  then ask you some questions about it.
6      It says, "When a Metropolitan Police officer
7  is involved in a less lethal force incident, the first
8  responsibilities of the officer involved shall be to
9  ensure that the scene is safe, render first aid, if
10 applicable, secure the scene's integrity and notify a
11 supervisor."
12     Now, I'd like to go through each of those
13 with you, if I may. First, can we agree that this is a
14 less lethal force, in other words, it was nondeadly?
15     A. Yes.
16     MR. ANDERSON: Do you need to see the
17 document or are you comfortable with him reading it?
18     THE WITNESS: No.
19 BY MR. GRENIER:
20     Q. Can we agree that the officer involved was
21 Officer Thomas?
22     A. Yes.

### Page 34

1      Q. Now, I'd like to go through each of these and
2  ask you whether you have an opinion one way or
3  another.
4      Do you believe based on what you reviewed
5  that Officer Thomas ensured that the scene was safe?
6      A. Was safe?
7      Q. Yes.
8      A. What was unsafe? I mean, I don't understand
9  the -- that the scene was safe?
10     Q. Yes. I'm using their words.
11     A. I really don't know what that means.
12     MR. ANDERSON: I'd like to follow along. I
13 have one of these in my office. If you don't have one,
14 should I go get it? Because I do want to follow what
15 you're reading to make sure that it's what you say it
16 is.
17     MR. GRENIER: Well, why don't I do this. Why
18 don't I let you read mine, bottom highlighted
19 paragraph.
20     MR. ANDERSON: Why don't I go get my own.
21 I'll go get my own. I have one of these, I think,
22 right in my file cabinet, and I'll be right back. And

### Page 35

1  then that way he can follow along, too.
2      (A brief recess was taken.)
3  BY MR. GRENIER:
4      Q. Mr. Wilson, did you have a chance to review
5  the less lethal force investigation section,
6  specifically the parts I highlighted?
7      A. Yes. And I might add that I see what -- now
8  looking at that, I recognize what they mean by make the
9  scene safe. That's sort of a generic procedure which
10 would apply in use of force out on the street where the
11 scene may be unsafe.
12     Q. So that's irrelevant to this situation then?
13     A. Well, yes, this scene is safe. There's no
14 danger of a crowd gathering or of further activity in
15 terms of the public. I'll say that at this point.
16     Q. Okay. Sure.
17     Do you have an opinion as to whether Officer
18 Thomas rendered first aid, if applicable?
19     A. There's the issue there of as applicable.
20 I'm not certain that first aid was applicable in this
21 case. The fact is that Officer Thomas said that he saw
22 about a three-by-five patch of blood on the floor, and

### Page 36

1  I'm now making some assumptions because I haven't seen
2  the evidence, but I've seen no evidence that there was
3  any external injury bleeding of the plaintiff, that the
4  bleeding was inside the mouth. I'm not confident that
5  there was any first aid that was applicable in this
6  case.
7      I might also add that I'm not confident that
8  Officer Thomas ever had possession to read or be
9  trained from that FIT report, which is an
10 organizational plan for the FIT people.
11     Q. Okay. Well, let me ask you this. Was
12 Officer Thomas required to render first aid to
13 Mr. Austin?
14     A. If it was required. If it was necessary,
15 Officer -- if it was necessary, first aid should have
16 been rendered to the plaintiff.
17     Q. Okay. When you say --
18     A. The reason I make the distinction is that --
19     Q. He might not have needed it?
20     MR. MEHIGAN: Let him answer.
21     A. A, he might not have needed it. B, Sergeant
22 Hawkins could have decided that someone else will do

**37**

1  the first aid. His supervisor was on the scene. So
2  was Officer Thomas required to, no.
3  BY MR. GRENIER:
4  Q. So am I correct then that you -- well, what
5  you just said, so is it your opinion then that under
6  the applicable standard of care, Officer Thomas was not
7  required to render first aid to Mr. Austin?
8  A. It is my opinion that the evidence does not
9  show a need for first aid for Mr. Austin.
10 Q. And when we say the evidence, have you seen
11 photographs of Mr. Austin post incident?
12 A. Yes.
13 Q. Can you describe what photos you've seen?
14 A. Well, I've seen the color photos of the
15 T-shirt. I think they were taken looked like outside
16 the courthouse or somewhere, but I've seen photos of
17 Mr. Austin and of his T-shirt, if that's what you're
18 referring to, yes.
19 Q. What did you observe about Mr. Austin's
20 T-shirt, if anything?
21 A. It had what appeared to be blood stains on
22 it.

**38**

1  Q. And despite seeing that, you still have an
2  opinion that he was not required to render first aid,
3  he being Officer Thomas?
4  A. I don't know how the blood stains -- whether
5  the blood -- the blood stains did not look to me as if,
6  but that's making a judgment, which I should not make
7  as an expert, as if they were pouring from his mouth.
8  They looked to me as if he probably was wiping his
9  mouth.
10     So I have no question that there was some
11 internal bleeding of Mr. -- some bleeding within
12 plaintiff's mouth, but in my view, unless it was
13 extreme, it was not something that would require first
14 aid. If it were so extreme as to require first aid,
15 then they should have called an ambulance.
16 Q. So does it depend on the amount of blood
17 that's visible to the officer to determine whether or
18 not first aid is required?
19 A. Well, you say as visible to the officer, yes,
20 yes.
21 Q. Do you have an understanding as to whether
22 there was any blood visible anywhere at or around the

**39**

1  scene of the incident?
2  A. I understand there was a three -- the
3  testimony is or I guess the statement, I haven't seen
4  testimony, the statement of Officer Thomas was that he
5  saw a patch of blood on the floor of about
6  three-by-five inches. The statement of Officer Hawkins
7  was that he saw, and I don't want to put words in his
8  mouth, but a small amount of blood.
9  Q. Should that have been something that
10 triggered an inquiry as to whether Mr. Austin needed
11 first aid?
12 A. I would think not.
13 Q. Why not?
14 A. Because Mr. Austin was not bleeding
15 profusely. I think when someone has been injured in
16 the mouth, you would expect there may be a bit of
17 blood.
18 Q. You said you saw all the photographs of
19 Mr. Austin?
20 A. I won't say all of them. I saw a few
21 photographs. I don't say I saw them all. I don't know
22 how many there were.

**40**

1  Q. Okay. Well, let me ask you this. Did
2  Mr. Austin have blood or what appeared to be blood on
3  his jeans?
4  A. He had stains on his jeans, yes.
5  Q. Well, I asked you did it appear to be blood
6  to you.
7  A. I couldn't tell.
8  Q. Well, assuming it's blood on his jeans, does
9  that alter your opinion as to whether anyone was
10 required to render first aid to Mr. Austin?
11 A. No.
12 Q. How about on Mr. Austin's sneakers, did you
13 see what appeared to be blood on his sneakers?
14 A. I saw some spots of what appeared to be
15 blood.
16 Q. Are you surmising that Mr. Austin used his
17 shoes to wipe any blood from his mouth?
18 A. No. These were clearly spots. I shouldn't
19 say clearly, but they appeared to be spots from drips,
20 a few drips of blood, yes.
21 Q. Are you surmising that any of what appeared
22 to be blood stains on Mr. Austin's jeans were the

Page 73

1  Q. January 29th, yesterday?
2  A. Yes. Was it yesterday? Yeah, yesterday.
3  You want me to -- you want to look at it or do you want
4  me to read it to you?
5  Q. Well, I don't know how chicken scratch you
6  write.
7  A. There are abbreviations in there, that's
8  all. I have trouble reading my own writing.
9  Q. Could you just read it all out loud? I'm
10 sorry. I can't read all of your writing.
11 A. I'll do my best.
12 Q. Sure.
13 A. Officer Bowman said he arrived at the central
14 cell block at 1740 with a prisoner from Greater
15 Southeast Hospital. He received the plaintiff. He was
16 not sure if he had received a dispatch or merely
17 arrived with the delivery of the other prisoner.
18    Let me interject something that isn't in my
19 notes. What he had said was that he was at D.C.
20 General Hospital with another prisoner -- D.C.
21 General -- at Greater Southeast Hospital with another
22 prisoner unrelated to this matter, that he was waiting

Page 74

1  for -- to transport back to the central cell block, and
2  that he thought that he received the dispatch at 1740
3  to go to the cell -- central cell block to pick up the
4  plaintiff, and so now what he is saying is that he
5  arrived at central cell block at 1740 with the prisoner
6  from Greater Southeast Hospital.
7  Q. Which is 5:40 p.m.
8  A. 5:40 p.m. And received the plaintiff, and he
9  says he wasn't sure if he had received a dispatch or
10 was merely arriving because he had this other prisoner
11 who was coming there in the normal course of business.
12 Says he transported him to Greater Southeast Hospital.
13 Q. Transported the plaintiff?
14 A. Plaintiff, yes. Says the emergency room
15 nurse took vitals. Officer was directed to remain at
16 the holding room with the prisoner. Much later the
17 plaintiff was taken to X-ray, and said the plaintiff
18 had not yet been treated when he was relieved at
19 11:40 p.m.
20    Clearly, based on the fact that Officer
21 Hawkins says that he's correct that they left at I
22 believe it was 10:20 or something like that, clearly

Page 75

1  Officer Bowman is mistaken, appears to be mistaken.
2  MR. ANDERSON: 8:20, I think.
3  MR. GRENIER: No. He said it right. Well,
4  it's 2020.
5  THE WITNESS: 2020, yeah. I'm sorry, yeah,
6  2020.
7  BY MR. GRENIER:
8  Q. Which is 8:20?
9  A. Yeah. So --
10 MR. ANDERSON: I actually think it was 2010.
11 THE WITNESS: It may have been 2010, yeah. I
12 can look it up. In fact, I've got it right here.
13 BY MR. GRENIER:
14 Q. I think we can agree it's 2010.
15 A. 2010, yeah.
16    You want me to continue with this?
17 Q. Yes, yes. We're now up to number 7, correct?
18 A. I think so. Well, obviously the order was in
19 effect without disputing that. But he says that when
20 the plaintiff complained of his injury to Officer
21 Thomas who denied immediate medical assistance of
22 plaintiff.

Page 76

1     Well, the evidence -- I don't want to say the
2  evidence. My understanding is that Officer Thomas had
3  informed his supervisor that plaintiff was injured,
4  and, therefore, to say that he denied assistance for
5  plaintiff is incorrect.
6  Q. If Officer Thomas observed Acting Sergeant
7  Hawkins violating general order 901.07, was Officer
8  Thomas permitted to ensure that 901.07 was complied
9  with, in other words, specifically with respect to
10 getting prompt medical attention for Mr. Austin?
11 A. Well, if -- Officer Thomas really discharges
12 his responsibility when he notifies his superior
13 officer that this person should be transported to the
14 hospital or words to that effect, he's injured -- or he
15 may not say should be transported to the hospital. He
16 may just say this prisoner is injured or this prisoner
17 is complaining that he's injured, and it's up to his
18 supervisor to determine what to do.
19    Now, if Officer -- now, you say that he
20 observed Hawkins not do anything.
21 Q. Yes.
22 A. That would assume that he's standing there

**Page 77**

1  watching Hawkins for the rest of the evening, which, of
2  course, is not the case. If Hawkins were to say to him
3  "I'm not going to send him to the hospital," then I
4  would say that Officer Thomas has a responsibility, if
5  he believes this person needs medical attention, and
6  I'm assuming he would, that he has a responsibility to
7  do something, but if he tells his superior that the
8  person is complaining of injury or that the person is
9  injured, and his superior knows it, and he goes --
10 Officer Thomas, he does not have a responsibility to
11 stand there and see that his superior does his duty.
12     Q.  What is your source for saying that Officer
13 Thomas was not required himself to summon medical
14 assistance immediately for Mr. Austin?
15     A.  Because he had notified his superior whose
16 responsibility it is to summon medical attention.
17     Q.  Was Officer Thomas prohibited, if he so
18 chose, immediately after Mr. Austin was injured to
19 summon medical assistance immediately for Mr. Austin?
20     A.  There's no written prohibition of that, but
21 the plaintiff was a prisoner in the central cell block
22 under the supervision of Officer Hawkins, and Officer

**Page 78**

1  Thomas without permission from Officer Hawkins had no
2  authority to allow the plaintiff to leave the cell
3  block for medical assistance or anything else.
4      Q.  I didn't say he had to leave the cell block.
5  I said was Officer Thomas allowed or I should say
6  prohibited from contacting medical assistance
7  immediately for Mr. Austin.
8      A.  Well, to contact medical assistance, he would
9  either have to call 911 or the dispatcher, and unless
10 Sergeant Hawkins ordered him not to call, he's not
11 flatly prohibited, but his responsibility is to notify
12 his superior, the person who is in charge of the
13 central cell block, and it is the responsibility of
14 that person to deal with transport of the prisoner to
15 the hospital.
16     Q.  Was Officer Thomas mandated after the use of
17 force against Mr. Austin to summon medical assistance
18 immediately for Mr. Austin?
19     A.  Officer Thomas was responsible to notify his
20 superior.
21     Q.  So is that a no?
22     A.  Assuming that the -- assuming that the

**Page 79**

1  plaintiff needed medical assistance, and Officer Thomas
2  knew it, Officer Thomas had a responsibility to notify
3  his superior that the plaintiff needed medical
4  attention and should have medical attention provided,
5  and it is up to his superior to deal with that issue.
6      Q.  So is that a no?
7      A.  I think it's a no. I'm not sure what the
8  original question was, but --
9      Q.  Well, let me tell you the original question
10 again.
11         Was Officer Thomas -- after the injury to
12 Mr. Austin, was Officer Thomas mandated to summon
13 medical assistance immediately for Mr. Austin?
14     A.  He has done his part in summoning medical
15 assistance when he notifies his superior.
16     Q.  So your answer is no, he does not need to
17 directly summon medical assistance?
18     A.  He has directly summoned medical attention by
19 notifying his superior.
20     Q.  That's what you consider to be summoning
21 medical assistance immediately?
22     A.  That is summoning medical assistance

**Page 80**

1  immediately, by notifying his superior whose
2  responsibility it now is to obtain medical assistance.
3      Q.  What if an hour goes by and Officer Thomas
4  observes that Acting Sergeant Hawkins has not summoned
5  medical assistance immediately?
6      A.  You mean he sat there for the hour and hasn't
7  seen him summon medical attention?
8      Q.  Yes.
9      A.  Then he should remind him.
10     Q.  What if two hours go by?
11     A.  He should remind him.
12     Q.  Is there a particular number of hours that go
13 by after which Officer Thomas personally is permitted
14 to obtain or summon medical assistance?
15     A.  Well, Officer Thomas has discharged his
16 responsibility when he notifies his superior that
17 medical assistance is needed for the plaintiff.
18         Now, if Officer Thomas comes to the
19 conclusion that his superior is neglecting his duty and
20 that the plaintiff is in serious medical -- needs
21 medical attention on an absolute emergency basis, then
22 he's got a responsibility to overcome his